IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION 2016 JAN -5 PM 2: 17

| | |
|---|---|
| JEFFREY MOLITOR, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | |
| v. | **CLASS ACTION COMPLAINT** |
| MANASSEH JORDAN MINISTRIES, INC., a New York Religious Corporation, and YAKIM MANASSEH JORDAN, an individual, | **JURY TRIAL DEMANDED** |
| *Defendants.* | 2016CH00079 CALENDAR/ROOM 05 TIME 00:00 Class Action |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jeffrey Molitor brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants Manasseh Jordan Ministries, Inc. ("MJM") and Yakim Manasseh Jordan ("Manasseh" and, together with MJM, "Defendants") to put a stop to the incessant and abusive spam robocalling practices they have perpetrated for years, *ad nauseum*, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.    Despite thousands of consumer complaints, an FCC citation, and multiple news articles decrying their practice, the Jordan family continues to place unsolicited robocalls to cellular telephones nationwide, by the thousands, in ways that routinely collect money from those most in need.

2.    By all accounts, these robocalls are extremely profitable. Defendant Manasseh

Jordan, a 25-year-old self-identified "prophet,"[1] lives a lavish lifestyle that includes multi-million dollar homes and Rolls Royce cars. These expenditures are largely funded through "seed-faith" money donated to his "nonprofit" corporation, MJM, and/or his father's corporation, Zoe Ministries, Inc. ("ZMI"). As will be made clear through this Complaint and subsequent discovery, Manasseh and his father partner to use MJM and ZMI as sham corporations and alter-egos so that they can commit willful torts for their own personal gain, all in abuse of the Religious Corporation structure set forth by the State of New York.

3.    Defendants use robocalling to constantly find new donors and generate new lines of revenue. Manasseh has been called a "predator who telemarkets prayers and 'miracles'"[2] and, despite agreeing to no fewer than nine *individual* TCPA settlements over the past three years,[3]

---

[1]    Manasseh Jordan Ministries, *About the Prophet*, http://prophetmanasseh.com/aboutprophet (last accessed Sept. 28, 2015).

[2]    Amazon Reviews, *Spiritual Protocol by Prophet Manasseh Jordan*, available at http://www.amazon.com/Spiritual-Protocol-Prophet-Manasseh-Jordan/dp/1934466182 (last accessed January 5, 2016).

[3]    This is at least the seventh TCPA lawsuit filed this year (and the fourteenth since 2012) complaining of robocalls that feature the prerecorded voice of Defendant Manasseh. All but one—an individual suit—have settled individually or have otherwise ended. *See Bankosz v. Manasseh Jordan Ministries et al.*, 6:15-cv-01182 (M.D. Fla. July 22, 2015); *Carter v. Manasseh Jordan Ministries*, 2:15-cv-14237 (S.D. Fla. June 30, 2015); *Cotto v. Manasseh Jordan Ministries et al.*, 6:15-cv-00741 (M.D. Fla. May 8, 2015); *Robles v. Manasseh Jordan Ministries et al.*, 8:15-cv-00789 (M.D. Fla. April 2, 2015), *Bundrage v. Jordan et al.*, 8:15-cv-00618 (M.D. Fla. March 20, 2015), *Linlor v. Manasseh Jordan Ministries*, 3:15-cv-00032 (S.D. Cal. Jan. 7, 2015); *Rice v. Manasseh Jordan Ministries*, 8:14-cv-02921 (M.D. Fla. Nov. 21, 2014); *Friedman v. The Prophet Manasseh Jordan Ministries*, 1:14-cv-03129 (S.D.N.Y. May 2, 2014); *Lemberg v. Manasseh Jordan Ministries*, 3:14-cv-00240 (D. Conn. Feb. 26, 2014); *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013); *Bontrager v. The Prophet Manasseh Jordan*, 2:13-cv-01853 (E.D. Cal. Sept. 6, 2013); *Ferguson v. The Prophet Manasseh Jordan Ministries*, 5:13-cv-02463 (N.D. Cal. May 31, 2013); *Alexander et al v. The Prophet Manasseh Jordan Ministries*, 3:12-cv-02584 (S.D. Cal. Oct. 23, 2012). Nevertheless, Defendants' calls continue and Plaintiff now brings the instant class action to conserve judicial resources and increase efficiency.

still finds it worthwhile to continue using his voice to make prerecorded calls. Defendant

Manasseh uses his alter ego, MJM, to knowingly break the law and repeatedly violate the TCPA,

all to increase his personal wealth at the expense of non-consenting consumers.

4.    Indeed, Manasseh, MJM, and/or their agents regularly place robocalls, *en masse*,

to the cellphone numbers of people who simply do not want them and never requested them. One

newspaper article from February of 2015 states:

> "I have heard from a person who considers me his dearest friend.
> He has told me so more than 100 times, even though I've never met
> him. His name is Manasseh Jordan, and he calls himself Prophet
> Manasseh. He calls me frequently because he is so concerned
> about me. He especially is worried about my finances and says he
> has special messages for me from God. . . .
>
> One thing I'm certain about: I'm not the only one being harassed
> by these calls. I Googled 'Prophet Manasseh phone calls' and
> found sites filled with complaints by people who have tried to stop
> this harassment. . . .
>
> In the end, the only way to stop these calls may be to have my
> number changed. It shouldn't have to come to that."[4]

5.    Like thousands of others, Plaintiff has long been subject to Defendants' abusive

and incessant robocalling practices. And, like thousands of others, Plaintiff never invited

Defendants to call. Nonetheless, Defendants regularly robocall his cellular telephone number,

without his consent, and despite his attempts to stop and block their calls.

6.    By making the telephone calls at issue in this Complaint, Defendants caused

Plaintiff and the members of a putative Class of consumers (defined below) actual harm,

including the aggravation, nuisance, and invasion of privacy that necessarily accompanies the

---

[4]    Deitz, Harry. *Do Not Call List Does Not Work For Manasseh's Dearest Friend.* The
Reading Eagle (Feb. 15, 2015) (available at http://www.readingeagle.com/news/article/harry-
deitz-do-not-call-list-does-not-work-for-manassehs-dearest-friend) (last accessed Sept. 28,
2015).

3

receipt of unsolicited and harassing telephone calls, as well as the monies paid to their carriers for the receipt of such telephone calls.

7.     The TCPA was enacted to protect consumers from unsolicited telephone calls exactly like those alleged in this case. In response to Defendants' unlawful conduct, Plaintiff files the instant lawsuit and seeks an injunction requiring Defendants to cease all unsolicited telephone calling activities to consumers and an award of statutory damages to the members of the Class under the TCPA, together with costs and reasonable attorneys' fees.

## PARTIES

8.     Plaintiff Jeffrey Molitor is a natural person and citizen of the State of Illinois and resident of Cook County.

9.     Defendant Yakim Manasseh Jordan is a natural person and a citizen of the United States. He has been associated with several residential properties at addresses in various states, including New York, Florida, Massachusetts, and New Jersey. He regularly travels through the United States to perform speaking arrangements and he regularly transacts business with and solicits payments from the citizens of Illinois, both in person and through robocalls. He has personally appeared in Cook County, Illinois, to hold a "Prophetic Service" as recently as June 28, 2015. He owns, directs, or otherwise controls Manasseh Jordan Ministries, Inc.

10.     Defendant Manasseh Jordan Ministries, Inc. ("MJM"), is a New York Religious Corporation located at 310 Riverside Drive, New York, New York 10025. MJM shares its address with Zoe Ministries, Inc., a nonprofit that is owned, directed, or otherwise controlled by Manasseh's father, E. Bernard Jordan. MJM sponsored a "Prophetic Service" in Cook County, Illinois, as recently as June 28, 2015, and conducts business and solicits payments throughout Cook County, the State of Illinois, and the United States.

4

## JURISDICTION AND VENUE

11.     The Court has personal jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)-(b) because Defendants transact business within this State, solicit payments in this State, perform services in this State, use real estate situated in this State, and because the tortious conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this State.

12.     Venue is proper because Defendants conduct business transactions in Cook County, perform in-person services in Cook County, solicit a significant amount of payments from within Cook County, and because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from Cook County. Additionally, Plaintiff, an individual, is a resident of Cook County.

## COMMON FACTUAL ALLEGATIONS

### I.     MJM Incorporates Just After the FCC Cites ZMI for Robocalling.

13.     ZMI is a "nonprofit" organization owned, directed, or otherwise controlled by Defendant Manasseh's father, E. Bernard Jordan ("Jordan").

14.     ZMI and Jordan pioneered the profitable prosperity pitch later adopted by Manasseh and MJM. As the Times Herald-Record once wrote,"[o]ver the years, preaching a gospel of prosperity and self-empowerment, Jordan built Zoe Ministries into a multimedia enterprise that collected $2.8 million from its loyal following in 2001. 'We live to give,' Jordan teaches his followers to say. And give they do."[5]

15.     "Jordan makes no apologies for his mansion and fleet of cars, which includes a

_____

[5]     McKenna, Chris. *The Prophet of Profit Sows the Seeds of Wealth.* Times Herald-Record (Sept. 14, 2003) (available at http://www.recordonline.com/article/20030914/news/309149999) (last accessed Sept. 28, 2015).

5

Rolls-Royce and a Mercedes-Benz SUV." *Id.* Indeed, through nonprofit funds, Jordan once commissioned a team of Russian artists to paint, over the course of "two to three years," elaborate murals of himself throughout his "27-room mansion," including "Jordan on a throne, as pharaoh," "Jordan as Jesus in the familiar iconography of medieval and Renaissance art," and, "in a room with scarlet walls and gilded filigree on top . . . Jordan on a throne, as God." *Id.*

16.     To maintain this lavish lifestyle, Jordan started reaching beyond the pockets of his immediate following. Specifically, he started using robocalls, *en masse*, to barge into the living rooms of consumers nationwide and seek fresh lines of revenues. Naturally, consumers complained:

> "We would get a phone call for each one of us, one right after the other. Way too annoying! I asked through email to be removed off there [*sic*] emailing list, calling list and mail list in [*sic*] behalf of my son (13yrs. old), my husband and myself. . . . So far nothing has worked for me. I emailed them repeatedly to remove me and to knock it off, I have sent back all mail (return to sender/no longer lives here) and tried calling with no solution. All the numbers they list are for you to give money or what they call seed. They are driving me crazy. I don't know what else to do. I just want them to leave me alone."[6]

17.     As a result of consumer complaints, the Federal Communications Commission ("FCC") issued a citation letter to ZMI and Jordan for "prerecorded and autodialed call message violations."[7] It noted that "[i]f, after receipt of this citation, you or your company violates the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or

---

[6]     Ripoff Report, *Report Against Zoe Ministries and Bishop E. Bernard Jordan*, http://www.ripoffreport.com/r/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-E-Bernard-Jordan/New-York-New-York/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-Email-Spam-Spamers-Repeated-T-235642 (last accessed Sept. 28, 2015).

[7]     *See* FCC Citation, attached as Exhibit A.

each day of a continuing violation." *Id.*

18.     With such a daunting threat looming, Jordan turned to his family to provide an alternative solution. As a result, within two months of the FCC citation, three of Jordan's children (including Manasseh), along with ZMI Prophet Charlie Berrian (a close family friend), incorporated MJM, which was then used as a replacement robocalling vehicle.[8]

19.     This newly-incorporated entity overlapped substantially with ZMI. It assumed the same operating address (310 Riverside Drive, New York, New York 10025). Its trustees—all Jordan family members or close friends—were all actively involved with ZMI, with at least one using the same "@zoeministries.com" email address while doing business for MJM. At least one MJM trustee listed a ZMI-owned mansion as a home address. And of course, both MJM and ZMI enjoyed the same "non-profit" status, with MJM's Articles of Incorporation specifically stating that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered . . . ." *Id.*

20.     Most problematic for consumers, the new entity took over the same robocalling practices of ZMI, offering prerecorded prayers, prophesies, and miracles-for-hire, over the phone and outside the immediate scrutiny of the FCC.

