**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JEFFREY MOLITOR, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>MANASSEH JORDAN MINISTRIES, INC., a New York Religious Corporation, and YAKIM MANASSEH JORDAN, an individual,<br><br>          Defendants. | Case No. 16-cv-2106 |

## DEFENDANT MANASSEH JORDAN MINISTRIES, INC.'S AND YAKIM MANASSEH JORDAN'S ANSWER TO PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Defendants Manasseh Jordan Ministries, Inc. (the "Ministry") and Yakim Manasseh Jordan ("Mr. Jordan") (collectively referred to as "Defendants"), by and through their undersigned counsel, Answer the First Amended Class Action Complaint ("FAC") of Plaintiffs Jeffrey Molitor, Laura C. De la Cabada, Steve Clarke, and Ruth Maki ("Plaintiffs") as follows. Defendants expressly deny any allegations which they do not expressly admit.[1]

## NATURE OF THE ACTION

1.       Despite thousands of consumer complaints, an FCC citation, and multiple news articles decrying their practice, the Jordan continues to place unsolicited "robocalls" to cellular telephones nationwide, by the thousands in ways that routinely collect money from those most in need.

**Answer**: Denied.

---

[1] Note that in recitation of the allegations, this Answer omits Plaintiff's footnotes.

2.     By all account, these robocalls are extremely profitable. Defendant Manasseh Jordan, a 25-old self-identified "prophet," lives a lavish lifestyle that includes multimillion dollar homes and Rolls Royce cars. These expenditures are largely funded through "seed-fiath" money donated to his "nonprofit" corporation, MJM, and/or his father's corporation, Zoe Ministries, Inc. ("ZMI"). As will be made clear through this Complaint and subsequent discovery, Manasseh and his father partner to use MJM and ZMI as sham corporations and alter-egos so that they can commit willful torts for their own personal gain, all in abuse of the Religious Corporation structure set forth by the State of New York.

**Answer:** Mr. Jordan admits that he is a 25 year old self-identified prophet.  Except as

specifically admitted, Defendants deny the allegations of paragraph 2 of the FAC.

3.     Defendants use robocalling to constantly find new donors and generate new Lines of revenue. Manasseh has been called a "predator who telemarkets prayers and 'miracles' and, despite agreeing to no fewer than nine *individual* TCPA settlements over the past three years, still finds it worthwhile to continue using his voice to make prerecorded calls. Defendant Manasseh uses his alter ego, MJM, to knowingly break the law repeatedly violate the TCPA, all to increase his personal wealth at the expense of non-consenting consumers.

**Answer**: Denied.

4.     Indeed, Manasseh, MJM and/or their agents regularly place robocalls, *en masse*, to the cellphone numbers of people who simply do not want them and never requested them. One newspaper article from February of 2015 states:

> I have heard from a person who considers me his dearest friend. He ha [sic] told me so more than 100 times, even though I've never met him. His name is Manasseh Jordan, and he calls himself Prophet Manasseh. He calls me frequently because he is so concerned about me. He especially is worried about my finances and says he has special messages for me from God . . . .
>
> One thing I'm certain about: I'm not the only one being harassed by these calls. I Googled "Prophet Manasseh phone calls" and found sites filled with complaints by people who have tried to stop this harassment . . . .

**Answer**: Denied.

5.     Like thousands of others, Plaintiff has long been subject to Defendant' abusive and incessant robocalling practices. And, like thousands of others, Plaintiff never invited Defendants to call. Nonetheless, Defendants regularly robocalls his cellular telephone number, without his consent, and despite his attempts to stop and block their calls.

**Answer**: Denied.

6.     By making the telephone calls at issue in this Complaint, Defendants caused Plaintiff and the members of a putative Class of consumers (Defined below) actual harm,

2

including the aggravation, nuisance, and invasion- of privacy that necessarily accompanies the receipt of unsolicited and harassing telephone calls, as well as the monies paid to their carriers for the receipt of such telephone calls.

**Answer**: Denied.

7.      The TCPA was enacted to protect consumers from unsolicited telephone calls exactly like those alleged in this case. In response to Defendants' unlawful conduct, Plaintiff files the instant and seeks an injunction requiring Defendants to cease all unsolicited telephone calling activities to consumer and an award of statutory damages to the members of the Class under the TCPA, together with costs and reasonable attorneys' fees.

**Answer**: Defendants admit that Plaintiff alleges violation of the Telephone Consumer Protection Act ("TCPA").  Except as specifically admitted, Defendants deny the allegations of paragraph 7 of the FAC.

## **PARTIES**

8.      Plaintiff Jeffrey Molitor is a natural person and citizen of the State of Illinois and resident of Cook County.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the FAC and denies them on that basis.

9.      Plaintiff Laura C. De la Cabada is natural person and citizen of the State of New York residing in New York City.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the FAC and denies them on that basis.