21.     As such, and on information and belief, MJM and ZMI are alter-egos of each other and act as a single business entity, with one committing TCPA torts and the other sheltering the assets received from such torts. Moreover, this single entity exists to enable the partnership of Manasseh and Jordan to enrich itself through self-dealing and purposeful tortious

---

[8]     *See* Articles of Incorporation, attached as Exhibit B.

conduct, and thus perverts the privilege of doing business in a corporate form. Indeed, Manasseh largely exercises his domination over MJM to place the same types of robocalls ZMI previously placed, all to profit while avoiding compliance with the TCPA and potential liability from ZMI's FCC citation. Moreover, on information and belief, both MJM and ZMI intermingle and manipulate assets, such that their assets concentrate under ZMI, Manasseh, and Jordan while their TCPA tort liabilities concentrate under MJM. This leaves MJM undercapitalized for the TCPA liabilities it purposefully accrues. As such, MJM generates proceeds through illegal robocalling while attempting to artificially limit the recovery available to the thousands of innocent consumers who never consented to interact with MJM and who are repeatedly harmed by its tortious conduct. Consequently, and as a direct result of Manasseh's wrongful domination of MJM, Manasseh is enriched while consumers are harmed.

22. Further, on information and belief, both MJM and ZMI have non-functioning trustees that allow Manasseh and Jordan, as partners, to siphon off corporate assets for their own personal use, at will. The entities have failed to maintain arm's length relationships with their executives, as MJM and ZMI provide Manasseh and Jordan with salaries and perquisites that far exceed the reasonable market value of services legally provided. This directly contravenes the non-profit purposes for which such entities were purportedly created and reflects self-dealing as opposed to honest and disinterested transacting. Indeed, Manasseh and Jordan treat the assets of MJM and ZMI as their own personal assets, living in the homes[9] and driving the cars[10] provided

---

[9]     For instance, homes associated with the 25-year-old Defendant Manasseh include a nine-bedroom mansion in Tuxedo, New York; a six-bedroom mansion in North Miami Beach, Florida; a Ritz Carlton residential condominium in Boston, Massachusetts; a 12,000+ square foot house in Saddle River, New Jersey; and several beachfront condominiums in Sunny Isles Beach, Florida.

8

to them directly (or indirectly through excessive salaries) by such entities.

## II.     Prophet Manasseh and MJM Continue Selling Prerecorded Prosperity, Making Robocalls to Cellphone Numbers.

23.     Manasseh himself claims to be a prophet of the Prophetic Order of Mar Elijah

("P.O.M.E."), another organization created and overseen by his father, "Master Prophet" E.

Bernard Jordan.[11] Manasseh has appeared several times on religiously-themed television

programs, including some shows hosted by his father and others by televangelist Benny Hinn, to

preach what is commonly known as the "prosperity gospel."[12] Specifically, Manasseh solicits

millions of dollars from people in need, commonly known as "seed-faith," which he promises

will purchase "favor" from God. *See, e.g., False Prophet Manasseh Jordan Exposed*, at 2:46-

3:21 (showing Manasseh telling viewers who "need God to change their season" to "sow a $52

---

[10]     For instance, cars associated with the 25-year-old Defendant Manasseh include a 2014 Rolls Royce Wraith with an original MSRP in excess of $350,000; a 2012 Rolls Royce Ghost with an original MSRP in excess of $290,000; a 2010 Bentley Continental with an original MSRP in excess of $267,000; a 2009 Mercedes-Benz AMG with an original MSRP in excess of $130,000; and a 2004 Rolls-Royce Phantom with an original MSRP in excess of $320,000.

[11]     "Master Prophet E. Bernard Jordan is the overseer of the Company of Prophets and P.O.M.E." "[A]s you continue to worship God with your offerings up to $1000, you will be given the opportunity to have access to more advanced teaching materials and assignments and you move up to Level 3, becoming a Silver Member. . . . When you have completed a total of $3,000, you have moved up to Level 4, and you are now a Gold Member. You are just about there. . . . When you have planted your seeds totaling $5,000, you are eligible to attend the next Prophecology meeting where you will make sacred vows unto God in the presence of the Master Prophet and other P.O.M.E. members and be inducted into the Prophetic Order of Mar Elijah." *See* Prophecology, *Why P.O.M.E.?*, and *Are You Called?*, available at http://prophecology.com/theme/arialist/layout/why_pome.html and http://prophecology.com/are_you_called.php (last accessed Sept. 28, 2015).

[12]     The ethics and merits of televangelism and the prosperity gospel are subjects of continuing public commentary. *See, e.g., Last Week Tonight with John Oliver: Televangelists*, available at https://www.youtube.com/watch?v=7y1xJAVZxXg (published Aug. 16, 2015) (last accessed Sept. 28, 2015).

9

seed for 52 weeks of favor.");[13] *see also* Figures 1 and 2, below (same); *cf.* Figure 3, below (showing Manasseh's father and business partner, Jordan, making the same request).


**Figure 1** (Manasseh, requesting $52 "seed").


**Figure 2** (same).


**Figure 3** (E. Bernard Jordan, also requesting $52 "seed").

24.     The "prosperity gospel" inherently targets struggling socio-economic groups, including the unemployed, the under employed, the elderly, the disabled, and single mothers, among many others struggling to make ends meet—in other words, those most susceptible to

---

[13]     Available at https://www.youtube.com/watch?v=bSxEr5TXa1U. *See also id.* at 3:20-3:33 (stating "[y]ou need to walk into this abundance. I want you to get on the phone *right now*. I want you to rush to it *right now*. I want you to move quickly to it *right now*. I want you to stop what you are doing. And I want you to give $52, $52, 52 weeks of favor.")

(and in need of) the promises of good fortune made by Defendants.[14] To persuade these individuals to give him as much money as possible, Manasseh routinely manufactures stories that tie miracles to money payments, often indicating that the needy can trigger such miracles by giving their "best seed."

25.    For example, the day after voting to incorporate MJM, Manasseh appeared before a crowd and said:

> "**I'll never forget** that I was in **Texas** . . . and I looked at a woman, and she **sowed a seed of $1,000.** I said, . . . '**God tells me that he's touching Glenda.**' . . . . [They said] '**Glenda** died a couple hours ago.'. . . . [But then] the hospital called, and they said that 'Your mother, that died a couple hours ago, came back to life.' They said, to the **Johnson** family . . . that she heard a man calling her name. The prophet is able to speak to something dead, and bring life where death is."[15] [Emphasis added].

26.    A few months later, Manasseh told the same story to another crowd, simply inserting new first names and new dollar amounts:

> "**I'll never forget** I was in San Antonio, **Texas**, a couple came up, they **sowed $2,000;** . . . I said '**God is touching Kathy.**' . . . . [But their pastor said] 'prophet, his mother's name is **Kathy** and was just declared dead a few hours ago.' . . . . [But then] they get a phone call through his doctor, the doctor says '**Mr. Johnson** . . . . Your momma **Kathy** just woke up and said she heard a man's voice. . . . [S]he heard a man call her name. . . .' When there is a prophetic anointing, anything that is dead must come back to life."[16] [Emphasis added].

27.    Not surprisingly, Manasseh uses the same money-for-miracles storytelling

---

[14]    *See, e.g., The Prophet of Profit, supra* Note 6 (" 'You sow money, you're going to reap money,' explains [Manasseh's father], seated on a red velvet couch near the foyer of his three-story mansion.")

[15]    *Manasseh Jordan Lying Wonder*, https://www.youtube.com/watch?v=hKBISUwXoNc, at 0:43-2:22.

[16]    *Id.* at 2:50-5:49.

techniques in his prerecorded calls. For example, he has told thousands of call recipients, in his own prerecorded voice, "the Lord spoke to me personally about you. I must speak to you. I'm going to pass the phone to my blessed assistant and he's [going to] give you my blessed number so that you can call me back so that you can hear this blessed word."[17] That "blessed word," in turn, is a ten minute recording from Manasseh, implying, among other things, that people who pay him their "best seed" while facing foreclosure or living below poverty will get free-and-clear homes and million-dollar business contracts:

> "What about the woman by the name of Evelyn, that was losing her home, her home was in foreclosure, she didn't know what to do, but she would get these phone calls, she would get these phone calls, and she began to prove God with her faith, and she would do her best seed, adding the change amount, and she got the call from CitiBank, and they said they forgave her for the loan, and that she owned the home free and clear. What about the lady that had a cleaning business that was living below poverty. . . . She would sow and sow week after week, and God released to her $1,300,000 worth of a commercial contract . . . . I want you now to step out and sow faith with your prosperity seed of $45 or $145 or your best seed of $20.45, the $345, the $545 seed, the $10.45 . . . . [W]atch [God] to begin to shower you with blessings, an anointing of prosperity will instantly begin to flow upon you . . ."[18]

28. Unfortunately, Manasseh, through MJM, placed thousands of these prerecorded phone calls to the cellphones of consumers who did not consent to be called and who have *never* interacted with Defendants in any way whatsoever. This has lead to significant consumer

---

[17] *See Do Not Call List Does Not Work, supra* Note 5.

[18] This prerecorded message plays when calling the number (770) 728-6113 (last accessed Sept. 28, 2015).

backlash, as evidenced by legions of online complaints:[19]

- "He has been calling me since 10/2014 and he has 31 different #'s and has called at least 172 times. SO SICK OF IT!!"

- "I receive at least 1 to 2 calls a day from a automated service from a Prophet Manasseh, I have removed myself from the calling list that I never put myself on at least 50 times and still get the calls. I have blocked the number but they are still able to leave a very long annoying voicemail. I have also emailed them and left voicemails begging them to stop calling but it still continues. What do I have to do to make it stop."

- "You can't get off this call list. If you're on a mobile phone, you just need to continue to block the numbers every time this idiot calls. I'm up to 7 phone numbers blocked under his name. Prophet Manasseh Jordan Ministries."

- "I once got two calls in a two hour time period from two different states! I have been so frustrated by these calls, I actually got my phone # changed."

- "I have sent numerous messages and text messages as well saying stop please stop even threatened to call the authorities on the show called prophet Manasseh my children answer my phone and one day hear him going off on a rant it scares them to death and we respectively text messaged back the number he called me on and the guy just doesn't take no for an answer he calls and calls and calls."

- "I too continue to get calls. This is a minutes phone and they have run down my [sic] drastically. To think I am paying for these calls!"

- "Five Hundred robo calls from five different numbers with the same Prophet Manassah recording in the past fifteen months. How does one stop this scammer?"

29.    Manasseh directly participates in these calls by recording his voice and by

directing MJM, over which he exercises full domination and control, to transmit these voice

---

[19]    These are just a small sampling of the approximately 600 online complaints placed on just one website concerning just one of the many Prophet Manasseh / MJM phone numbers. *See 800notes.com*, http://800notes.com/Phone.aspx/1-800-318-7853 (last visited January 5, 2016).

recordings through automated telephone calls, all in knowing violation of the TCPA. Indeed, Manasseh has specifically admitted in court filings, concurrently with MJM, to having "sent prerecorded calls to people,"[20] and yet continues to have such calls placed on his behalf and for his personal enrichment.