10.      Plaintiff Steve Clarke is a natural person and citizen of the State of California residing in Grand Terrace.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the FAC and denies them on that basis.

11.      Plaintiff Ruth Maki is a natural person and citizen of the State of California residing in San Marcos.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the FAC and denies them on that basis.

12.     Defendant Yakim Manasseh Jordan is a natural person and a citizen of the United States. He has been associated with several residential properties at addresses in various states, including New York, Florida. Massachusetts, and New Jersey. He regularly travels through the United States to perform speaking arrangements and he regularly transacts business with and solicits payments from the citizens of Illinois, both in person and through robocalls. He has personally appeared in Cook County, Illinois to hold a "Prophetic Service" as recently as June 28, 2015. He owns, directs, or otherwise controls Manasseh Jordan Ministries, Inc.

**Answer**: Mr. Jordan admits he is a citizen of the United States and has lived in and has

performed speaking engagements in several states. Except as specifically admitted, Mr. Jordan

denies the allegations of paragraph 12 of the FAC.

13.     Defendant Manasseh Jordan Ministries, Inc. ("MJM"), is a New York Religious Corporation located at 310 Riverside Drive, New York, New York 10025. MJM shares its address with Zoe Ministries, Inc., a nonprofit that is owned, directed, or otherwise controlled by Manasseh's father, E. Bernard Jordan. MJM sponsored a "Prophetic Service" in Cook County, Illinois, as recently as June 28, 2015, and conducts business and solicits payments throughout Cook County, the State of Illinois, and the United States.

**Answer**: The Ministry admits that it is a non-profit religious organization located in New

York. Except as specifically admitted, the Ministry denies the allegations of paragraph 13 of the

FAC.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

**Answer**: Defendants admit that this Court has subject matter jurisdiction over them in

this matter.

15.     This Court has personal jurisdiction over Defendants and venue in this District is proper under 28 U.S.C. § 1391(b) because Defendants transact business within this District, perform in-person services in this District, solicit a significant amount of payments from within this District, and because some of the wrongful conduct giving rise to this case was directed to and caused injury in this District. Additionally, Plaintiff Molitor, an individual, is a resident of this District.

**Answer**: The Ministry admits that this Court has personal jurisdiction over it and that

venue is proper with respect to this action against the Ministry. Mr. Jordan denies that this Court

has personal jurisdiction over him or that venue is proper with respect to this action against him.

Except as specifically admitted, Defendants deny the remaining allegations of paragraph 15 of

the FAC.

## COMMON FACTUAL ALLEGATIONS

16.     ZMI is a "nonprofit" organization owned, directed, or otherwise controlled by Defendant Manasseh's father, E. Bernard Jordan ("Jordan").

**Answer**: Denied.

17.     ZMI and Jordan pioneered the profitable prosperity pitch later adopted by Manasseh and JMJ. As the Times Herald Record once wrote: "[o]ver the years, preaching a gospel of prosperity and self-empowerment, Jordan built Zoe Ministries into a multimedia enterprise that collected $2.8 million from its loyal following in 2001. 'We live to give,' Jordan teaches his followers to say. And give they do."

**Answer**: Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 17 of the FAC and denies them on that basis.

18.     "Jordan makes no apologies for his mansion and fleet of cars, which includes a Rolls-Royce and a Mercedes-Benz SUV." *Id*. Indeed, through nonprofit funds, Jordan once commissioned a team of Russian artists to paint, over the course of "two to three years," elaborate murals of himself throughout his "27-room mansion," including "Jordan on a throne, as pharaoh," "Jordan as Jesus in the familiar iconography of medieval and Renaissance art," and, "in a room with scarlet walls and gilded filigree on top . . Jordan on a throne, as God." *Id*.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 18 of the FAC and denies them on that basis.

19.     To maintain this lavish lifestyle, Jordan started reaching beyond the pockets of his immediate following. Specifically, he started using robocalls, *en masse*, to barge into the living rooms of consumers nationwide and seek fresh lines of revenues. Naturally, consumers complained:

> "We would get a phone call for each one of us, one right after the other. Way too annoying! I asked through email to be removed off there [sic] emailing list, calling list and mail list in [.sic] behalf of my son (13 yrs. Old), my husband and myself . . . . So far nothing has worked for me. I emailed them repeatedly to remove me and to knock it off, I have sent back all mail (return to sender/no longer lives here) and tried calling with no solution. All the numbers they list are for you to give .money or what they call seed. They are driving me crazy. I don't know what else to do. I just want them to leave me alone."

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the FAC and denies them on that basis.