30.     As such, Manasseh and MJM knowingly placed (and continue to place) prerecorded calls to cellphone numbers without the prior express consent of the call recipients. Likewise, they continue to do so after receiving requests to stop, including at least *thirteen* individual TCPA lawsuits. As such, Manasseh and MJM not only invaded the personal privacy of Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

## FACTS SPECIFIC TO PLAINTIFF MOLITOR

31.     Starting in May of 2015, Plaintiff Molitor began receiving robocalls on his cellular telephone number from Defendants, all of which feature the prerecorded voice of Defendant Manasseh.

32.     Plaintiff received more than 50 of these robocalls from, at a minimum, the telephone numbers (203) 548-9311 and (203) 672-9236. *See* Figure 4, below (showing specific call dates and times).

| Date | Time | Number | Duration | Call Type |
|------|------|--------|----------|-----------|
| 5/5/15 | 5:46:50 PM | (203) 548-9311 | 0:01:20 | Inbound Cellular |
| 5/12/15 | 6:45:23 PM | (203) 548-9311 | 0:01:09 | Inbound Cellular |
| 5/16/15 | 2:25:17 PM | (203) 672-9236 | 0:01:10 | Inbound Cellular |
| 5/20/15 | 2:06:10 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 5/23/15 | 8:17:38 PM | (203) 672-9236 | 0:00:54 | Inbound Cellular |
| 5/27/15 | 11:54:10 AM | (203) 548-9311 | 0:01:08 | Inbound Cellular |

---

[20]     See Answer of Defendants Manasseh Jordan Ministries and Yakim Manasseh Jordan to Class Action Complaint at ¶¶ 18-23, *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013).

| | | | | |
|---|---|---|---|---|
| 5/29/15 | 3:08:45 PM | (203) 672-9236 | 0:01:03 | Inbound Cellular |
| 6/4/15 | 1:59:26 PM | (203) 672-9236 | 0:01:30 | Inbound Cellular |
| 6/5/15 | 4:34:13 PM | (203) 548-9311 | 0:01:18 | Inbound Cellular |
| 6/9/15 | 2:09:49 PM | (203) 672-9236 | 0:01:19 | Inbound Cellular |
| 6/12/15 | 6:32:27 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 6/16/15 | 4:11:58 PM | (203) 672-9236 | 0:01:15 | Inbound Cellular |
| 7/3/15 | 5:13:28 PM | (203) 672-9236 | 0:01:03 | Inbound Cellular |
| 7/7/15 | 2:05:43 PM | (203) 672-9236 | 0:01:04 | Inbound Cellular |
| 7/10/15 | 5:54:17 PM | (203) 548-9311 | 0:01:08 | Inbound Cellular |
| 7/15/15 | 2:14:35 PM | (203) 548-9311 | 0:01:10 | Inbound Cellular |
| 7/17/15 | 2:03:09 PM | (203) 548-9311 | 0:00:45 | Inbound Cellular |
| 7/19/15 | 6:13:07 PM | (203) 548-9311 | 0:01:10 | Inbound Cellular |
| 7/21/15 | 5:04:13 PM | (203) 548-9311 | 0:00:54 | Inbound Cellular |
| 7/24/15 | 5:53:37 PM | (203) 548-9311 | 0:01:14 | Inbound Cellular |
| 7/26/15 | 2:09:12 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 7/27/15 | 5:28:32 PM | (203) 672-9236 | 0:01:05 | Inbound Cellular |
| 7/29/15 | 3:25:32 PM | (203) 548-9311 | 0:01:13 | Inbound Cellular |
| 7/31/15 | 3:47:06 PM | (203) 548-9311 | 0:01:02 | Inbound Cellular |
| 8/2/15 | 8:18:48 PM | (203) 548-9311 | 0:00:55 | Inbound Cellular |
| 8/3/15 | 4:53:01 PM | (203) 548-9311 | 0:01:03 | Inbound Cellular |
| 8/4/15 | 3:10:25 PM | (203) 548-9311 | 0:00:54 | Inbound Cellular |
| 8/7/15 | 5:35:41 PM | (203) 548-9311 | 0:01:02 | Inbound Cellular |
| 8/8/15 | 1:51:34 PM | (203) 672-9236 | 0:00:21 | Inbound Cellular |
| 8/10/15 | 3:43:57 PM | (203) 548-9311 | 0:00:54 | Inbound Cellular |
| 8/11/15 | 2:09:27 PM | (203) 548-9311 | 0:01:13 | Inbound Cellular |
| 8/12/15 | 2:17:52 PM | (203) 548-9311 | 0:01:12 | Inbound Cellular |
| 8/14/15 | 6:40:13 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 8/16/15 | 8:55:25 PM | (203) 548-9311 | 0:01:11 | Inbound Cellular |
| 8/17/15 | 2:28:20 PM | (203) 548-9311 | 0:00:53 | Inbound Cellular |
| 8/18/15 | 1:59:03 PM | (203) 548-9311 | 0:01:15 | Inbound Cellular |
| 8/19/15 | 1:58:57 PM | (203) 548-9311 | 0:01:08 | Inbound Cellular |
| 8/21/15 | 4:26:48 PM | (203) 548-9311 | 0:01:12 | Inbound Cellular |
| 8/23/15 | 5:27:41 PM | (203) 548-9311 | 0:01:12 | Inbound Cellular |
| 8/24/15 | 4:03:14 PM | (203) 548-9311 | 0:00:32 | Inbound Cellular |
| 8/25/15 | 8:43:37 PM | (203) 548-9311 | 0:00:54 | Inbound Cellular |
| 8/25/15 | 2:06:55 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 8/26/15 | 2:02:38 PM | (203) 548-9311 | 0:01:15 | Inbound Cellular |
| 8/28/15 | 6:09:58 PM | (203) 548-9311 | 0:01:05 | Inbound Cellular |
| 8/31/15 | 7:59:38 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |
| 9/1/15 | 7:20:06 PM | (203) 548-9311 | 0:01:02 | Inbound Cellular |
| 9/1/15 | 1:54:08 PM | (203) 548-9311 | 0:01:00 | Inbound Cellular |

15

| 9/15/15 | 2:51:43 PM | (203) 548-9311 | 0:01:19 | Inbound Cellular |
|---------|------------|----------------|---------|------------------|
| 9/16/15 | 2:12:13 PM | (203) 548-9311 | 0:01:08 | Inbound Cellular |
| 9/18/15 | 1:45:59 PM | (203) 548-9311 | 0:00:59 | Inbound Cellular |
| 9/20/15 | 2:24:58 PM | (203) 548-9311 | 0:01:13 | Inbound Cellular |
| 9/21/15 | 8:07:46 PM | (203) 548-9311 | 0:01:14 | Inbound Cellular |
| 9/21/15 | 3:33:08 PM | (203) 548-9311 | 0:01:11 | Inbound Cellular |
| 9/22/15 | 2:17:36 PM | (203) 548-9311 | 0:01:21 | Inbound Cellular |
| 9/23/15 | 2:30:26 PM | (203) 548-9311 | 0:01:06 | Inbound Cellular |
| 9/25/15 | 2:04:14 PM | (203) 548-9311 | 0:00:57 | Inbound Cellular |
| 9/28/15 | 1:58:01 PM | (203) 548-9311 | 0:01:03 | Inbound Cellular |
| 9/29/15 | 4:22:10 PM | (203) 672-9236 | 0:01:05 | Inbound Cellular |
| 9/29/15 | 4:32:07 PM | (203) 548-9311 | 0:01:04 | Inbound Cellular |

**Figure 4** (showing over 50 calls from May through September, 2015.)

33. Plaintiff answered several of these calls and let others go to his voicemail. Each call featured a prerecorded message substantially similar to the other prosperity robocalls alleged throughout this Complaint, with instructions to call certain numbers back, including the number (678) 405-9374. When Plaintiff called this particular number in an attempt to stop the robocalls and get on an internal do-not-call list, he was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out.

34. Plaintiff does not have a relationship with Manasseh or MJM, has never provided either of them with his telephone number or with consent to call, and has made attempts to get them to stop calling. They continue calling anyways.

35. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff and similar consumers who have never consented to receive them.

## CLASS ALLEGATIONS

36. **Class Definition:** Plaintiff Molitor brings this action pursuant to 735 ILCS 5/2-801 on behalf of himself and a class of similarly situated individuals, defined as follows:

All persons in the United States to whom: (1) Defendants or their agents placed a call; (2) featuring a prerecorded voice; (3) to his or her cellular telephone number;

16

and (4) where Defendants have no record of prior express consent from him or her to place such call.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

37. **Numerosity:** The exact size of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants made telephone calls to thousands of consumers who fall into the definition of the Class. Members of the Class can be easily identified through Defendants' records.

38. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a)    Whether Defendants' conduct violated the TCPA;

(b)    Whether Defendants systematically made telephone calls to consumers—
       including Plaintiff and the Class—who did not previously provide Defendants
       and/or their agents with their prior express consent to receive such telephone
       calls;

(c)    Whether Defendants systematically made telephone calls to consumers—

17

including Plaintiff and the Class—featuring prerecorded voices; and

(d) Whether Plaintiff and the members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

39. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants has no defenses unique to Plaintiff.

40. **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. In many cases, the damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for many of the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### CAUSE OF ACTION
### Violations of 47 U.S.C. § 227(b)
### (On behalf of Plaintiff and the Class)

41. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

18

42.     Defendants placed unwanted telephone calls to Plaintiff's and the Class Members' cellular telephone numbers while lacking prior express consent to do so.

43.     Such telephone calls featured prerecorded voices.

44.     By placing telephone calls to Plaintiff's and the Class members' cellular telephone numbers, without prior express consent, and while utilizing artificial or prerecorded voices, Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii).

45.     As a result of Defendants' unlawful conduct, Plaintiff and the Class suffered invasions of privacy and actual damages in the form of monies paid to receive the unsolicited telephone calls on their cellular phones and, under 47 U.S.C. § 227(b)(3)(B), are each entitled to, *inter alia*, a minimum of $500 in statutory damages for each such violation of the TCPA.

46.     Because Defendants' conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Class.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jeffrey Molitor, individually and on behalf of the Class, prays for the following relief:

1.     An order certifying the Class as defined above, appointing Plaintiff Jeffrey Molitor as representative of the Class, and appointing his counsel as Class Counsel;

2.     An award of actual and statutory damages;

3.     An injunction requiring Defendants and their agents to cease all unsolicited telephone calling activities, and otherwise protecting the interests of the Class;

4.     An award of reasonable attorneys' fees and costs; and

5.     Such other and further relief that the Court deems reasonable and just.

19

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**JEFFREY MOLITOR**, individually and on behalf of all others similarly situated,

Dated: January 5, 2016

By: _____
One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

# Exhibit A

Federal Communications Commission



## FEDERAL COMMUNICATIONS COMMISSION
## WASHINGTON, D.C. 20554

July 16, 2010

### VIA REGULAR MAIL AND CERTIFIED MAIL
### RETURN RECEIPT REQUESTED

Zoe Ministries
Attn: Bishop E. Bernard Jordan
310 Riverside Drive
New York, New York 10025

RE: EB-10-TC-435

Dear Bishop Jordan:

This is an official **CITATION**, issued pursuant to section 503(b)(5) of the Communications Act of 1934, as amended (the Act), 47 U.S.C. § 503(b)(5), for violations of the Act and the Federal Communications Commission's rules that govern telephone solicitations, prerecorded and autodialed telephone calls and facsimile ("fax") transmissions.[1] As explained below, future violations of the Act or Commission's rules in this regard may subject you and your company to monetary forfeitures.