20.    As a result of Consumer complaints, the Federal Communications Commission ("FCC") issued a citation letter to ZMI and Jordan for "prerecorded and autodialed call message violations." It noted that "[i]f, after receipt for this citation, you or your company violates the Communications Act or the Commissions' rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or each day of a continuing violation." *Id.*

**Answer**: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the FAC and denies them on that basis.

21.    With such a daunting threat looming, Jordan turned to his family to provide an alternative solution. As a result, within two months of the FCC citation, three of Jordan's children (including Manasseh), along with ZMI Prophet Charlie Berrian (a close family friend), incorporated MJM, which was then used as a replacement robocalling vehicle.

**Answer**: Defendants admit that the Ministry is a non-profit corporation. Except as specifically admitted, Defendants deny the allegations of paragraph 21 of the FAC.

22.    This newly-incorporated entity overlapped substantially with ZMI. It assumed the same operating address (310 Riverside Drive, New York, NY 10025). Its trustees—all Jordan family members or close friends—were all actively involved with ZMI, with at least one using the same "@zoeministries.com" email address while doing business for MJM. At least one MJM trustee listed a ZMI-owned mansion as a home address. And of course, both MJM and ZMI enjoyed the same "non-profit" status, with MJM's Articles of Incorporation specifically stating that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered . . ." *Id.*

**Answer**: Defendants admit that the Ministry is a non-profit corporation. Except as specifically admitted, Defendants deny the allegations of paragraph 22 of the FAC.

23.    Most problematic for consumers, the new entity took over the same robocalling practices of ZMI, offering prerecorded prayers, prophesies, and miracles-for-hire, over the phone and outside the immediate scrutiny of the FCC.

**Answer**: Denied.

24.    As such, and on information and belief, MJM and ZMI are alter-egos of each other and act as a single business-entity, with one committing TCPA torts and the other

6

sheltering the assets received from such torts. Moreover, this single entity exists to enable the partnership of Manasseh and Jordan to enrich itself through self-dealing and purposeful tortious conduct, and this perverts the privilege of doing business in a corporate form. Indeed, Manasseh largely exercises his domination over MJM to place the same types of robocalls ZMI previously placed, all to profit while avoiding compliance with the TCPA and potential liability from ZMI's FCC citation. Moreover, on information and belief, both MJM and ZMI intermingle and manipulate assets, such that their assets concentrate under ZMI, Manasseh, and Jordan while their TCPA tort liabilities concentrate under MJM. This leaves MJM undercapitalized for the TCPA liabilities it purposefully accrues. As such MJM generates proceeds through illegal robocalling while attempting to artificially limit the recovery available to the thousands of innocent consumers who never consented to interact with MJM and who are repeatedly harmed by its tortious conduct. Consequently, and as a direct result of Manasseh's wrongful domination of MJM, Manasseh is enriched while consumers are harmed.

**Answer**: Denied.

25.     Further, on information and belief, both MJM and ZMI have non-functioning trustees that allow Manasseh and Jordan, as partners, to siphon off corporate assets for their own personal use, at will. The entities have failed to maintain arm's length relationships with their executives, as MJM and ZMI provide Manasseh and Jordan with salaries and perquisites that far exceed the reasonable market value of services legally provided. This directly contravenes the non-nonprofit purpose for which such entities were purportedly created and reflects self-dealing as opposed to honest and disinterested transacting. Indeed, Manasseh and Jordan treat the assets of MJM and ZMI as their own personal assets, living in the homes and driving the cars provided to them directly (or indirectly through excessive salaries) by such entities.

**Answer**: Denied.

26.     Manasseh himself claims to be a prophet of the Prophetic Order of Mar Elijah ("P.O.M.E."), another organization created and overseen by his father, "Master Prophet" E. Bernard Jordan. Manasseh has appeared several times on religiously-themed television programs, including some shows hosted by his father and others by televangelist Benny Hinn, to preach what is commonly known as the "prosperity gospel." Specifically, Manasseh solicits millions of dollars from people in need, commonly known as "seed-faith," which promises will purchase "favor" from God. *See, e.g., False Prophet Manasseh Jordon Exposed*, at 2:46-3:21 (showing Manasseh telling viewers who "need God to change their season" to "sow a $52 seed for 52 weeks of favor."); *see also* Figures 1 and 2, below (same; cf. Figure 3, below (showing Manasseh's father and business partner, Jordan, making the same request)). [Referenced Figures are omitted in this answer.]

**Answer:** Mr. Jordan admits he is a self-identified prophet and has appeared on television.

Except as specifically admitted, Mr. Jordan denies the allegations of paragraph 26 of the FAC.

27.     The "prosperity gospel" inherently targets struggling socio-economic groups, including the unemployed, the under employed, the elderly, the disabled, and single mothers, among many others struggling to make ends meet—in other words, those most susceptible to

7

(and in need of) the promises of good fortune made by Defendants. To persuade these individuals to give him as much money as possible, Manasseh routinely manufactures stories that tie miracles to money payments, often indicating that the needy can trigger such miracles by giving their "best seed."