It has come to our attention that you or your company, acting under your direction, apparently sent one or more calls or faxes in violation of Section 227(b) of the Communications Act and the Commission's related rules, as described in the attached complaint(s).[2] Specifically, one or more complaints have been filed against your company showing that your company, acting under your direction, committed the violation(s) checked below. Once you have identified the violation(s), proceed to the associated section(s) of the citation to obtain the legal requirements related to each violation and then read the section titled, "Responding to the Citation" if you wish to respond. While your company has not been accused of any of the other unchecked violations listed below, you might find it useful to familiarize yourself with the other

---

[1] 47 U.S.C. § 227; 47 C.F.R. § 64.1200. A copy of these provisions is enclosed for your convenience. Section 227 was added to the Communications Act by the Telephone Consumer Protection Act of 1991 and is most commonly known as the TCPA. The TCPA and the Commission's parallel rules restrict a variety of practices that are associated with telephone solicitation and use of the telephone network to deliver unsolicited advertisements or prerecorded and autodialed telephone calls.. 47 U.S.C. § 64.1200(a)(3); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 – Junk Fax Protection Act of 2005*, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787 (2006) (*2006 TCPA Report and Order*).

[2] We have attached 14 complaints at issue in this citation. The complaints address alleged TCPA violation(s) that contain the telephone number 212-967-8033, which you or your business utilized during the time period at issue.

**Federal Communications Commission**

sections so that you or your company will be better informed of the Commission's Telecommunications Consumer Protection Act ("TCPA") rules.

☐ FACSIMILE VIOLATIONS

    ☐ Unsolicited Fax Advertisement (See Section I(A) – page 1)
    ☐ Incomplete Fax Header (See Section I(B) – page 2)
    ☐ Insufficient Opt-Out Notice (See Section I(C) – page 2)
    ☐ Opt-Out Request Not Honored (See Section I(D) – page 3)

☒ PRERECORDED AND AUTODIALED CALL MESSAGE VIOLATIONS

    ☒ Prerecorded or Autodialed Call to a Cell Phone, Emergency Line or Health Care Facility (See Section II(A) – page 4)
    ☒ Prerecorded Call to a Residential Line (See Section II(B) – page 5)
    ☐ Prerecorded Line Seizure (See Section II(C) – page 6)
    ☐ Prerecorded Identification Not Provided (See Section II(D) – page 7)

☐ DO-NOT-CALL VIOLATIONS

    ☐ National Do-Not-Call  (See Section III(A) – page 7)
    ☐ Company-Specific Do-Not-Call (See Section III(B) – page 8)

☐ TIME OF DAY VIOLATION (See Section IV – page 9)

    **If, after receipt of this citation, you or your company violates the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or each day of a continuing violation.**

## RESPONDING TO THE CITATION

    You may respond to this citation within 30 days from the date of this letter either through (1) a written statement, (2) a teleconference interview with the Commission's Telecommunications Consumers Division in Washington, DC or (3) a personal interview at the closest Commission Field Office. Your response should specify the actions that you are taking to ensure that you do not violate the Commission's rules governing TCPA violations, as described above.

    **If you would like to submit a written statement, including any supporting documentation, send the response within 30 days of the date of this letter to the address below. If you would like to arrange a teleconference interview, please contact Al McCloud at (202) 418-2499. You should schedule an interview to take place within 30 days of the date of this letter.**

---

**Federal Communications Commission**

---

Joshua Zeldis
Assistant Division Chief
Telecommunications Consumers Division
Enforcement Bureau
Federal Communications Commission
445-12th Street, S.W., Rm. 4-A122
Washington, D.C. 20554

## Reference EB-10-TC-435 when corresponding with the Commission.

Reasonable accommodations for people with disabilities are available upon request. Include a description of the accommodation you will need including as much detail as you can. Also include a way we can contact you if we need more information. Please allow at least 5 days advance notice; last minute requests will be accepted, but may be impossible to fill. Send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau:

For sign language interpreters, CART, and other reasonable accommodations: 202-418-0530 (voice), 202-418-0432 (tty);

For accessible format materials (braille, large print, electronic files, and audio format): 202-418-0531 (voice), 202-418-7365 (tty).

Under the Privacy Act of 1974, 5 U.S.C. § 552(a)(e)(3), we are informing you that the Commission's staff will use all relevant material information before it, including information that you disclose in your interview or written statement, to determine what, if any, enforcement action is required to ensure your compliance with the Communications Act and the Commission's rules.

The knowing and willful making of any false statement, or the concealment of any material fact, in reply to this citation is punishable by fine or imprisonment under 18 U.S.C. § 1001.

Thank you in advance for your anticipated cooperation.

Sincerely,

Joshua P. Zeldis
Assistant Division Chief
Telecommunications Consumers Division
Enforcement Bureau
Federal Communications Commission

Enclosures

3

# Exhibit B

## CERTIFICATE OF INCORPORATION

### OF

### MANASSEH JORDAN MINISTRIES, INC.
### (Pursuant to Article 8 of the Religious Corporation Laws)

We the undersigned, all being of full age, for the purpose of forming a Religious Corporation pursuant to and in conformity with Article 8 of the Religious Corporation Law of the State of New York hereby certify as follows:

1. That a notice of the meeting of the members of **MANASSEH JORDAN MINISTRIES** for the purpose of incorporating a unincorporated Religious Congregation was duly given in pursuance of Section 160 of the Religious Corporation Law and said meeting was held in accordance therewith on the 7th Day of September, 2010 in the afternoon of that day at Riverside Drive, New York, NY 10025.

2. At said meeting, Manasseh Jordan known as the Prophet and one of the subscribers hereto, was the presiding officer, at which meeting a majority of the qualified voters, being six in number, were present.

3. That Charlie Berrian, Naomi Cook, and Aaron Jordan the other subscribers hereto, were present and voted thereat.

4. That at such meeting it was determined to incorporate such church as a Religious Corporation in pursuance of Section 161 and 162 of the Religious Corporation Laws.

5. The names and addresses of the persons duly elected as Trustees at such meetings for the unexpired term until the next annual meeting are as follows:

|  | NAME | ADDRESS |
|---|---|---|
| 1st Annual Election | Charlie Berrian | 76 Cauthers Road<br>Woodridge, NY 12789 |
| 2nd Annual Election | Naomi Cook | 4 Bayberry Court<br>Upper Saddle River, NJ 07458 |
| 3rd Annual Election | Aaron Jordan | 1 High Meadow Road<br>Tuxedo, NY 07458 |

One third to hold office until the first annual election of trustees thereafter, one third to hold office until the second annual election thereafter, and one third to hold office until the third annual election thereafter respectively.

STATE OF NEW YORK, COUNTY OF NEW YORK
SS: I, NORMAN GOODMAN, COUNTY CLERK AND
CLERK OF THE ... SUPREME ...

2010 NOV ...

WITH THE ORIGINAL FILED IN MY OFFICE ON

NOV - 8 2010

AND THAT THE SAME IS A CORRECT

7. The name of this church shall be **MANASSEH JORDAN MINISTRIES, INC.**

8. The principle place of worship of said church shall be located in the State of New York, the County of New York or any other place as the church may deem appropriate. The current address of the church is 310 Riverside Drive, New York, NY 10025

9. The purpose for which this church is to be formed is as follows:

   a. To establish and maintain and operate one or more places of worship for members of the church and anyone wishing to fellowship with the Church, to promote, continue and encourage the assembly of persons, on a regular basis, for the purpose of Divine Worship, Spiritual Fellowship and Religious Observances according to the Christian Faith.

   b. To provide a vehicle and institution for the promulgation, preaching and teaching, of belief and faith in God through Jesus Christ.

   c. To institute, participate in and/or support, all worthy activities and projects Divinely inspired or assigned.

   d. To conduct religious services, promote religious education, training and general community work and to assist benevolent charitable and worthy causes of a similar nature.

   e. To provide religious worship services on a non discriminatory basis without regard to race, color, creed, sex, religion, ethnic or national origin.

   f. To organize missionary work for the teaching of the Gospel of Christ, within and without the United States of America according to the tenets of the Christian Church.

   g. To promote the teaching of the Gospel of Jesus Christ among the members of the Church and also among the non members according to the tenets of the Christian Church.

   h. To develop multi-service programs and services in the local community and the community at large to assist in the religious, educational and social growth of the congregation, community and the world.

   i. To rent, lease or purchase such buildings or edifices which might be needed by the congregation; to alter or repair the same, and dispose of the same when no longer needed or used by the Church.

   j. To buy vacant land or buildings; alter, develop, build or repair the same for the use of the Church, and dispose of the same when no longer needed.

   k. To hold and operate such property which shall come into the possession of said Church; and sell, assign, transfer and otherwise dispose of any and all of the securities, properties and rights which may at any time be acquired or held by the Church and in all respects to deal with and in the same, in so far as may lawfully be done under the provisions of the Religious Corporation Law.

   l. To borrow money and to contract debts when necessary for the exercise of its corporate rights, privileges, or for any other lawful purpose of its corporation; and it may issue and dispose of its obligations from time to time, for and of the objects or purposes of the Church, and to mortgage its property, and/or to make such deed

of trust as may be necessary to secure the payment of such obligation or of any debts contracted for such purpose.

m. To enter into, make perform and carry out contracts with any person, firm, corporation, private, public, municipal or political body, under the Government of the United States of America, and foreign countries, so far and to the extent that the same may be done and performed under the provisions of the Religious Corporation Laws of the State of New York.

n. To do anything and everything that is proper to the aforesaid purposes and which may properly be done by a Religious Corporation organized under and subject to the laws of the State of New York: to possess all rights and privileges, and exercise all powers, permitted to such a corporation, including, without limitation, the power to solicit monies and contributions from the general public.

o. The Prophet of this church is Manasseh Jordan.

10. The duration of the church shall be perpetual.

11. The Trustees shall be three in number or such other number as may be determined at any annual meeting, with Prophet Manasseh Jordan, ex-officio member thereof.

12. That in September, 2011 and each year thereafter, there shall be held the Annual Meeting of the church for the purpose of electing Trustees and other officers and for such other business which shall come before the church at the said meeting.

13. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code (or corresponding section of any future Federal tax code.)

14. No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, directors, officers or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of Section 501(c)(3) purposes.

15. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

16. Upon dissolution of this corporation assets shall be distributed for one or more exempt purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code, i.e. charitable, educational, religious or scientific, or corresponding section of any future Federal tax code, or shall be distributed to the Federal government, or to a state or local government for a public purpose.

3

IN WITNESS WHEREOF, we have executed and acknowledged this certificate this _____ 6th _____ day of _October_ _____, 2010,

_Manasseh Jordan_
Manasseh Jordan
2 Avery Street 27F
Boston, MA 02111

_Charlie B_
Charlie Berrian
76 Cauthers Road
Woodridge, NY 12789

_Aaron Jordan_
Aaron Jordan
1 High Meadow Road
Saddle River, NY 07458

_Naomi Cook_
Naomi Cook
4 Bayberry Court
Upper Saddle River, NY 07458

State of New York _Bronx_
County of New York

On _8th_ day of _October_ _____, 2010 before me personally appeared Manasseh Jordan, Charlie Berrian, Aaron Jordan and Naomi Cook known to be the same parties who executed the above Certificate of Incorporation and acknowledge to me that they executed the same.

_Stephanie C. Gilbert_
Notary Public

STEPHANIE C GILBERT
Notary Public, State of New York
No. 01GI6079253
Qualified in Bronx New York
Commission Expires June 02 2011

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

JEFFREY MOLITOR, individually and on
behalf of all others similarly situated,

       *Plaintiff,*

v.