**Answer**: Denied.

28.     For example, the day after voting to incorporate MJM, Manasseh appeared before a crowd and said:

> "**I'll never forget** that I was in **Texas** . . . and I looked at a woman, and she **sowed a seed of $1,000**.  I said . . . '**God tells me that he's touching Glenda**.' . . . [They said] 'Glenda died a couple hours ago.' . . . [But then] the hospital called, and they said that 'Your mother, that dies a couple hours ago, came back to life.' They said, to the Johnson family . . . that she heard a man calling her name. The prophet is able to speak to something dead, and bring life where death is." [Emphasis added].

**Answer**: Mr. Jordan admits that, in his capacity working for the Ministry, he has spoken to crowds.  Except as specifically admitted, Mr. Jordan denies the allegations of paragraph 28 of the FAC.

29.     A few months later, Manasseh told the same story to another crowd, simply inserting new first names and new dollar amounts:

> "**I'll never forget** I was in San Antonio, **Texas,** a couple came up, they **sowed $2,000**; . . . I said '**God is touching Kathy**.' . . . [But their pastor said] 'prophet, his mother's name is **Kathy** and was just declared dead a few hours ago.' . . . . [But then] they get a phone call through his doctor, the doctor says '**Mr. Johnson** . . . . Your momma **Kathy** just woke up and said she heard a man's voice. . . . [S]he heard a man call her name. . . . .' When there is a prophetic anointing, anything that is dead must come back to life." [Emphasis added].

**Answer**: Mr. Jordan admits that, in his capacity working for the Ministry, he has spoken to crowds.  Except as specifically admitted, Mr. Jordan denies the allegations of paragraph 29 of the FAC.

30.     Not surprisingly, Manasseh uses the same money-for-miracles storytelling techniques in his prerecorded calls. For example, he has told thousands of call recipients, in his own prerecorded voice, "The Lord spoke to me personally about you. I must speak to you. I'm

8

going to pass the phone to my blessed assistant and he's [going to] give you my blessed number so that you can call me back so that you can hear this "blessed word." That 'blessed word," in turn is a ten minute recording from Manasseh, implying, among other things, that people who pay him their "best seed" while facing foreclosure or living below poverty will get fee-and-clear homes and million-dollar business contracts:

> "What about the woman by the name of Evelyn, that was losing her home, her home was in foreclosure, she didn't know what to do, but she would get these phone calls, she would get these phone calls, and she began to prove God with her faith, and she would do her best seed, adding the change amount, and she got the call from CitiBank, and they said they forgave her for the loan, and that she owned the home free and clear. What about the lady that had a cleaning business that was living below poverty. . . . She would sow and sow week after week, and God released to her $1,300,000 worth of a commercial contract . . . . I want you now to step out and sow faith with your prosperity seed of $45 or $145 or your best seed of $20.45., the $345, the $545 seed, the $10.45 . . . . [W]atch [God] begin to shower you with blessings, an anointing of prosperity will instantly begin to blow upon you. . . ."

**Answer**: Mr. Jordan admits that, in his capacity working for the Ministry, he has placed calls to people who have expressed interest in receiving information from the Ministry. Except as specifically admitted, Defendants deny the allegations of paragraph 30 of the FAC.

31.     Unfortunately, Manasseh, through MJM placed thousands of these prerecorded phone calls to the cellphones of consumers who did not consent to be called and who have never interacted with Defendants in any way whatsoever. This has led to significant consumer backlash, as evidenced by legions of online complaints:

- "He has been calling me since 10/2014 and has 31 different #/s and has called at least 172 times. SO SICK OF IT!!"

- "I receive at least 1 to 2 calls a day from a automated service from a Prophet Manasseh. I have removed myself from the calling list that I never put myself on at least 50 times and still get calls. I have blocked the number but they have still able to leave a very long annoying voicemail. I have also emailed them and left voicemails begging them to stop calling but it still continues. What do I have to do to make it stop."

- "You can't get off this call list. If you're on a mobile phone, you just need to continue to block the numbers every time this idiot

calls. I'm up to 7 phone numbers blocked under his name. Prophet Manasseh Jordan Ministries."

- "I once got two calls in a two hour time period from two different states! I have been frustrated by these calls. I actually got my phone # changed."

- "I have sent numerous messages and text messages as well saying stop please stop even threatened to call the authorities on the show called prophet Manasseh my children answer amy phone and one day hear him going off on a rant it scares them to death and we respectively text messaged back the number he called me on and the guy just doesn't take no for an answer he calls and call and calls."

- "I too continue to get calls. This is a minutes phone and they have run down my [sic] drastically. To think I am paying for these calls!"

- "Five Hundred robo calls from five different numbers with the same Prophet Manasseh recording in the past fifteen months. How does one stop this scammer?"