MANASSEH JORDAN MINISTRIES, INC., a
New York Religious Corporation, and YAKIM
MANASSEH JORDAN, an individual,

       *Defendants.*

Case No. 2016 CH 00079

## PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Jeffrey Molitor, by and through his undersigned counsel, hereby respectfully moves the Court for an Order certifying this case as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure, but requests that the Court enter and continue the motion until after the completion of discovery on class-wide issues, at which time Plaintiff will submit a more detailed memorandum of points and authorities in support of class certification.[1]

## I.   INTRODUCTION.

This matter readily satisfies the prerequisites to class certification. Through a common course of conduct, Defendant "Prophet" Yakim Manasseh Jordan ("Manasseh") and his sham corporation, Defendant Manasseh Jordan Ministries, Inc. ("MJM"), placed thousands of predatory robocalls, without consent, to the cellular telephone numbers of consumers

---

[1]    Plaintiff files this motion at the outset of litigation to prevent Defendants from attempting a so-called "buy off" to moot his representative claims (*i.e.*, attempting to moot his class claims by tendering to him the full amount of his individual claims). *See Barber v. Am. Airlines, Inc.*, 241 Ill. 2d 450, 459 (2011) (noting that under Illinois law, "a named plaintiff who files a motion for class certification *prior* to a Defendants' tender may avoid a mootness determination, at least until after the circuit court rules on the motion for class certification.").

1

nationwide—including Plaintiff and a proposed Class of consumers (defined below)—in a widespread and illegal effort to solicit money from vulnerable consumers. Through that common course of conduct, Defendants not only invaded the personal privacy of Plaintiff and the members of the Class, but repeatedly violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a law enacted specifically to protect consumers from unsolicited telephone calls exactly like those alleged in this case.

For these reasons and as discussed further herein, the proposed Class readily satisfies the prerequisites to certification under Section 2-801, and the instant motion should therefore be granted in its entirety. Notwithstanding, Plaintiff respectfully requests that the Court: (1) enter and reserve ruling on his Motion for and Memorandum in Support of Class Certification; (2) allow for and schedule discovery to take place on class-wide issues; (3) grant him leave to file a supplemental memorandum in support of his Motion for Class Certification upon the conclusion of class-wide discovery; (4) grant his Motion for Class Certification after full briefing of the issues presented herein; and (5) provide all other and further relief that the Court deems reasonable and just.

## II.    FACTUAL BACKGROUND.

### A.    Facts Applicable to All Members of the Putative Class.

Defendants Manasseh, a televangelist "prophet," is a notorious, abusive robocaller. (Compl. ¶¶ 1, 3, 6, 27-30.) Specifically, Manasseh telemarkets what is commonly known as the "prosperity gospel," whereby he solicits "seed-faith" from people in need through automated robocalls promising the purchase of "favor" from God. (*Id.*) His target audience—vulnerable individuals who, often facing tremendous personal needs, desperately want the miracles he is selling—pay, in the aggregate, millions of dollars to Manasseh and MJM, which is ultimately

2

used to finance luxury cars and homes around the country. (*Id.*)

Indeed, Manasseh routinely records his voice and, in conjunction with MJM, uses sophisticated telephone dialing systems to robocall thousands of consumers' cellular telephone numbers, *en masse*, using his prerecorded messages. (*Id.*) Most of these calls are placed to consumers who never provided consent to be called and with whom Defendants had no relationship. (*Id.*) Defendants knowingly made (and continue to make) robocalls without the prior express consent of the call recipients and knowingly continue to call them after requests to stop. (*Id.*)

Not surprisingly, these practices have led to thousands of complaints. (*Id.* ¶¶ 16, 28.) By placing such calls, Defendants routinely violate the TCPA. Worse, Defendants are well aware that they routinely violate the TCPA, as they have been sued under that law no fewer than 13 times since 2013. (*Id.* ¶ 3.) Indeed, a core purpose of MJM's corporate form is to provide a liability shield for Manasseh to engage in willful TCPA violations. (*Id.* ¶¶ 21-22.) As such, Defendants not only invaded the personal privacy of Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA. (*Id.*)

### B.    Facts Applicable to Plaintiff Molitor.

Starting in or around May 2015, Plaintiff Molitor began receiving robocalls on his cellular telephone from Defendants, including from the phone numbers (203) 548-9311 and (203) 672-9236. (*Id.* ¶¶ 31-32.) Over the course of four months, Plaintiff received more than fifty of these robocalls from Defendants. (*Id.*) When he answered these calls, he heard Defendant Manasseh's prerecorded voice, offering God's future services in exchange for Plaintiff's best, immediate, and ongoing donations. (*Id.* ¶¶ 27, 31-33.)

Although Plaintiff attempted to request that Defendants stop calling him, he continued to

3

receive calls. (*Id.* ¶ 33.) Plaintiff does not have a relationship with Defendants, has never

provided his telephone number directly to Defendants, and has never requested that Defendants

place calls to him. (*Id.* ¶¶ 33-34.) Simply put, Plaintiff has never provided Defendants with his

prior express consent to place calls to him and has no business relationship with them. (*Id.*)

Ultimately, Defendants are and were aware that the above-described telephone calls were

and are being made to consumers like Plaintiff who had not consented to receive them. (*Id.* ¶ 35.)

### C.    The Proposed Class.

As a result of Defendants' conduct described above, Plaintiff Molitor brought this lawsuit

and now seeks certification of a class of similarly situated individuals, defined as follows:[2]

> All persons in the United States to whom: (1) Defendants or their agents placed a
> call; (2) featuring a prerecorded voice; (3) to his or her cellular telephone number;
> and (4) where Defendants had no record of prior express consent from him or her
> to place such call.

(Compl. ¶ 36.) As demonstrated below, the proposed Class meets each of the

prerequisites for certification under Section 2-801 and therefore, the instant motion should be

granted in its entirety.

### III.   THE PROPOSED CLASS SATISFIES EACH OF THE REQUIREMENTS FOR CERTIFICATION.

Certifying a class in Illinois requires the plaintiff to establish that: "(1) [t]he class is so

numerous that joinder of all members is impracticable[;] (2) [t]here are questions of fact or law

common to the class, which common questions predominate over any questions affecting only

---

[2]    The following are excluded from the Class: (1) any Judge or Magistrate presiding
over this action and members of their families; (2) Defendants, Defendants' subsidiaries,
parents, successors, predecessors, and any entity in which the Defendants or their parents
have a controlling interest and its current or former employees, officers and directors; (3)
persons who properly execute and file a timely request for exclusion from the Class; (4)
persons whose claims in this matter have been finally adjudicated on the
merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the
legal representatives, successors, and assigns of any such excluded persons.

individual members[;] (3) [t]he representative parties will fairly and adequately protect the interest of the class[; and] (4) [t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801.

In determining whether to certify a proposed class, the Court need not decide whether the plaintiff will ultimately prevail on the merits. *See Chultem v. Ticor Title Ins. Co.*, 401 Ill. App. 3d 226, 237 (1st Dist. 2010) (citing *Cruz v. Unilock Chi., Inc.*, 383 Ill. App. 3d 752, 764 (2d Dist. 2008)) (finding that an issue that goes to the merits of the underlying actions "is not appropriate to be considered when examining the propriety of class certification"). Instead, for purposes of considering whether to grant certification, the Court should accept as true the allegations in the complaint, *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 53 (1st Dist. 2007) (quoting *Clark v. TAP Pharm. Prods., Inc.*, 343 Ill. App. 3d 538, 544–45 (5th Dist. 2003)), and "should err in favor of maintaining class [certifications]." *Id.* (quoting *Clark*, 343 Ill App. 3d at 545).

Here, the putative Class is sufficiently numerous, consisting of thousands—and potentially tens of thousands—of individual members. Plaintiff's and the putative Class members' claims are based on Defendants' common course of conduct, such that common issues will predominate over individualized ones. Plaintiff and his counsel are adequate representatives of the proposed Class, with no potential conflicts or interests adverse to the Class. And a class action is the most appropriate method to adjudicate the Class members' claims given the often small individual damages involved, the uniformity and widespread nature of Defendants' conduct, and the unlikelihood of Class members pursuing individual actions. Accordingly, this Court should grant class certification.

5

A.   **Numerosity: The Proposed Class is Sufficiently Numerous and Likely Consists of Thousands of Individual Members.**

The first step in certifying a class is a showing that "the class is so numerous that joinder of all members is impracticable." 735 ILCS 5/2-801(1). This requirement is met when joining "such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991) (citing *Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 337 (1977)). "Plaintiffs need not demonstrate a precise figure for the class size, because a good-faith, nonspeculative estimate will suffice." *Cruz v. Unilock Chicago*, 383 Ill. App. 3d 752, 771 (Ill. App. Ct. 2008). Generally, "[t]he court is permitted to make common sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC*, 2004 WL 719278, at *2 (N.D. Ill. March 31, 2004)[3] (citations omitted); *see also* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 7.20, 66 (4th ed. 2001).

Here, Molitor alleges—and discovery will show—that Defendants placed unsolicited prerecorded telephone calls to the cellular telephone numbers of thousands of individuals throughout the country. (Compl. ¶ 28; *see also id.* at ft. 19 (noting that there are more than 600 online complaints from just one website concerning just one of Defendants' dozens of robocalling numbers.)). An allegation that the proposed class consists of more than a thousand members provides "ample basis" to support the conclusion that the class is so numerous that joinder of all members is impracticable. *Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (1st Dist. 1983); *see also Tassan v. United Dev. Co.*, 88 Ill. App. 3d 581, 594 (1st Dist.

---

[3]   Because 735 ILCS 5/2-801 was patterned after Rule 23 of the Federal Rules of Civil Procedure, "federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005).

1980) (finding more than 150 potential claimants would satisfy numerosity); *Kulins v. Malco, A Microdot Co., Inc.*, 121 Ill. App. 3d 520, 530 (1st Dist. 1984) (finding even 35 class members could satisfy numerosity).

Further, even aside from the sheer numbers of potential Class members, joinder is impracticable and class certification is warranted because (1) the members of the proposed Class are geographically dispersed throughout the country; (2) the claims per person are often relatively small and unlikely to be the subject of litigation on an individual basis; and (3) the lawsuit seeks, *inter alia*, injunctive relief for Manasseh's statutory violations. *See Wood River Area Dev. Corp. v. Germania Fed. Sav. and Loan Ass'n*, 198 Ill. App. 3d 445, 451-53 (5th Dist. 1990).

Accordingly, the first prerequisite for class certification is met.[4]

### B. Commonality and Predominance: The Proposed Class Shares Common Questions of Law and Fact that Predominate Over Any Individual Issues.

Section 2-801's second prerequisite requires that there are "questions of fact or law common to the class" and those questions "predominate over any questions affecting only individual members." 735 ILCS 5/2-801(2). Common questions of law or fact are typically found to exist when the members of a proposed class have been aggrieved by the same or similar misconduct. *See Miner v. Gillette Co.*, 87 Ill. 2d 7, 17 (1981); *Steinberg*, 69 Ill. 2d at 341; *McCarthy v. LaSalle Nat'l Bank & Trust Co.*, 230 Ill. App. 3d 628, 634 (Ill. Ct. App. 1992). After common questions of law or fact have been identified, these common questions must also predominate over any issues affecting only individual class members. *See O-Kay Shoes, Inc. v. Rosewell*, 129 Ill. App. 3d 405, 408 (Ill. Ct. App. 1984). Ultimately, commonality is a relatively

---

[4]     To the extent the Court requires additional details regarding the number of members in the Class, such information may be readily obtained through discovery.

7

low and easily surmountable hurdle. *See Scholes v. Stone, McGuire, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–132 (2009)).