**Answer:** Denied.

32.     Manasseh directly participates in these calls by recording his voice and by directing MJM, over which he exercises full domination and control, to transmit these voice recordings through automated telephone calls, all in knowing violation of the TCPA. Indeed, Manasseh has specifically admitted in court filings, concurrently with MJM, to having "sent prerecorded calls to people," and yet continues to have such calls placed on his behalf and for his personal enrichment.

**Answer**: Denied.

33.     As such, Manasseh and MJM knowingly placed (and continue to place) prerecorded calls to cellphone numbers without the prior express consent of the call recipients. Likewise, they continue to do so after receiving requests to stop, including at least thirteen individual TCPA lawsuits. As such, Manasseh and MJM not only invaded the personal privacy of Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

**Answer**: Denied.

10

## FACTS SPECIFIC TO PLAINTIFF MOLITOR

34.     Starting in May of 2015, Plaintiff Molitor began receiving robocalls on his cellular telephone number from defendants, all of which feature the prerecorded voice of Defendant Manasseh.

**Answer**: Denied.

35.     Plaintiff Molitor received more than 50 of these robocalls from, at a minimum, the telephone numbers (203) 548-9311 and (203) 672-9236. *See* Figure 4, below (showing specific call dates and times). [Figure 4 is omitted in this Answer.]

**Answer**: Denied.

36.     Plaintiff Molitor answered several of these calls and let others go to his voicemail. Each call featured a prerecorded message substantially similar to the other prosperity robocalls alleged throughout this Complaint, with instructions to call certain numbers back, including the number (678) 405-9374. When Plaintiff Molitor called this particular number in an attempt to stop the robocalls and get an internal do-no-call list, he was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out.

**Answer**: Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 36 of the FAC and denies them on that basis..

37.     Plaintiff Molitor does not have a relationship with Manasseh or MJM has never provided either of them with his telephone number or with consent to call, and has made attempts to get them to stop calling. They continue calling anyways.

**Answer**: Denied.

38.     Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Molitor and similar consumers who have never consented to receive them.

**Answer**: Denied.

## FACTS SPECIFIC TO PLAINTIFF DE LA CABADA

39.     For at least two years, Plaintiff De la Cabada has received robocalls on her cellular telephone from Defendants, all of which feature the prerecorded voice of Defendant Manasseh. Each prerecorded message was preceded by a pause before the recording began.

**Answer:** Denied.

40.     Since September 2015 alone, Plaintiff De la Cabada has received more than 108 of these robocalls from, at a minimum, 20 distinct telephone numbers, including, inter alia: (704)

257-3531; (510) 275-1830; (800) 422-5590; (800) 203-0028; (213) 375-0371; (917) 728-1013;(800) 352-3407; (206) 209-1337; (917) 341-5318; (320) 207-9068; (917) 336-8793; (423) 794-2999; (917) 336-9082; (917) 391-0291; (917) 391-0695; (917) 391-0290; (480) 439-0194; (505) 359-6558; (917) 624-9877; (917) 391-0046; (917) 633-7378; and (917) 336-9146.

**Answer:** Denied.

41.     Additionally, since September 2015, Defendants left 74 recorded messages on Plaintiff De la Cabada's cellular device. Plaintiff De la Cabada was able to block approximately 34 calls, but she received hundreds of additional calls prior to that time.

**Answer:** Denied.

42.     Despite Plaintiff De la Cabada attempts to block Defendants calls, she has been unable to keep them from continuing to contact her. Specifically, when Plaintiff De la Cabada called in an attempt to get on an internal do-not-call list, she was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out. Even worse, Plaintiff De la Cabada was only able to reach a live person on one occasion, and when she was connected, that person feigned inability to hear her request to opt out of the calls.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 42 of the FAC and denies them on that basis.

43.     Plaintiff De la Cabada's young child has severe health complications, and she makes it her regular practice to answer phone calls even from unrecognized numbers to ensure her child's safety and welfare are intact. Her heart jumps every time her cellphone rings. As such, Defendants' continuous and unrelenting calls are not only time consuming and distressing, they constitute harassment.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 43 of the FAC and denies them on that basis.

44.     Plaintiff De la Cabada does not have a relationship with Manasseh or MJM, has never provided either of them with her telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, Defendants continue calling anyways without regard to her requests that the calls cease. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff De la Cabada and similar consumers who have never consented to receive them.

**Answer:** Denied.

## FACTS SPECIFIC TO PLAINTIFF CLARKE

45.     Since December 7, 2015, Defendants made at least 14 calls to Plaintiff Clarke's cellular telephone using an autodialer and an artificial or prerecorded voice. Each pre-recorded message was preceded by a pause before the recording began.

**Answer:** Denied.

46.     For example, Defendants called Plaintiff Clarke's cellular telephone with a pre-recorded message every week over the course of at least seven weeks, even after he asked them to stop calling. The following chart shows several of the dates and times that Defendants called Mr. Clarke's cellular telephone number from their (800) 352-3407 number. See <u>Figure 5</u>, below (showing specific call dates and times). [Figure 5 is omitted in this Answer.]