Here, Plaintiff's and the Class members' claims are based upon the same common contention: that Defendants violated the TCPA by repeatedly placing robocalls to their cellular telephone numbers despite the fact that the called parties *never* consented to receiving such calls. (Compl. ¶¶ 5, 27-30.) Defendants made the telephone calls systematically and their conduct affected Plaintiff and the members of the Class in a virtually identical manner (*i.e.*, subjecting them to the aggravation and costs associated with the receipt of such calls). (*Id.*) Moreover, Defendants' unlawful conduct will be proven through the use of common and generalized evidence applicable to the Class as a whole.

Defendants' conduct gives rise to several common questions of both law and fact. The common questions for the Class include: (i) whether Defendants' conduct violated the TCPA; (ii) whether Defendants and/or their agents systematically placed telephone calls to the cellular telephone numbers of consumers—including those of Plaintiff and the Class members—who did not previously provide prior express consent to receive these telephone calls; (iii) whether Defendants and/or their agents systematically placed these telephone calls using artificial or prerecorded voices; and (iv) whether Plaintiff and the members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct. (*Id.* ¶ 24.)

Accordingly, Section 2-801's commonality and predominance requirements are met.

8

C. Adequacy of Representation: Plaintiff and His Counsel are Adequate Representatives and Have No Conflicts with the Members of the Class.

The third prerequisite of Section 2-801 requires that "[t]he representative parties will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3). The purpose of the adequacy of representation requirement is "to insure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Purcell and Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1078 (Ill. Ct. App. 1988); *Gordon*, 224 Ill. App. 3d at 203.

In this case, Plaintiff has the same interests as the proposed Class members. They each received telephone calls from Defendants as a result of Defendants' uniform course of conduct. (Compl. ¶¶ 27-35.) Thus, Plaintiff suffered the same injury, has the same claims available to him, and has no interests antagonistic to those of the Class. (*Id.*) He will fairly and adequately protect the interests of the Class and his pursuit of the instant action demonstrates as much. (*Id.*)

Similarly, Plaintiff's counsel are well-respected members of the legal community, who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (See Declaration of Benjamin H. Richman ¶¶ 4-5, a true and accurate copy of which is attached hereto as Exhibit 1.) Indeed, proposed class counsel have prosecuted many successful TCPA cases and have litigated "some of the largest consumer class actions in the country on this issue." *Ellison v. Steven Madden*, No. 11-cv-05935, Dkt. 73 at *9 (C.D. Cal. May 7, 2013); *see also Miller v. Red Bull*, No. 12-cv-04961 (N.D. Ill. Aug. 12, 2013) (proposed counsel class counsel appointed class counsel in nationwide class action settlement of TCPA claims); *Lozano v. Twentieth Century Fox Films Corp.*, No. 09-cv-6344 (N.D. Ill. Apr. 15, 2011) (same). Moreover, they have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country. (See Richman

Declaration at ¶¶ 4-6; *see also* Firm Resume of Edelson PC, a true and accurate copy of which is attached as Exhibit 1-A to the Richman Declaration.) Proposed class counsel have already diligently investigated the claims at issue in this action and dedicated substantial resources to the case, and they will continue to do so throughout its pendency. (Id. ¶ 6.)

Thus, the adequacy of representation requirement is satisfied as well.

**D.      Appropriateness: This Class Action is the Most Appropriate Method to Adjudicate the Claims at Issue.**

The final prerequisite to class certification is met where "[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801(4). "In applying this prerequisite in a particular case, a court considers whether a class action: (1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204; *Purcell and Wardrope Chtd.*, 175 Ill. App. 3d at 1079 ("[T]he predominance of common issues [may] make a class action . . . a fair and efficient method to resolve the dispute."). Additionally, a "controlling factor in many cases is that the class action is the only practical means for class members to receive redress." *Gordon*, 224 Ill. App. 3d at 203; *Eshaghi v. Hanley Dawson Cadillac Co., Inc.*, 214 Ill. App. 3d 995, 1004 (Ill. App. Ct. 1991) ("In a large and impersonal society, class actions are often the last barricade of consumer protection.").

Under the circumstances of this case, a class action is the most appropriate method for the fair and efficient adjudication of the claims of Plaintiff and the proposed Class. The injuries suffered by many of the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by

Defendants' conduct. (Compl. ¶ 40.) Thus, absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief. (*Id.*) Maintenance of this case as a class action is also appropriate because it would avoid the necessity for multiple adjudications of identical legal and factual issues, thereby reducing the burden on the parties and the judiciary. Likewise, the fact that Section 2-801's numerosity, commonality and predominance, and adequacy of representation requirements have been satisfied, further demonstrates the appropriateness of proceeding with this case as a class action.

Accordingly, Section 2-801's final prerequisite is satisfied and the proposed Class warrants certification.

## IV.    CONCLUSION.

For the reasons stated above, and which will be borne out by class discovery, this case is appropriate for class certification. Plaintiff Jeffrey Molitor, individually and on behalf of the proposed Class, respectfully requests that the Court: (1) enter and reserve ruling on his Motion for and Memorandum in Support of Class Certification; (2) allow for and schedule discovery to take place on class-wide issues; (3) grant him leave to file a supplemental memorandum in support of his Motion for Class Certification upon the conclusion of class-wide discovery; (4) grant his Motion for Class Certification after full briefing of the issues presented herein; and (5) provide all other and further relief that the Court deems reasonable and just.

Respectfully Submitted,

**JEFFREY MOLITOR,**
individually and on behalf of all others
similarly situated,

Dated: January 5, 2016            By: _____
                                       One of Plaintiff's Attorneys

11

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

12

# Exhibit 1

## DECLARATION OF BENJAMIN H. RICHMAN
## IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I, Benjamin H. Richman, hereby declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated. If called to testify as to the matters stated herein, I could and would competently do so.

2.      I am an attorney at the law firm of Edelson PC, which has been retained to represent the named Plaintiff in this matter, Jeffrey Molitor.

3.      Attached hereto as Exhibit 1-A is a true and accurate copy of the firm resume of Edelson PC.

4.      As shown in Exhibit 1-A, Edelson PC has significant experience prosecuting consumer class actions and complex litigation of a similar nature, scope, and complexity to the instant case.

5.      Edelson PC and its attorneys have regularly engaged in major complex litigation involving the Telephone Consumer Protection Act, 47 U.S.C. § 227; have the resources necessary to conduct litigation of this nature; and have frequently been appointed lead class counsel by courts throughout the country.

6.      To date, Edelson PC and its attorneys have diligently investigated, prosecuted, and dedicated substantial resources to the claims in this matter, and will continue to do so throughout its pendency.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed this January 5, 2016, at Chicago, Illinois.

Benjamin H. Richman

2

# Exhibit 1-A

## EDELSON PC FIRM RESUME

EDELSON PC is a plaintiffs' class action and commercial litigation firm with attorneys in Illinois and California.

Our attorneys have been recognized as leaders in these fields by state and federal courts, legislatures, national and international media groups, and our peers. Our reputation has led state and federal courts across the country to appoint us lead counsel in many high-profile cases, including in cutting-edge privacy class actions against comScore, Netflix, Time, Microsoft, and Facebook; Telephone Consumer Protection Act class actions against technology, media, and retail companies such as Google, Twentieth Century Fox, Simon & Schuster, and Steve Madden; data security class actions against LinkedIn and AvMed; banking cases against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit; fraudulent marketing cases against software companies such as Symantec and Ascentive; mobile content class actions against all major cellular telephone carriers; and product liability cases, including the Thomas the Tank Engine lead paint class actions and the tainted pet food litigation.

We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy, and other consumer issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools, and serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a specialized focus on consumer technology. Our firm is "known for securing multi-million dollar settlements against tech giants" (Chicago Daily Law Bulletin, September 2013), and has been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *See In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. Dec. 10, 2010) (order appointing us interim co-lead of privacy class action); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing us sole lead counsel due, in part, to our "significant and particularly specialized expertise in electronic privacy litigation and class actions. . . .").We have also been recognized by courts for our uniquely zealous and efficient approach to litigation, which lead the then-Chief Judge of the United States Court for the Northern District of Illinois to praise our work as "consistent with the highest standards of the profession" and "a model of what the profession should be. . . ." *In re Kentucky Fried Chicken Coupon Marketing & Sales Practices Litig.*, No. 09-cv-7670, MDL 2103 (N.D. Ill. Nov. 30, 2011). Likewise, in appointing our firm interim co-lead in one of the most high profile banking cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill. July 16, 2010). After hard fought litigation, that case settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines. In addition, the firm is uniquely able to try cases, especially those involving sophisticated technology issues. Lead by a deputy chief of the

cybercrime unit for the United States Attorney's Office, our trial team has handled both jury and bench trials on issues ranging from general consumer matters to complex cyber crimes (including hacking and cyber intrusions, data breaches, and large-scale identity theft cases) that rested on sophisticated computer forensics.

We have several sub-specialties within our plaintiffs' class action practice:

## PRIVACY/DATA LOSS

### *Data Loss/Unauthorized Disclosure of Data*

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Redbox, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft, and others involving failures to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.): Lead counsel in certified class action accusing Internet analytics company of improper data collection practices. The court has finally approved a $14 million settlement.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.): Lead counsel in data breach case filed against health insurance company. Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred. Case also resulted in the first class action settlement in the country to provide data breach victims with monetary payments irrespective of identity theft.

- *In re Netflix Privacy Litigation*, No. 11-cv-00379 (N.D. Cal.): Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information. Case resulted in a $9 million dollar *cy pres* settlement that has been finally approved.

- *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Grenke v. Hearst Communications, Inc.*, No. 12-cv-14221 (E.D. Mich.); *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich.): Consolidated actions brought under Michigan's Preservation of Personal Information Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer. In January and July of 2015, final approval was granted to a settlement reached in the *Bauer Publishing* matter and an adversarial class was certified in the *Time* case, respectively.

- *Standiford v. Palm*, No. 09-cv-05719-LHK (N.D. Cal.): Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litig.*, No. 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation*, No. 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litigation*, No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears*, No. 08 CH 00448 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the Internet.

**Telephone Consumer Protection Act**

Edelson has been at the forefront of TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Rojas v CEC*, No. 10-cv-05260 (N.D. Ill.): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litigation*, No. 11-md-2261, 2012 WL 762888 (S.D. Cal.): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile*, No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

* *Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D. Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

* *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.): Lead counsel in $10 million text spam settlement.

* *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.): Lead counsel in $6 million text spam settlement.

* *Woodman v. ADP Dealer Services*, No. 2013 CH 10169 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $7.5 million text spam settlement.

* *Lockett v. Mogreet, Inc.*, No 2013 CH 21352 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $16 million text spam settlement.

* *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $16 million.

* *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): Co-lead counsel in in $10 million text spam settlement.

* *Weinstein v. Airit2me, Inc.*, No. 06 C 0484 (N.D. Ill): Co-lead counsel in $7 million text spam settlement.

## CONSUMER TECHNOLOGY

### *Fraudulent Software*

In addition to the settlements listed below, EDELSON PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others. Representative settlements include:

* *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

* *Gross v. Symantec Corp.*, No. 12-cv-00154-CRB (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $11 million.

- *LaGarde v. Support.com, Inc.*, No. 12-cv-00609-JSC (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $8.59 million.

- *Ledet v. Ascentive LLC*, No. 11-CV-294-PBT (E.D. Pa.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.6 million.

- *Webb v. Cleverbridge, Inc.*, No. 1:11-cv-04141 (N.D. Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $5.5 million.