**Answer:** Denied.

47.     Defendants called Mr. Clarke at least 14 times using an autodialer and/or an artificial prerecorded voice without his prior express written consent.

**Answer:** Denied.

48.     Plaintiff Clarke does not have a relationship with Manasseh or MJM, has never provided either of them with his telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, they continue calling anyways without regard to his requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Clarke and similar consumers who have never consented to receive them.

**Answer:** Denied.

49.     In fact, on March 11, 2016, Plaintiff Clarke filed a complaint (that has since been voluntarily dismissed without prejudice) in the Southern District of New York in an attempt to get Defendants to cease making these calls. *See Clarke, et al. v. Manasseh Jordan Ministries, Inc., et al.*, Civil Action No. 16-cv-01859. Despite that filing, Defendants have continued to call Mr. Clarke with an autodialer and/or an artificial prerecorded voice as recently as June 9, 2016.

**Answer:** Defendants admit Plaintiff Clarke filed the referenced complaint.  Except as

specifically admitted, Defendants deny the allegations of paragraph 49 of the FAC.

## <u>FACTS SPECIFIC TO PLAINTIFF MAKI</u>

50.     Plaintiff Maki was similarly harassed by Defendants, receiving multiple calls with prerecorded messages for several weeks. The following chart shows several of the dates and times that Defendants called Plaintiff Maki on her cellular telephone from their (800) 352-3407 number. See <u>Figure 6</u>, below (showing specific call dates and times). [Figure 6 is omitted in this Answer.]

**Answer:** Denied.

51.     Defendants called Plaintiff Maki on her cellular phone at least 6 times using an autodialer and an artificial or prerecorded voice, without her prior express written consent. Each prerecorded message was preceded by a pause before the recording began.

**Answer:** Denied.

52.     Defendants' unsolicited robocalls are regularly placed, *en masse*, to thousands of cellular telephone numbers without the consent of the call recipients. As demonstrated above, on December 7, 2015, Plaintiff Clarke and Plaintiff Maki received robocalls from Defendants only 5 minutes apart.  On December 9, 2015, they received unsolicited robocalls only two minutes apart.

**Answer:** Denied.

53.     Plaintiff Maki does not have a relationship with Manasseh or MJM, has never provided either of them with her telephone number or with consent to call, and has requested that they stop calling her by, among other things, filing a complaint in the Southern District of New York. *See Clarke, et al. v. Manasseh Jordan Ministries, Inc., et al.*, Civil Action No. 16-cv-01859. Defendants continue calling anyways without regard to her requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Maki and similar consumers who have never consented to receive them.

**Answer:** Defendants admit Plaintiff Maki filed the referenced complaint.  Except as

specifically admitted, Defendants deny the allegations of paragraph 53 of the FAC.

## CLASS ALLEGATIONS

54.     **Class Definition:**  Plaintiffs Molitor, De la Cabada, Clarke, and Maki bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and a class of similarly situated individuals , defined as follows:

> All persons in the United States to whom: (1) Defendants or their agents placed a call; (2) using computerized dialing equipment and/or that featured a prerecorded voice; (3) to his or her cellular telephone number, and (4) where Defendants have no record of prior express consent from him or her to place such call.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) personas who properly execute and file a timely request for exclusion from the Class; (4) personas whose claims in this matte have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors and assigns of any such excluded persons.

**Answer**: Defendants admit that Plaintiff is bringing this action as a putative class action.

Except as specifically admitted, Defendants deny the allegations of paragraph 54 of the

Complaint.

55.     **Numerosity:** The exact size of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants made telephone calls to thousands of consumers who fall into the definition of the Class. Members of the Class can be easily identified through Defendant's records.

**Answer**: Denied.

56.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a)     Whether Defendants' conduct violated the TCPA;

(b)     Whether Defendants systematically made telephone calls to consumers—including Plaintiff and the Class—who did not previously provide Defendants and/or their agents with their prior express consent to receive such telephone calls;

(c)     Whether Defendants systematically made telephone calls to consumers—including Plaintiff and the Class—featuring prerecorded voices; and

(d)     Whether Plaintiff and the members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

**Answer**: Denied.

57.     **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the members of the Class all sustained the same statutory injuries, aggravation, and invasion of privacy caused by Defendant's uniform wrongful conduct.

**Answer:** Denied.

58.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendants has [sic] no defenses unique to Plaintiff.

**Answer**: Denied.

59.     **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect each of the members of the Class uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

**Answer:** Denied.

60.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. In many cases, the damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for many of the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**Answer**: Denied.

## CAUSE OF ACTION
### Violations of 47 U.S.C. § 227(b)
### (On behalf of Plaintiff and the Class)

61.     Plaintiffs incorporates [sic] the foregoing allegations as if fully set forth herein.

**Answer**: Defendants incorporate by reference their responses to paragraphs 1-60 as if

fully set forth herein.