### Video Games

EDELSON PC has litigated cases video-game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc.

### MORTGAGE & BANKING

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Our suits include claims that certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring). Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152-CW (N.D. Cal.): Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.): Lead counsel in class actions challenging Citibank's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.): In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

## GENERAL CONSUMER PROTECTION CLASS ACTIONS

We have successfully prosecuted countless class actions against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, EDELSON PC have litigated consumer fraud cases in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

### *Mobile Content*

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton Cnty. Super. Ct., Ga.): Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation. "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges. Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Case settled for $12 million.

- *Parone v. m-Qube, Inc.*, No. 08 CH 15834 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges. Case settled for $12.254 million.

- *Williams v. Motricity, Inc.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.): Lead counsel in class action settlement alleging unauthorized mobile content charges. Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (L.A. Super. Ct., Cal.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.*, No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

### Deceptive Marketing

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill.): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 10-cv-02964 (N.D. Ill.): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No. 11-cv-01785 (N.D. Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763 (N.D. Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill.): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill.): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com*, No. 01-600703 (N.Y. Sup. Ct., N.Y. Cnty.): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

## PRODUCTS LIABILITY CLASS ACTIONS

We have been appointed lead counsel in state and federal products liability class settlements, including a $30 million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D.N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

## INSURANCE CLASS ACTIONS

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable

policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney*, No. 97 C 4555 (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

## MASS/CLASS TORT CASES

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second-hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority*, No. 99 L 11738 (Cir. Ct. Cook Cnty., Ill.): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving

up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner OF EDELSON PC. He has been recognized as one of the nation's leading class action lawyers, especially in the areas of privacy, technology, and consumer advocacy. His notable cases include ones involving the national banks' suspensions of home equity lines of credit in the aftermath of the housing collapse, which resulted in the restoration of billions of dollars of consumer credit lines. He has developed much of the positive law under the Telephone Consumer Protection Act, especially in the area of text message spam, resulting in settlements collectively worth over a hundred millions of dollars and earning him the moniker, "the Spam Slammer." Jay has been recognized as a "pioneer" in the emerging field of electronic privacy, having established key precedent in cases throughout the country and reaching some of the most important settlements in this space. Based primarily on his success in bringing consumer technology class actions, the national press has dubbed Jay and his firm the "most feared" litigators in Silicon Valley and, according to the New York Times, tech's "babyfaced … boogeyman." The international press has called Jay one of the world's "profiliertesten (most prominent)" privacy class action attorneys.

In addition to complex defense-side litigation, which he handles only in select cases, Jay also offers strategic support to start-ups, including several that have become national brands.

Jay is a frequent speaker and writer on class action issues, the practice of law more generally, and training and law firm management — the latter earning him recognition by the ABA as one of "the most creative minds in the legal industry". He is an adjunct professor at Chicago-Kent School of Law, where he has taught seminars on class actions and negotiation. He has written a blog for Thomson Reuters, called Pardon the Disruption, where he focused on ideas necessary to reform and reinvent the legal industry.

**RYAN D. ANDREWS** is a Partner at EDELSON PC. He presently leads the firm's complex case resolution and appellate practice group, which oversees the firm's class settlements, class notice programs, and briefing on issues of first impression.

Ryan has been appointed class counsel in numerous federal and state class actions nationwide that have resulted in over $100 million dollars in refunds to consumers, including: *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.); *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.); *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.); *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.); *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.); and *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.).

Representative reported decisions include: *Lozano v. Twentieth Century Fox*, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); *In re Jiffy Lube Int'l Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D.

Cal. 2013); and *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292 (D. Nev. Mar. 26, 2014).

Ryan graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications. Ryan received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Ryan has served as an Adjunct Professor of Law at Chicago-Kent, teaching a third-year seminar on class actions. While in law school, Ryan was a Notes & Comments Editor for The Chicago-Kent Law Review, earned CALI awards for the highest grade in five classes, and was a teaching assistant for both Property Law and Legal Writing courses. Ryan externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

Ryan is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and General Counsel at EDELSON PC. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation. In the class action context, Rafey has extensive experience both prosecuting and defending class actions.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, and has achieved landmark settlements involving the telecom industry worth hundreds of millions of dollars, including nationwide settlements in the cases *Pimental, et al. v. Google, Inc.*, No. 11-cv-2585 (N.D. Cal.); *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Williams v. Motricity, Inc., et al.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook Cnty., Ill.).

Rafey's plaintiff's class action practice also focuses on consumer privacy issues and some of his most notable accomplishments include nationwide settlements reached with companies such as Netflix (*In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.)) and RockYou (*Claridge v. RockYou, Inc.*, No. 09-cv-6030 (N.D. Cal.)). Rafey also led the effort to secure adversarial class certification of what is believed to be the largest privacy class action in the history of U.S. jurisprudence in the case of *Dunstan, et al. v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successfully litigated numerous multi-million dollar cases, including several "bet the company" cases. And, with respect to the defense of class action, Rafey's practice focuses mainly on the defense of corporate clients facing wage and hour lawsuits brought under the Fair Labor Standards Act.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. A native of Colorado,

Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at EDELSON PC where he focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, groundbreaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. *See Kramer v. Autobytel, Inc.*, No. 10-cv-02722-CW (N.D. Cal.); *Turner v. Storm8, LLC*, No. 09-cv-05234 (N.D. Cal.); *Standiford v Palm, Inc.*, No. 09-cv-05719-LHK (N.D. Cal.); and *Espinal v. Burger King Corp.*, No. 09-cv-20982 (S.D. Fla.). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855 (N.D. Cal. 2011); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); and *Van Tassell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770 (N.D. Ill. 2011). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Outside of consumer class actions, Chris actively advises technology related startups, including providing compliance and marketing guidance, as well as hands-on concept and business development.

Prior to joining EDELSON PC, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated *magna cum laude* from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating *magna cum laude* from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**ALEXANDER T.H. NGUYEN** is a Partner at EDELSON PC and leads the firm's Complex Trials Team.

Before joining the firm, Alex served as federal prosecutor and deputy chief of the cybercrime unit for the United States Attorney's Office in the Eastern District of Virginia in Alexandria, Virginia. In that capacity, he investigated, prosecuted, supervised, and tried a wide range of

computer crime and intellectual property matters, including hacking and cyber intrusions, data breaches, intellectual property violations, large-scale identity theft and online fraud, national security, trade secrets, and online child exploitation matters. Before that, he also served as a federal prosecutor for the United States Attorney's Office in the Eastern District of Pennsylvania in Philadelphia, Pennsylvania, where he prosecuted criminal matters, including tax evasion, political corruption, fraud, money laundering, terrorism, narcotics, and violent crime.

In 2010 and 2011, he served in the Office of the White House Counsel to help manage and implement key White House law and public policy initiatives, helped respond to congressional oversight investigations, provided ethics advice to senior officials, and assisted with political appointments.

Alex graduated *magna cum laude* from Harvard University and received his J.D. from Yale Law School. He has previously served on the board of the Asian Pacific American Bar Association Educational Fund and was the president of the Vietnamese American Bar Association in Washington, D.C.

**BENJAMIN H. RICHMAN** is a Partner at EDELSON PC. He handles plaintiffs'-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is also the director of EDELSON PC's Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC and leads the firm's Data Security Litigation Group. He handles technology-related class actions, focusing mainly on cases involving privacy and data security issues, including the illegal collection, storage, and disclosure of personal

information and text message spam. Ari has been appointed class counsel by state and federal courts in several nationwide class actions, including *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich. July 27, 2015); *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.); *In re: LinkedIn User Privacy Litigation*, No. 5:12-cv-03088 (N.D. Cal.); *Coffman v. Glide Talk, Ltd.*, No. 14 CH 08513 (Cir. Ct. Cook Cnty, Ill.); *Webb v. Cleverbridge, et al.*, No. 11-cv-4141 (N.D. Ill.); *Ledet v. Ascentive*, No. 11-cv-294 (E.D. Penn.); and *Grant v. Commonwealth Edison Company*, No. 13-cv-8310 (N.D. Ill.), and was appointed sole-lead class counsel in *Loewy v. Live Nation*, No. 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he "understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013, 2014, 2015) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for THE JOHN MARSHALL LAW REVIEW and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**COURTNEY BOOTH** is an Associate at EDELSON PC where her practice focuses on consumer and tech-related class actions.

Courtney received her J.D., *magna cum laude*, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney represented John Marshall at the Mercer Legal Ethics and Professionalism Competition where she was a semi-finalist and won Best Respondent's Brief and at the Cardozo/BMI Entertainment and Communications Law Competition where she placed in the top three oralists. Courtney was a 2013 Member of the National Order of Scribes.

Courtney focuses her public service efforts on providing settlement-related assistance to *pro se* plaintiffs. In one of her recent *pro bono* cases, the Court recognized Courtney's efforts and "express[ed] its appreciation" to her, stating that "[t]he work she has done for the plaintiff is of the highest order and the way she has conducted herself in court is to be commended." *See Sroga v. City of Chicago*, No. 12-cv-9288, Dkt. 65 (N.D. Ill. Aug. 6, 2014).

Prior to law school, Courtney attended Saint Louis University where she earned a B.A. in Communication. While there, she was a community relations intern for the St. Louis Blues.

**JONATHAN W. HODGE** is an Associate at EDELSON PC where his practice focuses on complex consumer class actions.

Prior to joining EDELSON PC, Jonathan handled complex commercial litigation at an Am Law 100 defense firm, where he drove successful outcomes in matters with as much as $100,000,000 in controversy. Previously, Jonathan served as a consultant for a tech incubator where he helped clients form new business based on patent-protected technologies developed at the University of Michigan. He also served in the accounting department of Nucor Steel-Hertford, where his IT skillsets helped him largely automate the monitoring of the largest cost at a multibillion-dollar division of America's largest steel company.

Jonathan received his J.D. from the University of Michigan Law School. While in law school, Jonathan participated in the Campbell Moot Court and the Frank Murphy Society 1L Oral Advocacy Competition. He was awarded Legal Practice Honors for performing in the top 20% of his first-year legal research and writing classes.

Jonathan graduated *summa cum laude* from Chowan University, earning his B.S. in Business Administration with a double concentration in Information Systems and Accounting.

**JAMIE J. R. HOLZ** is an Associate at EDELSON PC where his practice focuses on tech and privacy-related class actions.

Jamie received his J.D., *magna cum laude*, from The John Marshall Law School. While attending law school, Jamie participated in The John Marshall Law Review and the Moot Court Honors Council, and was a Board Member for The John Marshall Trial Advocacy and Dispute Resolution Honors Board. Jamie competed nationally on several alternative dispute resolution teams, was the Herzog Moot Court Competition champion and a two-time Triple Crown Alternative Dispute Resolution Competition champion.

Jamie was an extern to the Honorable Arlander Keys in the United States District Court for the Northern District of Illinois and with the Cook County State's Attorney's Office. Jamie completed his time at John Marshall as a David R. Sargis Scholar and walked away with CALI awards in property law and civil procedure.

Prior to law school, Jamie attended Loras College where he earned a B.A. in Creative Writing and English Literature.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated *magna cum laude* from the University of Southern California, earning her B.A. in Communication. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC where his practice focuses on technology and privacy class actions.

Nick has been appointed class counsel in multiple class actions that have resulted in tens of millions of dollars in refunds to consumers, including: *In re LinkedIn User Privacy Litig.*, No. 12-cv-3088 (N.D. Cal.); *Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831 (E.D. Mich.); *Dunstan v. comScore*, No. 11-cv-5807 (N.D. Ill.); and *In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.).