62.     Defendants placed unwanted telephone calls to Plaintiffs' and the Class Members' cellular telephone numbers without their prior express consent.

**Answer**: Denied.

63.     These calls featured prerecorded voices.

**Answer**: Denied.

64.     These calls were also placed using telephone dialing equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and/or to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without active human intervention.

**Answer:** Denied.

65.     By placing telephone calls to Plaintiffs' and the Class members' cellular telephone numbers, without prior express consent, and while utilizing automatic telephone dialing equipment and/or artificial or prerecorded voices, Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii).

**Answer**: Denied.

66.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class received unwanted and intrusive telephone calls, and suffered invasions of privacy, violations of their statutory rights, loss of time, and actual damages in the forms of wear and tear on their telephone equipment; consumed battery life; diminished use, enjoyment, value, and utility of their cellular telephone plans; and the loss of any cellular minutes consumed by such calls.

**Answer**: Denied.

67.     Accordingly, under 47 U.S.C. § 227(b)(3)(B), Plaintiffs and the members of the Class are each entitled to, *inter alia*, a minimum of $500 in statutory damages for each of Defendants' violations of the TCPA.

**Answer:** Denied.

68.     Because Defendants' conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiffs and the other members of the Class.

**Answer**: Denied.

## **PRAYER FOR RELIEF**

Defendants deny that Plaintiffs or the putative class are entitled to any of the relief set forth in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Defendants assert the following defenses, each as separate and distinct defenses to Plaintiffs' FAC. Insofar as any of the following expresses denial of any element of any claim alleged against Defendants, such expression does not indicate that Plaintiffs are relieved of their burden to prove each and every element of any such claims or that Defendants have assumed any burden of proof. Further, nothing in Defendants' affirmative defenses shall be construed to alter or shift to Defendants the burden of proof.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' FAC fails to state a claim upon which relief may be granted because the factual allegations are incomplete and/or do not state any factual bases which state a claim under the TCPA against either Mr. Jordan or the Ministry. Plaintiffs have failed to allege what party made the purported telephone calls, including whether or not Plaintiffs are basing liability upon a special relationship between the Ministry and/or Mr. Jordan and the actual entity or entities that allegedly called Plaintiffs, thereby giving rise to some theory of liability by the Ministry and/or Mr. Jordan for the alleged telephone calls.[2] Therefore, these allegations are not enough to raise a right to relief above the speculative level.[3]

---

[2] *See Schaffer v. A.O. Smith Harvestore Prods., Inc.,* 74 F.3d 722, 731 (6th Cir. 1996) (approving the district court's finding that separate entities are "entitled to be treated as such" and granting summary judgment for defendant upon plaintiff's failure to allege a theory of vicarious liability linking defendant to the acts alleged in the complaint).

[3] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007); *Watts v. Florida Int'l Univ.*, 495 F.3d 1289 (11th Cir. 2007).

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims under the TCPA are barred because Plaintiffs gave their prior express consent for the Ministry to call their cellular telephones, and such consent was never validly revoked.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs lack standing to assert their claims against Defendants.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, and none being admitted, were not caused by Defendants, but were caused by another person or entity. Defendants are not responsible for these parties and exercise no control and/or has no right to control over their activities.

## FIFTH AFFIRMATIVE DEFENSE

Defendants are entitled to a set-off against any damage awarded to Plaintiffs for any and all payments made by any collateral source.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims must be denied to the extent some or all the alleged calls described in their FAC were in fact made by the Ministry to a "landline" telephone, instead of Plaintiffs' cellular telephones, and were therefore not prohibited by the TCPA under its exemption for tax-exempt nonprofit organizations.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrines of estoppel and unclean hands. Upon information and belief, Plaintiffs solicited the alleged calls described in the FAC for the purpose of generating a TCPA lawsuit against the Ministry and Mr. Jordan by furnishing the Ministry with their cellular telephone numbers and representing the numbers as a landline telephone

number. Defendants relied to their detriment upon Plaintiffs' representations, to the extent they made alleged calls to Plaintiffs' cellular telephone numbers based upon the mistaken belief they were landline telephone numbers, to which calls are not prohibited by the TCPA under the Ministry's exemption for tax-exempt nonprofit organizations.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' requests for injunctive relief are moot because the acts complained of in the FAC have ceased and have no reasonable likelihood of recurring.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' requests for the imposition of statutory damages would be so punitive and disproportionate to the gravity of the violations alleged in the FAC as to amount to a violation of the Due Process provisions of both the United States Constitution and the Illinois Constitution.