Nick received his J.D., *cum laude*, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business. His student Comment, which examines the legal issues that may arise from National Hockey League players' participation in the 2014 Olympic Winter Games, appears in Vol. 32, No. 3A of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law and played on the school's rugby team.

**J. AARON LAWSON** is an Associate at EDELSON PC where his practice focuses on appeals and complex motion practice.

Before coming to Edelson, Aaron served for two years as a Staff Attorney for the United States Court of Appeals for the Seventh Circuit, handling appeals involving a wide variety of subject matter, including consumer-protection law, employment law, criminal law, and federal habeas corpus. While at the University of Michigan Law School, Aaron served as the Managing Editor for the Michigan Journal of Race & Law, and participated in the Federal Appellate Clinic. In the clinic, Aaron briefed a direct criminal appeal to the United States Court of Appeals for the Sixth Circuit, and successfully convinced the court to vacate his client's sentence.

**DAVID I. MINDELL** is an Associate at EDELSON PC where he helps direct a team of attorneys and engineers in investigating and litigating cases involving complex tech fraud and privacy violations. His team's research has led to lawsuits involving the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through mobile-devices and computers, unlawful collection, storage, and dissemination of consumer data, mobile-device privacy violations, large-scale data breaches, and the Bitcoin industry. On the other side, David also serves as a consultant to a variety of emerging technology companies.

Prior to joining EDELSON PC, David co-founded several tech, real estate, and hospitality related ventures, including a tech startup that was acquired by a well-known international corporation within its first three years. David has advised tech companies on a variety of legal and strategic business-related issues, including how to handle and protect consumer data. He has also consulted with startups on the formation of business plans, product development, and launch.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has spoken to a wide range of audiences about his investigations and practice.

**AMIR MISSAGHI** is an Associate at EDELSON PC where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**ROGER PERLSTADT** is an Associate at EDELSON PC, where he concentrates on appellate and complex litigation advocacy. He has briefed and argued appeals and motions in both federal and state appellate courts.

Prior to joining the firm, Roger was a law clerk to United States District Court Judge Elaine E. Bucklo, an associate at a litigation boutique in Chicago, and a Visiting Assistant Professor at the University of Florida Levin College of Law. He has published articles on the Federal Arbitration Act in various law reviews.

Roger has been named a Rising Star by *Illinois Super Lawyer Magazine* four times since 2010.

Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review. After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

**EVE-LYNN J. RAPP** is an Associate at EDELSON PC, focusing her practice in the areas of class action and general litigation.

Prior to joining the firm, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses, and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating *cum laude*, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also

clerked for both civil and criminal judges (Honorable Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BEN THOMASSEN** is an Associate at EDELSON PC. At the firm, Ben's practice centers on the prosecution of class actions cases that address federally protected privacy rights and issues of consumer fraud—several of which have established industry-changing precedent. Among other high profile cases, Ben recently played key roles in delivering the winning oral argument before the United States Court of Appeals for the Eleventh Circuit in *Curry v. AvMed*, 693 F.3d 1317 (11th Cir. 2012) (a data breach case that has, following the Eleventh Circuit's decision, garnered national attention both within and without the legal profession) and securing certification of a massive consumer class in *Dunstan v. comScore*, No. 11 C 5807, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) (estimated by several sources as the largest privacy case ever certified on an adversarial basis).

Ben received his J.D., *magna cum laude*, from the Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, *summa cum laude*, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.

**SAMUEL LASSER** is Of Counsel to EDELSON PC.

Samuel graduated with a degree in history from the University of Michigan (Ann Arbor) and received his J.D. from the University of San Francisco.

**SHAWN DAVIS** is the Director of Digital Forensics at Edelson PC, where he leads a technical team in investigating claims involving privacy violations and tech-related abuse. His team's investigations have included claims arising out of the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through digital devices, unlawful collection, storage, and dissemination of consumer data, large-scale data breaches, receipt of unsolicited communications, and other deceptive marketing practices.

Prior to joining Edelson PC, Shawn worked for Motorola Solutions in the Security and Federal Operations Centers as an Information Protection Specialist. Shawn's responsibilities included network and computer forensic analysis, malware analysis, threat mitigation, and incident

handling for various commercial and government entities.

Shawn has been a member of the adjunct faculty of the School of Applied Technology at the Illinois Institute of Technology (IIT) since December of 2013. Additionally, Shawn is a faculty member of the IIT Center for Cyber Security and Forensics Education which is a collaborative space between business, government, academia, and security professionals. Shawn's contributions aided in IIT's designation as a National Center of Academic Excellence in Information Assurance by the National Security Agency.

Shawn graduated with high honors from the Illinois Institute of Technology with a Masters of Information Technology Management with a specialization in Computer and Network Security. During graduate school, Shawn was inducted into Gamma Nu Eta, the National Information Technology Honor Society.

Edelson PC

350 North LaSalle Street, Suite 1300, Chicago, Illinois 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

January 5, 2016

**VIA PROCESS SERVER**

Yakim Manasseh Jordan
Manasseh Jordan Ministries, Inc.
708 3rd Avenue, 6th Floor
New York, New York 10011

> Re: *Molitor, et al., v. Manasseh Jordan Ministries, Inc., et al.*, No. 2016CH00079
> **Preservation, Discovery, and Production**

To Whom It May Concern:

I write to provide notice to Yakim Manasseh Jordan and Manasseh Jordan Ministries, Inc. (collectively, "Defendants"), of their instant and continuing duty to preserve all documents, records, data, information, and other tangible evidence that are relevant to or which may lead to the discovery of information relevant to the subject matter of the above-referenced lawsuit. This duty applies to this case as well as to all existing or future additional related actions that may be commenced, and extends to both Defendants and their agents, affiliates, independent contractors, and others acting on their behalf, to the extent those individuals or entities have any such information within their possession, custody or control.

In particular, Plaintiff intends to seek the production of relevant, non-privileged information, including documents, correspondence, source code, and other electronically stored information ("ESI") relating to: (i) the manner in which the unauthorized telephone calls at issue were made to Plaintiff and the members of the putative Class, (ii) the equipment used to make such unauthorized calls, (iii) the manner in which the telephone numbers of Plaintiff and the members of the putative Class were obtained, (iv) the total number of individuals who received the unauthorized telephone calls at issue, (v) written policies, training materials, and other materials related to compliance with the Telephone Consumer Protection Act, 47 U.S.C. § 227, and (vi) any contracts, agreements, or other written understandings related to the telephone calls at issue in this case.

Plaintiff intends to seek the above-described information in its native electronic format. Thus, absent agreement by the Parties, copying, preserving, or otherwise converting any digital evidence or information to .tiff files or other non-native formats will *not* be considered compliant with this notice, irrespective of whether such production is as initial disclosures pursuant to Fed. R. Civ. P. Rule 26(a)(1)(A), or in connection with Plaintiff's anticipated written discovery requests.[1]

---

[1] To be clear, we're willing to discuss (and receive) alternative forms of production for the sake of efficiency. Nevertheless, Defendants should preserve all relevant and discoverable information and documents in their native data format in the event that production in that form is ultimately necessary. Regardless of form, Plaintiff reserves the right to seek the production of discoverable information in its native format.

Illinois / California

Edelson PC

Additionally, Defendants have a continuing duty to suspend all routine data retention policies and other processes or practices to the extent they involve the destruction of any evidence that is or is likely to be considered relevant in this matter. We also remind Defendants of their continuing obligation to preserve evidence that may come into existence after the date of this letter, or which may exist now or in the future, but of which they have no current knowledge.

Finally, and in light of the foregoing, we propose that the Parties schedule a conference between counsel and any other necessary persons to address the nature and context of ESI discovery in this matter. In an effort to facilitate the Parties' discussions, we may have present and participating at any such conference our technology expert(s) and propose that Defendants do the same. During the conference, we intend to discuss the nature, form, and format for the production of ESI by Defendants in their Fed. R. Civ. P. 26(a)(1) initial disclosures, as well as in response to Plaintiff's anticipated written discovery requests. Our objective in proceeding in this manner is to reach agreement on a stipulated ESI discovery protocol, which will minimize the potential for misinterpretation of discovery requests, deficient discovery responses, and discovery-related motion practice. At the conference and in addition to the issues outlined above, we intend to raise and will be prepared to discuss the following non-exhaustive list of topics:

a.  Agreement as to general discovery-related definitions to be used by the Parties;

b.  Identification of individuals, including any non-party or third-party individuals, who can testify to ESI-related issues, including network and computing infrastructure, electronic records management and retention, and sources of potentially relevant ESI;

c.  Identification of all data storage, whether connected or not connected to Defendants' network mapping that may be a source of relevant ESI;

d.  Defendants' policies for managing the system(s) that generate and store ESI. Examples include, but are not limited to, back-up and business continuity policies, data retention policies, as well as internally and externally prepared audit reports documenting adherence to these policies;

e.  Acquisition and examination of all relevant versions of uncompiled source code;

f.  The necessity for restoration of previously deleted data and information;

g.  Determining whether back-up and archive information is within the scope of discovery;

h.  Defendants' data protection policies and methodologies, such as continuous data protection, database snapshots, or other rollback technologies;

i.  Existing and continuing necessity for ESI preservation;

Illinois / California

Edelson PC

*Molitor, et al., v. Manasseh Jordan Ministries, Inc., et al.*
January 5, 2016
Page 3 of 3

j.  Existing and future necessity for forensic evidence collection, preservation orders, and other extraordinary ESI preservation activities;

k.  ESI search terms, search protocols, sampling, and error testing;

l.  Nature, form, and format of ESI production;

m.  Production (where applicable) of structured data, including search queries;

n.  Nature, form, and format of initial disclosures of ESI;

o.  Description of the processes of production;

p.  Production schedule and costs;

q.  Privilege log format, timing, and privileged document metadata;

r.  Clawback and other Fed. R. Evid. 502 issues; and

s.  Documenting efforts to reach an accord regarding ESI and general discovery disputes.

Of course, if there are any additional discovery-related matters you would like to discuss, we would certainly be willing to do so. If, however, you are unwilling to engage in such discussions or otherwise disagree with this proposal, please let us know as soon as possible, so that we may bring the Parties' respective positions to the attention of the Court at the appropriate time. If you are willing to engage in the discussions outlined above, please let me know when you and your technology expert(s) (if any) are available to do so.

We look forward to working with you to expedite the discovery process in this matter and more generally.

Very truly yours,

EDELSON PC

Benjamin H. Richman

# W.R. GEORGE ASSOCIATES
# WORLD WIDE PROCESS SERVICE

## William R George
## 17436 Sandy Creek Valley Rd
## Watertown NY 13601
## 315 788-6788
## wgeorge1@twcny.rr.com
## www.george-pi.com
## www.icuspi.com

**Providing our clients with prompt, reliable, and professional service since 1981. We provide services for Law Firms, Process Services Agencies, businesses, and individuals.**

**Utilizing the latest technology in GPS and digital recording through**

## LOYAL DOG SOFTWARE.

**Jefferson, Oswego, Lewis, St. Lawrence & Franklin Counties.**

**$45.00 to $55.00 routine service.**

**Can also service New York State & Nation wide with a network of other professional servers.**

**Call for all other quotes:**

**\*\*\*\*\*RUSH SERVICE\*\*\*\*PERSONAL SERVICE ONLY\*\*\*\*INDEXING & FILING\*\*\*\*\***

**\*\*\*\*\*VOLUME JOBS\*\*\*\*\***

**William R George is also a partner with**

**ICU SECURITY & PRIVATE INVESTIGATIONS**

**34 Public Square Suite 6**

**Watertown NY 13601**