## TENTH AFFIRMATIVE DEFENSE

To the extent calls were made to Plaintiffs' cellular telephones, which Defendants do not admit, Plaintiffs' claims should be barred as a matter of public policy because the Ministry is a tax-exempt nonprofit organization and was not calling Plaintiffs for the purpose of selling goods or services but merely to further its charitable mission of promoting Christianity.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because neither the Ministry nor Mr. Jordan use an automatic telephone dialing system, as defined under the TCPA, and no automatic telephone dialing system was used to contact Plaintiffs.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent the TCPA, facially and/or as applied to them in this case, violates Defendants' rights under the First Amendment to free speech and free exercise of religion.

## THIRTEENTH AFFIRMATIVE DEFENSE

To the extent any provision of the TCPA was violated as a result of a purported revocation of consent from Plaintiffs, Plaintiffs' damages, if any, would be limited to the number of purported calls which took place after Plaintiffs actually revoked their consent.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Plaintiffs directed, encouraged, consented to, ratified, or acquiesced to all of the alleged actions of the Ministry or Mr. Jordan, and they are not entitled to any relief for communications he expressly requested and authorized.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because they allege a mere technical violation of the TCPA and fail to allege any actual, concrete injury-in-fact.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have not alleged any plausible facts to establish that Defendants have acted intentionally, maliciously, willfully, knowingly, recklessly, negligently, or under a false pretense in any of their alleged conduct, and therefore Plaintiffs are barred from recovering treble damages under the TCPA.

## SEVENTEENTH AFFIRMATIVE DEFENSE

To the extent Defendants engaged in any conduct which may have violated any provision of the TCPA, such violation was unintentional, accidental, and as a result of a bona fide error

which occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such error and ensure compliance with all applicable statutory, regulatory, and common law requirements. Accordingly, Defendants assert their good faith compliance as a defense to Plaintiffs' claims for punitive damages and treble damages for alleged willing or knowing violations of the TCPA.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Defendants complied with all applicable statutory, regulatory, and common law requirements and, accordingly, Plaintiffs' claims are barred.

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate their damages, if any, based in part on Plaintiffs' failure to notify the caller(s) that calls were made to their cellular telephones and on their failure to request that the calls cease.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims arise solely from alleged corporate acts of the Ministry and their claims against Mr. Jordan must be dismissed because Mr. Jordan did not participate in, or authorize, alleged corporate acts of the Ministry in violation of the TCPA, and Mr. Jordan did not personally direct and control the policies and practices of the Ministry with respect to the TCPA, as necessary to impose personal liability on him for alleged violations of the TCPA by the Ministry.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case, and hereby reserve the right to amend this answer and offer or assert additional defenses that cannot now be articulated because, among other reasons, Defendants have not conducted discovery.

**WHEREFORE**, Defendants pray that:

A.      Plaintiffs' FAC be dismissed in its entirety with prejudice;

B.      Plaintiffs and members of the putative class take nothing by this action;

C.      Defendants be awarded their expenses and costs incurred in defense of this action, including their attorneys' fees to the extent permitted by law; and

D.      Defendants be awarded such other relief as the Court deems just and proper.


                                    Respectfully submitted,

Dated: July 11, 2016                **VENABLE LLP**

                        By:     /s/ Daniel S. Silverman
                                Daniel S. Silverman (appearing *pro hac vice*)
                                **Venable LLP**
                                2049 Century Park East, Suite 2100
                                Los Angeles, CA 90067
                                dsilverman@venable.com
                                Tel.: (310) 229-9900
                                Fax: (310) 229-9901

                                **ROESER BUCHEIT & GRAHAM LLC**

                        By:     /s/ Darrell J. Graham
                                Darrell J. Graham
                                John E. Bucheit
                                **Roeser Bucheit & Graham LLC**
                                2 N. Riverside Plaza, Ste. 1420
                                Chicago, IL  60606
                                (312) 621-0301
                                *Attorneys for Defendants*
                                MANASSEH JORDAN MINISTRIES,
                                INC. and YAKIM MANASSEH JORDAN

<u>**CERTIFICATE OF SERVICE**</u>

I, Darrell J. Graham, hereby certify that on this 11th day of July 2016, a copy of the

foregoing **DEFENDANT MANASSEH JORDAN MINISTRIES, INC.'S AND YAKIM**

**MANASSEH JORDAN'S ANSWER TO PLAINTIFF'S FIRST AMENDED CLASS**

**ACTION COMPLAINT** was served via the Court's ECF system and Email and to the address

listed below:

EDELSON PC
Rafey S. Balabanian
Banjamin H. Richman
Eve-Lynn Rapp
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Email: rbalabanian@edelson.com
Tel: (312) 589-6370
Fax: (312) 589-6378
Firm ID: 44146

*Counsel for Plaintiff*
JEFFREY MOLITOR,
individually and on behalf of all others
similarly situated

/s/ Darrell J. Graham
*Attorney for Defendants*
MANASSEH JORDAN MINISTRIES,
INC. and YAKIM MANASSEH JORDAN