# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JEFFREY MOLITOR, LAURA C. DE LA CABADA, STEVE CLARKE, and RUTH MAKI, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>MANASSEH JORDAN MINISTRIES, INC., a New York Religious Corporation, YAKIM MANASSEH JORDAN, an individual, KINGDOM MINISTRIES CHURCH, INC., a Georgia Nonprofit Corporation, and ROBERT SEIBEL, an individual,<br><br>*Defendants.* | Case No. 1:16-cv-02106<br><br>Honorable Charles R. Norgle, Sr.<br><br><br>**SECOND AMENDED**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

## SECOND AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs, Jeffrey Molitor, Laura C. De la Cabada, Steve Clarke, and Ruth Maki (collectively, "Plaintiffs") bring this Second Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants Manasseh Jordan Ministries, Inc. ("MJM"), Yakim Manasseh Jordan ("Manasseh"), Kingdom Ministries Church, Inc. ("Kingdom"), and Robert Seibel, ("Seibel" and, together with MJM, Manasseh, and Kingdom, "Defendants") to put a stop to the incessant and abusive spam robocalling practices they have perpetrated for years, *ad nauseum*, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

**NATURE OF THE ACTION**

1.     Despite thousands of consumer complaints, an FCC citation, and multiple news articles decrying their practices, the Jordan family continues to place unsolicited robocalls to cellular telephones nationwide, by the thousands, in ways that routinely collect money from those most in need.

2.     By all accounts, these robocalls are extremely profitable. Defendant Manasseh Jordan, a 25-year-old self-identified "prophet,"[1] lives a lavish lifestyle that includes multi-million dollar homes and Rolls Royce cars. These expenditures are largely funded through "seed-faith" money donated to his "nonprofit" corporation, MJM, and/or his father's corporation, Zoe Ministries, Inc. ("ZMI"). As will be made clear through this Complaint and subsequent discovery, Manasseh and his father partner to use MJM and ZMI as sham corporations and alter-egos so that they can commit willful torts for their own personal gain, all in abuse of the Religious Corporation structure set forth by the State of New York.

3.     Similarly, Manasseh and Robert Seibel—his business associate and attorney for Manasseh and MJM—are using both MJM and a related shell corporation, Kingdom Ministries, to shelter millions of dollars in cash, real estate, and other property. While Kingdom is purportedly a church run by Pastor David Few, Jr., Kingdom does not appear to conduct regular services or verifiable public events, supposedly maintains its principle place of business in a strip mall (whose residents claim never to have heard of Kingdom), lists its Florida office as Robert Seibel's business address, regularly ignores its own bylaws, and otherwise fails to observe corporate formalities. Despite this, Kingdom somehow accumulated over $3 million in revenue

---

[1]     Manasseh Jordan Ministries, *About the Prophet*, http://prophetmanasseh.com/aboutprophet (last accessed Sept. 28, 2015).

and over $1 million in expenses from January 2016 through July 2017. The purpose of this shell is simple: to hide Defendants' assets. As explained in this Complaint, Kingdom is deeply intertwined with Manasseh, Seibel, and MJM.

4.     Defendants use robocalling to constantly find new donors and generate new lines of revenue. Despite agreeing to no fewer than nine *individual* TCPA settlements over the past three years,[2] Defendants still find it worthwhile to continue using Manasseh's voice to make prerecorded calls. Defendant Manasseh uses his alter egos, MJM and Kingdom, to knowingly break the law and repeatedly violate the TCPA, all to increase his personal wealth at the expense of non-consenting consumers. Defendant Seibel, who notably has power of attorney over Defendant Manasseh, does the same.

5.     Indeed, Defendants and/or their agents regularly place robocalls, *en masse*, to the cellphone numbers of people who simply do not want them and never requested them. One

---

[2]     At the time of filing Plaintiff Molitor's original complaint, this was at least the seventh TCPA lawsuit filed this year (and the fourteenth since 2012) complaining of robocalls that feature the prerecorded voice of Defendant Manasseh. All but one—an individual suit—have settled individually or have otherwise ended. *See Bankosz v. Manasseh Jordan Ministries et al.*, 6:15-cv-01182 (M.D. Fla. July 22, 2015); *Carter v. Manasseh Jordan Ministries*, 2:15-cv-14237 (S.D. Fla. June 30, 2015); *Cotto v. Manasseh Jordan Ministries et al.*, 6:15-cv-00741 (M.D. Fla. May 8, 2015); *Robles v. Manasseh Jordan Ministries et al.*, 8:15-cv-00789 (M.D. Fla. April 2, 2015), *Bundrage v. Jordan et al.*, 8:15-cv-00618 (M.D. Fla. March 20, 2015), *Linlor v. Manasseh Jordan Ministries*, 3:15-cv-00032 (S.D. Cal. Jan. 7, 2015); *Rice v. Manasseh Jordan Ministries*, 8:14-cv-02921 (M.D. Fla. Nov. 21, 2014); *Friedman v. The Prophet Manasseh Jordan Ministries*, 1:14-cv-03129 (S.D.N.Y. May 2, 2014); *Lemberg v. Manasseh Jordan Ministries*, 3:14-cv-00240 (D. Conn. Feb. 26, 2014); *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013); *Bontrager v. The Prophet Manasseh Jordan*, 2:13-cv-01853 (E.D. Cal. Sept. 6, 2013); *Ferguson v. The Prophet Manasseh Jordan Ministries*, 5:13-cv-02463 (N.D. Cal. May 31, 2013); *Alexander et al v. The Prophet Manasseh Jordan Ministries*, 3:12-cv-02584 (S.D. Cal. Oct. 23, 2012). Nevertheless, Defendants' calls continue and Plaintiffs now bring the instant class action to conserve judicial resources and increase efficiency.

newspaper article from February of 2015 states:

> "I have heard from a person who considers me his dearest friend. He has told me so more than 100 times, even though I've never met him. His name is Manasseh Jordan, and he calls himself Prophet Manasseh. He calls me frequently because he is so concerned about me. He especially is worried about my finances and says he has special messages for me from God. . . .
>
> One thing I'm certain about: I'm not the only one being harassed by these calls. I Googled 'Prophet Manasseh phone calls' and found sites filled with complaints by people who have tried to stop this harassment. . . .
>
> In the end, the only way to stop these calls may be to have my number changed. It shouldn't have to come to that."[3]

6.      Like thousands of others, Plaintiffs have long been subject to Defendants' abusive and incessant robocalling practices. And, like thousands of others, Plaintiffs never invited Defendants to call. Nonetheless, Defendants regularly robocall their cellular telephone numbers, without their consent, and despite their attempts to stop and block their calls.

7.      By making the telephone calls at issue in this Complaint, Defendants caused Plaintiffs and the members of a putative Class of consumers (defined below) actual harm, including the aggravation, nuisance, wasted time, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing telephone calls, as well as the monies paid to their carriers for the receipt of such telephone calls.

8.      The TCPA was enacted to protect consumers from unsolicited telephone calls exactly like those alleged in this case. In response to Defendants' unlawful conduct, Plaintiffs file the instant lawsuit and seek an injunction requiring Defendants to cease all unsolicited

---

[3]      Deitz, Harry. *Do Not Call List Does Not Work For Manasseh's Dearest Friend*. The Reading Eagle (Feb. 15, 2015) (available at http://www.readingeagle.com/news/article/harry-deitz-do-not-call-list-does-not-work-for-manassehs-dearest-friend) (last accessed Sept. 28, 2015).

telephone calling activities to consumers and an award of statutory damages to the members of the Class under the TCPA, together with costs and reasonable attorneys' fees.

## PARTIES

9.     Plaintiff Jeffrey Molitor is a natural person and citizen of the State of Illinois and resident of Cook County.

10.     Plaintiff Laura C. De la Cabada is a natural person and citizen of the State of New York residing in New York City.

11.     Plaintiff Steve Clarke is a natural person and citizen of the State of California residing in Grand Terrace.

12.     Plaintiff Ruth Maki is a natural person and citizen of the State of California residing in San Marcos.

13.     Defendant Yakim Manasseh Jordan is a natural person and a citizen of the United States. He has been associated with several residential properties at addresses in various states, including New York, Florida, Massachusetts, and New Jersey. He regularly travels through the United States to perform speaking arrangements and he regularly transacts business with and solicits payments from the citizens of Illinois, both in person and through robocalls. He has personally appeared in Cook County, Illinois, to hold a "Prophetic Service" as recently as June 28, 2015. He owns, directs, or otherwise controls Manasseh Jordan Ministries, Inc. and Kingdom Ministries Church, Inc.

14.     Defendant Robert Seibel is a natural person and a citizen of the United States. He is associated with several residential properties in Florida and New York. He regularly travels with Defendant Manasseh to attend events and speaking engagements throughout the United States, and regularly transacts business with and solicits payments from the citizens of Illinois,

through robocalls and otherwise through his control over Manasseh Jordan Ministries, Inc. He has also filed a *pro hac vice* appearance in the Northern District of Illinois on behalf of Defendants Manasseh and MJM in this case. He also directs or otherwise controls Manasseh Jordan Ministries, Inc. and Kingdom Ministries Church, Inc. as explained in further detail below.

15.     Defendant Manasseh Jordan Ministries, Inc. ("MJM"), is a New York Religious Corporation located at 310 Riverside Drive, New York, New York 10025. MJM shares its address with Zoe Ministries, Inc., a nonprofit that is owned, directed, or otherwise controlled by Manasseh's father, E. Bernard Jordan. MJM sponsored a "Prophetic Service" in Cook County, Illinois, as recently as June 28, 2015, and conducts business and solicits payments throughout Cook County, the State of Illinois, and the United States. As explained below, MJM operates as an alter ego of Defendants Kingdom Ministries Church, Inc., Manasseh, and Seibel.

16.     Defendant Kingdom Ministries Church, Inc. ("Kingdom"), is Georgia non-profit corporation located at 194 Jonesboro Road, Jonesboro, Georgia 30236. It has conducted business in the states of Georgia and Florida, and has solicited donations throughout the United States, including from Illinois citizens, through robocalls and otherwise through operating as MJM's alter ego. Both Kingdom and its agents conduct business throughout Cook County, the State of Illinois, and the United States. Kingdom has also previously appeared, through counsel, in the Northern District of Illinois to contest certain third party discovery in this case. As explained in this Complaint, Kingdom operates as an alter ego of Defendants MJM, Manasseh, and Seibel.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

18.     This Court has personal jurisdiction over Defendants and venue in this District is

proper under 28 U.S.C. § 1391(b) because Defendants transact business within this District, perform in-person services in this District, solicit a significant amount of payments from within this District, engage in other conduct intended to benefit their pecuniary interests within this District, and because some of the wrongful conduct giving rise to this case was directed to and caused injury in this District. Additionally, Plaintiff Molitor, an individual, is a resident of this District.

## COMMON FACTUAL ALLEGATIONS

### I.   MJM Incorporates Just After the FCC Cites ZMI for Robocalling.

19.    ZMI is a "nonprofit" organization owned, directed, or otherwise controlled by Defendant Manasseh's father, E. Bernard Jordan ("Jordan").

20.    ZMI and Jordan pioneered the profitable prosperity pitch later adopted by Manasseh and MJM. As the Times Herald-Record once wrote,"[o]ver the years, preaching a gospel of prosperity and self-empowerment, Jordan built Zoe Ministries into a multimedia enterprise that collected $2.8 million from its loyal following in 2001. 'We live to give,' Jordan teaches his followers to say. And give they do." [4]

21.    "Jordan makes no apologies for his mansion and fleet of cars, which includes a Rolls-Royce and a Mercedes-Benz SUV." *Id*. Indeed, through nonprofit funds, Jordan once commissioned a team of Russian artists to paint, over the course of "two to three years," elaborate murals of himself throughout his "27-room mansion," including "Jordan on a throne, as pharaoh," "Jordan as Jesus in the familiar iconography of medieval and Renaissance art," and,

---

[4]    McKenna, Chris. *The Prophet of Profit Sows the Seeds of Wealth*. Times Herald-Record (Sept. 14, 2003) (available at http://www.recordonline.com/article/20030914/news/309149999) (last accessed Sept. 28, 2015).

"in a room with scarlet walls and gilded filigree on top . . . Jordan on a throne, as God." *Id.*

22. To maintain this lavish lifestyle, Jordan started reaching beyond the pockets of his immediate following. Specifically, he started using robocalls, *en masse*, to barge into the living rooms of consumers nationwide and seek fresh lines of revenues. Naturally, consumers complained:

> "We would get a phone call for each one of us, one right after the other. Way too annoying! I asked through email to be removed off there [*sic*] emailing list, calling list and mail list in [*sic*] behalf of my son (13yrs. old), my husband and myself. . . . So far nothing has worked for me. I emailed them repeatedly to remove me and to knock it off, I have sent back all mail (return to sender/no longer lives here) and tried calling with no solution. All the numbers they list are for you to give money or what they call seed. They are driving me crazy. I don't know what else to do. I just want them to leave me alone."[5]

23. As a result of consumer complaints, the Federal Communications Commission ("FCC") issued a citation letter to ZMI and Jordan for "prerecorded and autodialed call message violations."[6] It noted that "[i]f, after receipt of this citation, you or your company violates the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or each day of a continuing violation." *Id.*

24. With such a daunting threat looming, Jordan turned to his family to provide an alternative solution. As a result, within two months of the FCC citation, three of Jordan's

---

[5]      Ripoff Report, *Report Against Zoe Ministries and Bishop E. Bernard Jordan*, http://www.ripoffreport.com/r/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-E-Bernard-Jordan/New-York-New-York/Zoe-Ministries-Bishop-Jordan-Bishop-E-Bernard-Jordan-Email-Spam-Spamers-Repeated-T-235642 (last accessed Sept. 28, 2015).

[6]      *See* <u>FCC Citation</u>, attached as Exhibit A.

children (including Manasseh), along with ZMI Prophet Charlie Berrian (a close family friend), incorporated MJM, which was then used as a replacement robocalling vehicle.[7]

25.     This newly-incorporated entity overlapped substantially with ZMI. It assumed the same operating address (310 Riverside Drive, New York, New York 10025). Its trustees—all Jordan family members or close friends—were all actively involved with ZMI, with at least one using the same "@zoeministries.com" email address while doing business for MJM. At least one MJM trustee listed a ZMI-owned mansion as a home address. And of course, both MJM and ZMI enjoyed the same "non-profit" status, with MJM's Articles of Incorporation specifically stating that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered . . . ." *Id.*

26.     Most problematic for consumers, the new entity took over the same robocalling practices of ZMI, offering prerecorded prayers, prophesies, and miracles-for-hire, over the phone and outside the immediate scrutiny of the FCC.

27.     As such, and on information and belief, MJM and ZMI are alter-egos of each other and act as a single business entity, with one committing TCPA torts and the other sheltering the assets received from such torts. Moreover, this single entity exists to enable the partnership of Manasseh and Jordan to enrich itself through self-dealing and purposeful tortious conduct, and thus perverts the privilege of doing business in a corporate form. Indeed, Manasseh largely exercises his domination over MJM to place the same types of robocalls ZMI previously

---

[7]     *See* Articles of Incorporation, attached as Exhibit B.

placed, all to profit while avoiding compliance with the TCPA and potential liability from ZMI's FCC citation. Additionally, on information and belief, both MJM and ZMI intermingle and manipulate assets, such that their assets concentrate under ZMI, Manasseh, and Jordan while their TCPA tort liabilities concentrate under MJM. This leaves MJM undercapitalized for the TCPA liabilities it purposefully accrues. As such, MJM generates proceeds through illegal robocalling while attempting to artificially limit the recovery available to the thousands of innocent consumers who never consented to interact with MJM and who are repeatedly harmed by its tortious conduct. Consequently, and as a direct result of Manasseh's wrongful domination of MJM, Manasseh is enriched while consumers are harmed.

28.     Further, on information and belief, both MJM and ZMI have non-functioning trustees that allow Manasseh and Jordan, as partners, to siphon off corporate assets for their own personal use, at will. The entities have failed to maintain arm's length relationships with their executives, as MJM and ZMI provide Manasseh and Jordan with salaries and perquisites that far exceed the reasonable market value of services legally provided. This directly contravenes the non-profit purposes for which such entities were purportedly created and reflects self-dealing as opposed to honest and disinterested transacting. Indeed, Manasseh and Jordan treat the assets of MJM and ZMI as their own personal assets, living in the homes[8] and driving the cars[9] provided

---

[8]     For instance, homes associated with the 25-year-old Defendant Manasseh include a nine-bedroom mansion in Tuxedo, New York; a six-bedroom mansion in North Miami Beach, Florida; a Ritz Carlton residential condominium in Boston, Massachusetts; a 12,000+ square foot house in Saddle River, New Jersey; and several beachfront condominiums in Sunny Isles Beach, Florida.

[9]     For instance, cars associated with the 25-year-old Defendant Manasseh include a 2014 Rolls Royce Wraith with an original MSRP in excess of $350,000; a 2012 Rolls Royce Ghost with an original MSRP in excess of $290,000; a 2010 Bentley Continental with an original MSRP in excess of $267,000; a 2009 Mercedes-Benz AMG with an original MSRP in excess of $130,000; and a 2004 Rolls-Royce Phantom with an original MSRP in excess of $320,000.

to them directly (or indirectly through excessive salaries) by such entities.

## II. Prophet Manasseh and MJM Continue Selling Prerecorded Prosperity, Making Robocalls to Cellphone Numbers.

29.    Manasseh himself claims to be a prophet of the Prophetic Order of Mar Elijah ("P.O.M.E."), another organization created and overseen by his father, "Master Prophet" E. Bernard Jordan.[10] Manasseh has appeared several times on religiously-themed television programs, including some shows hosted by his father and others by televangelist Benny Hinn, to preach what is commonly known as the "prosperity gospel."[11] Specifically, Manasseh solicits millions of dollars from people in need, commonly known as "seed-faith," which he promises will purchase "favor" from God. *See*, *e.g.*, *False Prophet Manasseh Jordan Exposed*, at 2:46-3:21 (showing Manasseh telling viewers who "need God to change their season" to "sow a $52

---

[10]    "Master Prophet E. Bernard Jordan is the overseer of the Company of Prophets and P.O.M.E." "[A]s you continue to worship God with your offerings up to $1000, you will be given the opportunity to have access to more advanced teaching materials and assignments and you move up to Level 3, becoming a Silver Member. . . . When you have completed a total of $3,000, you have moved up to Level 4, and you are now a Gold Member. You are just about there. . . . When you have planted your seeds totaling $5,000, you are eligible to attend the next Prophecology meeting where you will make sacred vows unto God in the presence of the Master Prophet and other P.O.M.E. members and be inducted into the Prophetic Order of Mar Elijah." *See* Prophecology, *Why P.O.M.E.?*, and *Are You Called?*, available at http://prophecology.com/ theme/arialist/layout/why_pome.html and http://prophecology.com/are_ you_called.php (last accessed Sept. 28, 2015).

[11]    The ethics and merits of televangelism and the prosperity gospel are subjects of continuing public commentary. *See*, *e.g.*, *Last Week Tonight with John Oliver: Televangelists*, available at https://www.youtube.com/watch?v=7y1xJAVZxXg (published Aug. 16, 2015) (last accessed Sept. 28, 2015).

seed for 52 weeks of favor.");[12] *see also* <u>Figures 1 and 2</u>, below (same); *cf.* <u>Figure 3</u>, below (showing Manasseh's father and business partner, Jordan, making the same request).



**Figure 1** (Manasseh, requesting $52 "seed").



**Figure 2** (same).



**Figure 3** (E. Bernard Jordan, also requesting $52 "seed").

30. The "prosperity gospel" inherently targets struggling socio-economic groups, including the unemployed, the under employed, the elderly, the disabled, and single mothers, among many others struggling to make ends meet—in other words, those most susceptible to

---

[12] Available at https://www.youtube.com/watch?v=bSxEr5TXa1U. *See also id*. at 3:20-3:33 (stating "[y]ou need to walk into this abundance. I want you to get on the phone *right no*w. I want you to rush to it *right now*. I want you to move quickly to it *right now*. I want you to stop what you are doing. And I want you to give $52, $52, 52 weeks of favor")

(and in need of) the promises of good fortune made by Defendants.[13] To persuade these individuals to give him as much money as possible, Manasseh routinely manufactures stories that tie miracles to money payments, often indicating that the needy can trigger such miracles by giving their "best seed."

31. For example, the day after voting to incorporate MJM, Manasseh appeared before a crowd and said:

> "**I'll never forget** that I was in **Texas** . . . and I looked at a woman, and she **sowed a seed of $1,000**. I said, . . . '**God tells me that he's touching Glenda**.' . . . . [They said] '**Glenda** died a couple hours ago.'. . . . [But then] the hospital called, and they said that 'Your mother, that died a couple hours ago, came back to life.' They said, to the **Johnson** family . . . that she heard a man calling her name. The prophet is able to speak to something dead, and bring life where death is."[14] [Emphasis added].

32. A few months later, Manasseh told the same story to another crowd, simply inserting new first names and new dollar amounts:

> "**I'll never forget** I was in San Antonio, **Texas**, a couple came up, they **sowed $2,000**; . . . I said '**God is touching Kathy**.' . . . . [But their pastor said] 'prophet, his mother's name is **Kathy** and was just declared dead a few hours ago.' . . . . [But then] they get a phone call through his doctor, the doctor says '**Mr. Johnson** . . . . Your momma **Kathy** just woke up and said she heard a man's voice. . . . [S]he heard a man call her name. . . .' When there is a prophetic anointing, anything that is dead must come back to life."[15] [Emphasis added].

33. Not surprisingly, Manasseh uses the same money-for-miracles storytelling

---

[13]    *See, e.g., The Prophet of Profit, supra* n.6 ("'You sow money, you're going to reap money,' explains [Manasseh's father], seated on a red velvet couch near the foyer of his three-story mansion.")

[14]    *Manasseh Jordan Lying Wonder*, https://www.youtube.com/watch?v=hKBISUwXoNc, at 0:43-2:22.

[15]    *Id*. at 2:50-5:49.

techniques in his prerecorded calls. For example, he has told thousands of call recipients, in his own prerecorded voice, "the Lord spoke to me personally about you. I must speak to you. I'm going to pass the phone to my blessed assistant and he's [going to] give you my blessed number so that you can call me back so that you can hear this blessed word."[16] That "blessed word," in turn, is a ten-minute recording from Manasseh, implying, among other things, that people who pay him their "best seed" while facing foreclosure or living below poverty will get free-and-clear homes and million-dollar business contracts:

> "What about the woman by the name of Evelyn, that was losing her home, her home was in foreclosure, she didn't know what to do, but she would get these phone calls, she would get these phone calls, and she began to prove God with her faith, and she would do her best seed, adding the change amount, and she got the call from CitiBank, and they said they forgave her for the loan, and that she owned the home free and clear. What about the lady that had a cleaning business that was living below poverty. . . . She would sow and sow week after week, and God released to her $1,300,000 worth of a commercial contract . . . . I want you now to step out and sow faith with your prosperity seed of $45 or $145 or your best seed of $20.45, the $345, the $545 seed, the $10.45 . . . . [W]atch [God] to begin to shower you with blessings, an anointing of prosperity will instantly begin to flow upon you . . . ."[17]

34.     Unfortunately, Manasseh, through MJM, placed thousands of these prerecorded phone calls to the cellphones of consumers who did not consent to be called and who have *never* interacted with Defendants in any way whatsoever. This has led to significant consumer

---

[16]     *See Do Not Call List Does Not Work*, *supra* n.5.

[17]     This prerecorded message plays when calling the number (770) 728-6113 (last accessed Sept. 28, 2015).

backlash, as evidenced by legions of online complaints:[18]

- "He has been calling me since 10/2014 and he has 31 different #'s and has called at least 172 times. SO SICK OF IT!!"

- "I receive at least 1 to 2 calls a day from a automated service from a Prophet Manasseh, I have removed myself from the calling list that I never put myself on at least 50 times and still get the calls. I have blocked the number but they are still able to leave a very long annoying voicemail. I have also emailed them and left voicemails begging them to stop calling but it still continues. What do I have to do to make it stop."

- "You can't get off this call list. If you're on a mobile phone, you just need to continue to block the numbers every time this idiot calls. I'm up to 7 phone numbers blocked under his name. Prophet Manasseh Jordan Ministries."

- "I once got two calls in a two hour time period from two different states! I have been so frustrated by these calls, I actually got my phone # changed."

- "I have sent numerous messages and text messages as well saying stop please stop even threatened to call the authorities on the show called prophet Manasseh my children answer my phone and one day hear him going off on a rant it scares them to death and we respectively text messaged back the number he called me on and the guy just doesn't take no for an answer he calls and calls and calls."

- "I too continue to get calls. This is a minutes phone and they have run down my [sic] drastically. To think I am paying for these calls!"

- "Five Hundred robo calls from five different numbers with the same Prophet Manassah recording in the past fifteen months. How does one stop this scammer?"

35.    Manasseh directly participates in these calls by recording his voice and by

directing MJM, over which he exercises full domination and control, to transmit these voice

---

[18]    These are just a small sampling of the approximately 600 online complaints placed on just one website concerning just one of the many Prophet Manasseh / MJM phone numbers. *See 800notes.com,* http://800notes.com/Phone.aspx/1-800-318-7853 (last visited Sept. 28, 2015).

recordings through automated telephone calls, all in knowing violation of the TCPA. Indeed, Manasseh has specifically admitted in court filings, concurrently with MJM, to having "sent prerecorded calls to people,"[19] and yet continues to have such calls placed on his behalf and for his personal enrichment.

36.     As such, Manasseh and MJM knowingly placed (and continue to place) prerecorded calls to cellphone numbers without the prior express consent of the call recipients. Likewise, they continue to do so after receiving requests to stop, including at least *thirteen* individual TCPA lawsuits. As such, Manasseh and MJM not only invaded the personal privacy of Plaintiffs and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

### III.     Manasseh and MJM's Connections to Robert Seibel and Kingdom Ministries.

37.     ZMI isn't the only ministry that appears to blatantly overlap with MJM. MJM also has numerous operational and fiscal ties to another ministry, Kingdom Ministries. Not only that, but there appears to be a certain individual who exercises control over the affairs of MJM, Kingdom Ministries, and Defendant Manasseh, combined: Defendant Robert Seibel. On information and belief, Defendant Seibel controls the business affairs of MJM and Kingdom Ministries. Defendant Seibel also exercises power of attorney over Defendant Manasseh.

38.     Not content to confine their activities to MJM, Manasseh and Seibel have created a separate shell entity—Kingdom Ministries—in which to stash MJM's assets, including money tied to MJM and Manasseh's alleged TCPA violations.

39.     Kingdom Ministries is a registered 501(c)(3) non-profit entity that was

---

[19]     See Answer of Defendants Manasseh Jordan Ministries and Yakim Manasseh Jordan to Class Action Complaint at ¶¶ 18–23, *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013).

incorporated in the state of Georgia in December 2015. Its stated mission is to share a belief in Christ, as well as to share that belief with the community at large. It is purportedly led by Pastor David Few, Jr., who also serves as Kingdom's CEO and a director on its board of directors, alongside—until recently—former Kingdom secretary and treasurer Robert Seibel.

40.    Kingdom Ministries' office address is listed as 194 Jonesboro Road in Jonesboro, Georgia, in a strip mall whose other residents have never heard of Kingdom Ministries. *See* Figure 4, below.[20]



**Figure 4** (Google Maps Street View of 194 Jonesboro Road, Jonesboro, Georgia).

41.    Kingdom Ministries' website is similarly suspect. It contains photographs of churches with no known affiliation to Kingdom, as well as false articles about Kingdom's so-

---

[20]    Available at https://www.google.com/maps/place/194+Jonesboro+Rd,+Jonesboro,+GA+ 30236/@33.5371793,-84.3530319,17z/data=!3m1!4b1!4m5!3m4!1s0x88f4f97ee543f3 ff:0xf3c34b78d9a96baa!8m2!3d33.5371793!4d-84.3508432.

called activities, such as a groundbreaking for a Mormon church in Colombia. The website currently contains no contact information and no address for Kingdom's supposed office(s) or church(es). It claims to provide links to Kingdom's social media pages, but those links are either inoperative or direct to the accounts of other persons or businesses, including a Twitter account that has not been used since 2012. *See* Figures 5,[21] 6,[22] 7,[23] and 8,[24] below.



**Figure 5** (Kingdom Ministries website screenshot referencing supposed social media accounts).

---

[21]     Available at kingdommchurch.com/contact/wearesocial (last visited Nov. 22, 2017).

[22]     Available at https://www.linkedin.com\company/2323297 (last visited Nov. 22, 2017).

[23]     Available at https://twitter.com/kingdomchurch (last visited Nov. 22, 2017).

[24]     Available at https://facebook.com/kingdom.church (last visited Nov. 22, 2017).



**Figure 6** (LinkedIn account linked from Kingdom Ministries' social media page).



**Figure 7** (Twitter account linked from Kingdom Ministries' social media page).



**Figure 8** (Facebook account linked from Kingdom Ministries' social media page).

42.     The only part of Kingdom's website that appears to be fully fleshed out is its

donation page, which contains language identical to MJM's donation page and which, at one

point in time, actually contained references to MJM and Defendant Manasseh and listed

Kingdom's contact information as being the same as MJM's. *See* Figures 9-10, below.



**Figure 9** (Internet Archive Screen Shot of Kingdom Ministries' Donations Page, taken

from August 7, 2016.)[25]



**Figure 10** (Internet Archive Screen Shot from MJM's Donation Page, taken from March 3, 2017).[26]

43.    For most of the past year, the online portal for Kingdom Ministries contained no contact information, no listed events, and no description of the church on its "History of the Church" page. Recent changes have added a description of the Church's history, and retroactively added several events from last year. However, these additions include no description of the events itself, include no location information for the events, and no contact information for those interested in participating. *See* Figure 11, below.

---

[25]    Available at https://web.archive.org/web/20160807064315/kingdommchurch.com/donations (last visited Nov. 28, 2017).

[26]    Available at https://web.archive.org/web/20170303063117/prophetmanasseh.com/donations (last visited Nov. 28, 2017).



**Figure 11** (Past Events Page from Kingdom Ministries' Website).[27]

44.     A prior version of Kingdom Ministries' "History of the Church" page *did* provide more detail about Kingdom. Specifically, on August 6, 2016, the page contained a description of Kingdom's leader, David Few, which included the following text:

> David Few is a Christian minister currently based in Boston. He has been involved in Christian Ministry all his life As a Christian he believes and testifies that Jesus Christ is the Son of God and there is no other way to salvation than through Him. His ministry and his life are based on this belief. **Prophet Manasseh appears weekly on BET's Morning inspiration.**

*See* Figure 12, below.

[27]     Available at kingdommchurch.com/events/pastevents (last visited Nov. 22, 2017).



**Figure 12** (Internet Archive Screen Shot from Kingdom Ministries' About the Church Page from August 6, 2016).[28]

45.     Kingdom's and Seibel's real estate activities also intersect with MJM and Manasseh. In June 2016, Kingdom Ministries purchased a six-bedroom mansion in a subdivision adjacent to an exclusive golf club, located at 12220 NW 68th Ct. in Parkland, Florida. Kingdom Ministries purchased the home on June 16, 2016 for $2.65 million. Despite Kingdom Ministries' June 2016 purchase of the mansion, Manasseh resided there over much of the next year.

46.     However, less than one year later on May 15, 2017—just one week after Kingdom Ministries was served with Plaintiffs' subpoenas for documents and a deposition— Kingdom directors David Few and Robert Seibel approved the sale of this property to a company, RAS Realty Management LLC ("RAS Realty"), for just under $1.4 million.

---

[28]     Available at https://web.archive.org/web/20160806044426/http://kingdommchurch.com:80/about/history (last visited Nov. 28, 2017).

47.     RAS Realty is a Florida company that was formed in January 2016 and is *solely managed by Robert Seibel*. Seibel's Boca Raton address is listed as RAS Realty's principal and mailing addresses; RAS Realty's registered agent, the firm of Spiegel & Utrera, P.A., also serves as Kingdom Ministries' registered agent in Florida. Indeed, prior to filing, Seibel represented to Plaintiffs' counsel that he currently owns the Parkland mansion located at 12220 NW 68th Ct. and claimed that Plaintiffs would never get to it as an asset in this litigation.

48.     This transaction also speaks to Kingdom's failure to adhere to corporate formalities. Kingdom's five-person board of directors has, in its two years of existence, met infrequently and its board meeting minutes are devoid of any activities related to its stated evangelist mission. Instead, its activities appear to have been limited to approving the Florida property transaction, addressing signatories to Kingdom's bank accounts (to which Seibel was a signatory until June of 2017), and dealing with several other legal documents. Kingdom's bylaws explicitly require at least three members on its board of directors at all times; however, records show that the decision to sell 12220 NW 68th Ct. was made by Seibel and Pastor David Few, Jr. alone.

49.     In addition, there is no record of one Kingdom director, its COO Shalanda Lakeshia Few (sister of Pastor and CEO David Few), having *ever* been appointed to Kingdom's board through the procedure set forth in its bylaws.

50.      Manasseh is heavily involved in Kingdom Ministries' operations as well. In addition to living in a mansion purchased by Kingdom, Manasseh often appears at Kingdom functions to preach (when they actually do occur). Moreover, Manasseh has referred to Kingdom Ministries' Pastor and CEO David Few as part of "his team" on social media. *See* Figure 13, below.



**Figure 13** (A photo from Yakim Manasseh Jordan's Instagram account depicting—from left to right—Manasseh, Kingdom CEO David Few, and an unknown individual. The caption states, in part, "I don't remember what they were showing me but it put a smile on my face . . . love *my team*") (emphasis added).[29]

51. As such, and on information and belief, MJM and Kingdom Ministries are alter-egos of each other and act as a single business entity, with one committing TCPA torts and the other sheltering the assets received from such torts. Moreover, these entities exist to enable the partnership of Defendant Manasseh and Defendant Seibel to enrich itself through self-dealing and purposeful tortious conduct, and thus perverts the privilege of doing business in a corporate form. Indeed, Defendants Manasseh and Seibel largely exercise their domination over Defendant MJM to place robocalls in order to profit while avoiding compliance with the TCPA, all the while sheltering assets from that enterprise in Kingdom Ministries to avoid potential liability.

[29]    Available at https://www.instagram.com/p/BRJRNcphB_d/?hl=en&taken-by=prophetmanasseh (last visited Nov. 28, 2017).

52.     Indeed, on information and belief, both MJM and Kingdom Ministries intermingle and manipulate assets, such that their assets concentrate under Kingdom Ministries and Defendant Seibel, while their TCPA tort liabilities concentrate under MJM. This leaves MJM undercapitalized for the TCPA liabilities it purposefully accrues. As such, MJM generates proceeds through illegal robocalling while attempting to artificially limit the recovery available to the thousands of innocent consumers who never consented to interact with MJM and who are repeatedly harmed by its tortious conduct. Consequently, and as a result of Defendant Manasseh's and Defendant Seibel's wrongful domination of MJM and Kingdom Ministries, Manasseh and Seibel are enriched while consumers are harmed.

53.     Further, on information and belief, both MJM and Kingdom Ministries have non-functioning corporate directors that allow Defendant Manasseh and Defendant Seibel to siphon off corporate assets for their own personal use, at will. The entities have failed to maintain arm's length relationships with their executives, as MJM and Kingdom Ministries provide Defendant Manasseh and Defendant Seibel with perquisites that far exceed the reasonable market value of services legally provided. This directly contravenes the non-profit purposes for which such entities were purportedly created and reflects self-dealing as opposed to honest and disinterested transacting. Indeed, Defendant Manasseh and Defendant Seibel treat the assets of MJM and Kingdom Ministries as their own personal assets, living in the homes and driving the cars provided to them directly by such entities.

## FACTS SPECIFIC TO PLAINTIFF MOLITOR

54.     Starting in May of 2015, Plaintiff Molitor began receiving robocalls on his cellular telephone number from Defendants, all of which feature the prerecorded voice of Defendant Manasseh.

55. Plaintiff Molitor received more than 50 of these robocalls from, at a minimum, the telephone numbers (203) 548-9311 and (203) 672-9236. *See* <u>Figure 14</u>, below (showing specific call dates and times).

| Date | Time | Number |
|------|------|--------|
| 5/5/15 | 5:46 PM | (203) 548-9311 |
| 5/12/15 | 6:45 PM | (203) 548-9311 |
| 5/16/15 | 2:25 PM | (203) 672-9236 |
| 5/20/15 | 2:06 PM | (203) 548-9311 |
| 5/23/15 | 8:17 PM | (203) 672-9236 |
| 5/27/15 | 11:54 AM | (203) 548-9311 |
| 5/29/15 | 3:08 PM | (203) 672-9236 |
| 6/4/15 | 1:59 PM | (203) 672-9236 |
| 6/5/15 | 4:34 PM | (203) 548-9311 |
| 6/9/15 | 2:09 PM | (203) 672-9236 |
| 6/12/15 | 6:32 PM | (203) 548-9311 |
| 6/16/15 | 4:11 PM | (203) 672-9236 |
| 7/3/15 | 5:13 PM | (203) 672-9236 |
| 7/7/15 | 2:05 PM | (203) 672-9236 |
| 7/10/15 | 5:54 PM | (203) 548-9311 |
| 7/15/15 | 2:14 PM | (203) 548-9311 |
| 7/17/15 | 2:03 PM | (203) 548-9311 |
| 7/19/15 | 6:13 PM | (203) 548-9311 |
| 7/21/15 | 5:04 PM | (203) 548-9311 |
| 7/24/15 | 5:53 PM | (203) 548-9311 |
| 7/26/15 | 2:09 PM | (203) 548-9311 |
| 7/27/15 | 5:28 PM | (203) 672-9236 |
| 7/29/15 | 3:25 PM | (203) 548-9311 |
| 7/31/15 | 3:47 PM | (203) 548-9311 |
| 8/2/15 | 8:18 PM | (203) 548-9311 |
| 8/3/15 | 4:53 PM | (203) 548-9311 |
| 8/4/15 | 3:10 PM | (203) 548-9311 |
| 8/7/15 | 5:35 PM | (203) 548-9311 |
| 8/8/15 | 1:51 PM | (203) 672-9236 |
| 8/10/15 | 3:43 PM | (203) 548-9311 |
| 8/11/15 | 2:09 PM | (203) 548-9311 |
| 8/12/15 | 2:17 PM | (203) 548-9311 |
| 8/14/15 | 6:40 PM | (203) 548-9311 |
| 8/16/15 | 8:55 PM | (203) 548-9311 |
| 8/17/15 | 2:28 PM | (203) 548-9311 |
| 8/18/15 | 1:59 PM | (203) 548-9311 |

| | | |
|---|---|---|
| 8/19/15 | 1:58 PM | (203) 548-9311 |
| 8/21/15 | 4:26 PM | (203) 548-9311 |
| 8/23/15 | 5:27 PM | (203) 548-9311 |
| 8/24/15 | 4:03 PM | (203) 548-9311 |
| 8/25/15 | 8:43 PM | (203) 548-9311 |
| 8/25/15 | 2:06 PM | (203) 548-9311 |
| 8/26/15 | 2:02 PM | (203) 548-9311 |
| 8/28/15 | 6:09 PM | (203) 548-9311 |
| 8/31/15 | 7:59 PM | (203) 548-9311 |
| 9/1/15 | 7:20 PM | (203) 548-9311 |
| 9/1/15 | 1:54 PM | (203) 548-9311 |
| 9/15/15 | 2:51 PM | (203) 548-9311 |
| 9/16/15 | 2:12 PM | (203) 548-9311 |
| 9/18/15 | 1:45 PM | (203) 548-9311 |
| 9/20/15 | 2:24 PM | (203) 548-9311 |
| 9/21/15 | 8:07 PM | (203) 548-9311 |
| 9/21/15 | 3:33 PM | (203) 548-9311 |
| 9/22/15 | 2:17 PM | (203) 548-9311 |
| 9/23/15 | 2:30 PM | (203) 548-9311 |
| 9/25/15 | 2:04 PM | (203) 548-9311 |
| 9/28/15 | 1:58 PM | (203) 548-9311 |
| 9/29/15 | 4:22 PM | (203) 672-9236 |
| 9/29/15 | 4:32 PM | (203) 548-9311 |

**Figure 14** (showing over 50 calls from May through September, 2015.)

56. Plaintiff Molitor answered several of these calls and let others go to his voicemail. Each call featured a prerecorded message substantially similar to the other prosperity robocalls alleged throughout this Complaint, with instructions to call certain numbers back, including the number (678) 405-9374. When Plaintiff Molitor called this particular number in an attempt to stop the robocalls and get on an internal do-not-call list, he was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out.

57. Plaintiff Molitor does not have a relationship with Manasseh, MJM, Seibel, or Kingdom, has never provided any of them with his telephone number or with consent to call, and has made attempts to get them to stop calling. They continue calling anyways.

58. Defendants are and were aware that the above-described telephone calls were and

are being made to Plaintiff Molitor and similar consumers who have never consented to receive them.

## FACTS SPECIFIC TO PLAINTIFF DE LA CABADA

59.     For at least two years, Plaintiff De la Cabada has received robocalls on her cellular telephone from Defendants, all of which feature the prerecorded voice of Defendant Manasseh. Each prerecorded message was preceded by a pause before the recording began.

60.     Since September 2015 alone, Plaintiff De la Cabada has received more than 108 of these robocalls from, at a minimum, 20 distinct telephone numbers, including, *inter alia*: (704) 257-3531; (510) 275-1830; (800) 422-5590; (800) 203-0028; (213) 375-0371; (917) 728-1013;(800) 352-3407; (206) 209-1337; (917) 341-5318; (320) 207-9068; (917) 336-8793; (423) 794-2999; (917) 336-9082; (917) 391-0291; (917) 391-0695; (917) 391-0290; (480) 439-0194; (505) 359-6558; (917) 624-9877; (917) 391-0046; (917) 633-7378; and (917) 336-9146.

61.     Additionally, since September 2015, Defendants left 74 recorded messages on Plaintiff De la Cabada's cellular device. Plaintiff De la Cabada was able to block approximately 34 calls, but she received hundreds of additional calls prior to that time.

62.     Despite Plaintiff De la Cabada's attempts to block Defendants calls, she has been unable to keep them from continuing to contact her. Specifically, when Plaintiff De la Cabada called in an attempt to get on an internal do-not-call list, she was met by one of Manasseh's ten-minute prerecorded prosperity pitches and was given no opportunity to opt-out. Even worse, Plaintiff De la Cabada was only able to reach a live person on one occasion, and when she was connected, that person feigned inability to hear her request to opt out of the calls.

63.     Plaintiff De la Cabada's young child has severe health complications, and she makes it her regular practice to answer phone calls even from unrecognized numbers to ensure

her child's safety and welfare are intact. Her heart jumps every time her cellphone rings. As such, Defendants' continuous and unrelenting calls are not only time consuming and distressing, they constitute harassment.

64.    Plaintiff De la Cabada does not have a relationship with Manasseh, MJM, Seibel, or Kingdom, has never provided any of them with her telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, Defendants continue calling anyways without regard to her requests that the calls cease. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff De la Cabada and similar consumers who have never consented to receive them.

## FACTS SPECIFIC TO PLAINTIFF CLARKE

65.    Since December 7, 2015, Defendants made at least 14 calls to Plaintiff Clarke's cellular telephone using an autodialer and an artificial or prerecorded voice. Each pre-recorded message was preceded by a pause before the recording began.

66.    For example, Defendants called Plaintiff Clarke's cellular telephone with a pre-recorded message every week over the course of at least seven weeks, even after he asked them to stop calling. The following chart shows several of the dates and times that Defendants called Mr. Clarke's cellular telephone number from their (800) 352-3407 number. *See* <u>Figure 15</u>, below (showing specific call dates and times).

| Date | Time | Number |
|------|------|--------|
| 12/7/15 | 3:45 PM | (800) 352-3407 |
| 12/9/15 | 1:07 PM | (800) 352-3407 |
| 12/9/15 | 3:21 PM | (800) 352-3407 |
| 12/14/15 | 2:19 PM | (800) 352-3407 |
| 2/16/15 | 4:41 PM | (800) 352-3407 |
| 12/19/15 | 1:47 PM | (800) 352-3407 |

| 12/21/15 | 2:07 PM | (800) 352-3407 |
|---|---|---|
| 12/28/15 | 2:01 PM | (800) 352-3407 |
| 12/30/15 | 2:03 PM | (800) 352-3407 |
| 1/4/16 | 2:04 PM | (800) 352-3407 |
| 1/13/16 | 1:06 PM | (800) 352-3407 |
| 1/18/16 | 1:06 PM | (800) 352-3407 |
| 1/20/16 | 1:04 PM | (800) 352-3407 |
| 1/25/16 | 1:13 PM | (800) 352-3407 |

**Figure 15** (showing 14 calls from December through January 2016.)

67.    Defendants called Mr. Clarke at least 14 times using an autodialer and/or an artificial prerecorded voice without his prior express written consent.

68.    Plaintiff Clarke does not have a relationship with Manasseh, MJM, Seibel, or Kingdom, has never provided any of them with his telephone number or with consent to call, and has made every attempt to get them to stop calling. Nevertheless, they continue calling anyways without regard to his requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Clarke and similar consumers who have never consented to receive them.

69.    In fact, on March 11, 2016, Plaintiff Clarke filed a complaint (that has since been voluntarily dismissed without prejudice) in the Southern District of New York in an attempt to get Defendants to cease making these calls. *See Clarke*, *et al. v. Manasseh Jordan Ministries, Inc.*, *et al.*, Civil Action No. 16-cv-01859. Despite that filing, Defendants have continued to call Mr. Clarke with an autodialer and/or an artificial prerecorded voice as recently as June 9, 2016.

## FACTS SPECIFIC TO PLAINTIFF MAKI

70.    Plaintiff Maki was similarly harassed by Defendants, receiving multiple calls with prerecorded messages for several weeks. The following chart shows several of the dates and

times that Defendants called Plaintiff Maki on her cellular telephone from their (800) 352-3407 number. *See* <u>Figure 16</u>, below (showing specific call dates and times).

| Date | Time | Number Calling |
|------|------|----------------|
| 12/7/15 | 3:40 PM | (800) 352-3407 |
| 12/7/15 | 3:40 PM | (800) 352-3407 |
| 12/9/15 | 1:08 PM | (800) 352-3407 |
| 12/14/15 | 2:14 PM | (800) 352-3407 |
| 12/16/15 | 4:44 PM | (800) 352-3407 |
| 12/21/15 | 2:04 PM | (800) 352-3407 |

**Figure 16** (showing 6 calls in December 2015.)

71.     Defendants called Plaintiff Maki on her cellular phone at least 6 times using an autodialer and an artificial or prerecorded voice, without her prior express written consent. Each prerecorded message was preceded by a pause before the recording began.

72.     Defendants' unsolicited robocalls are regularly placed, *en masse*, to thousands of cellular telephone numbers without the consent of the call recipients. As demonstrated above, on December 7, 2015, Plaintiff Clarke and Plaintiff Maki received robocalls from Defendants only 5 minutes apart.  On December 9, 2015, they received unsolicited robocalls only two minutes apart.

73.     Plaintiff Maki does not have a relationship with Manasseh, MJM, Seibel, or Kingdom, has never provided any of them with her telephone number or with consent to call, and has requested that they stop calling her by, among other things, filing a complaint in the Southern District of New York. *See Clarke, et al. v. Manasseh Jordan Ministries, Inc., et al.*, Civil Action No. 16-cv-01859.  Defendants continue calling anyways without regard to her requests. Defendants are and were aware that the above-described telephone calls were and are being made to Plaintiff Maki and similar consumers who have never consented to receive them.

# CLASS ALLEGATIONS

74. **Class Definition**: Plaintiffs Molitor, De la Cabada, Clarke, and Maki bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of themselves and a class of similarly situated individuals, defined as follows:

> All persons in the United States to whom: (1) Defendants or their agents placed a call; (2) using computerized dialing equipment and/or that featured a prerecorded voice; (3) to his or her cellular telephone number; and (4) where Defendants have no record of prior express consent from him or her to place such a call.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

75. **Numerosity**: The exact size of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants made telephone calls to thousands of consumers who fall into the definition of the Class. Members of the Class can be easily identified through Defendants' records.

76. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a)     Whether Defendants' conduct violated the TCPA;

(b)      Whether Defendants systematically made telephone calls to consumers—including Plaintiffs and the Class—who did not previously provide Defendants and/or their agents with prior express consent to receive such telephone calls;

(c)      Whether Defendants systematically made telephone calls to consumers—including Plaintiffs and the Class—featuring prerecorded voices; and

(d)      Whether Plaintiffs and the members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

77.    **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the members of the Class all sustained the same statutory injuries, aggravation, and invasion of privacy caused by Defendants' uniform wrongful conduct.

78.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendants has no defenses unique to Plaintiffs.

79.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect each of the members of the Class uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

80.    **Superiority**: This class action is appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. In many cases, the damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for many of the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## CAUSE OF ACTION
### Violations of 47 U.S.C. § 227(b)
### (On behalf of Plaintiffs and the Class)

81.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

82.     Defendants placed unwanted telephone calls to Plaintiffs' and the Class Members' cellular telephone numbers without their prior express consent.

83.     These calls featured prerecorded voices.

84.     These calls were also placed using telephone dialing equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and/or to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without active human intervention.

85.     By placing telephone calls to Plaintiffs' and the Class members' cellular telephone numbers, without prior express consent, and while utilizing automatic telephone dialing equipment and/or artificial or prerecorded voices, Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii).

86.     Defendants perpetrated this unlawful conduct jointly, through the existence of alter ego relationships between MJM, Manasseh, Seibel, and Kingdom. Moreover, Manasseh and Seibel wholly control the activities of MJM and Kingdom, and conducted these unlawful calls for their own pecuniary enrichment.

87.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class received unwanted and intrusive telephone calls, and suffered invasions of privacy, violations of their statutory rights, loss of time, and actual damages in the forms of wear and tear on their telephone equipment; consumed battery life; diminished use, enjoyment, value, and utility of their cellular telephone plans; and the loss of any cellular minutes consumed by such calls.

88.     Accordingly, under 47 U.S.C. § 227(b)(3)(B), Plaintiffs and the members of the Class are each entitled to, *inter alia*, a minimum of $500 in statutory damages for each of Defendants' violations of the TCPA.

89.     Because Defendants' conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiffs and the other members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for the following relief:

1.     An order certifying the Class as defined above, appointing Plaintiffs as

representatives of the Class, and appointing their counsel as Class Counsel;

2.      An award of actual and statutory damages;

3.      An injunction requiring Defendants and their agents to cease all unsolicited

telephone calling activities, and otherwise protecting the interests of the Class;

4.      An award of reasonable attorneys' fees and costs; and

5.      Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**JEFFREY MOLITOR, LAURA C. DE LA CABADA, STEVE CLARKE, AND RUTH MAKI** individually and on behalf of all others similarly situated,

Dated: November 30, 2017          By: /s/ Benjamin H. Richman
                                              One of Plaintiffs' Attorneys

Benjamin H. Richman
brichman@edelson.com
Sydney M. Janzen
sjanzen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Joseph I. Marchese (*Pro Hac Vice*)
jmarchese@bursor.com
Philip L. Fraietta (*Pro Hac Vice*)
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

*Attorneys for Plaintiffs and the Putative Class*

# Exhibit A



**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

July 16, 2010

## VIA REGULAR MAIL AND CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

Zoe Ministries
Attn: Bishop E. Bernard Jordan
310 Riverside Drive
New York, New York 10025

RE: EB-10-TC-435

Dear Bishop Jordan:

This is an official **CITATION**, issued pursuant to section 503(b)(5) of the Communications Act of 1934, as amended (the Act), 47 U.S.C. § 503(b)(5), for violations of the Act and the Federal Communications Commission's rules that govern telephone solicitations, prerecorded and autodialed telephone calls and facsimile ("fax") transmissions.[1] As explained below, future violations of the Act or Commission's rules in this regard may subject you and your company to monetary forfeitures.

It has come to our attention that you or your company, acting under your direction, apparently sent one or more calls or faxes in violation of Section 227(b) of the Communications Act and the Commission's related rules, as described in the attached complaint(s).[2] Specifically, one or more complaints have been filed against your company showing that your company, acting under your direction, committed the violation(s) checked below. Once you have identified the violation(s), proceed to the associated section(s) of the citation to obtain the legal requirements related to each violation and then read the section titled, "Responding to the Citation" if you wish to respond. While your company has not been accused of any of the other unchecked violations listed below, you might find it useful to familiarize yourself with the other

---

[1] 47 U.S.C. § 227; 47 C.F.R. § 64.1200. A copy of these provisions is enclosed for your convenience. Section 227 was added to the Communications Act by the Telephone Consumer Protection Act of 1991 and is most commonly known as the TCPA. The TCPA and the Commission's parallel rules restrict a variety of practices that are associated with telephone solicitation and use of the telephone network to deliver unsolicited advertisements or prerecorded and autodialed telephone calls.. 47 U.S.C. § 64.1200(a)(3); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 – Junk Fax Protection Act of 2005*, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787 (2006) (*2006 TCPA Report and Order*).

[2] We have attached 14 complaints at issue in this citation. The complaints address alleged TCPA violation(s) that contain the telephone number 212-967-8033, which you or your business utilized during the time period at issue.

sections so that you or your company will be better informed of the Commission's Telecommunications Consumer Protection Act ("TCPA") rules.

☐ FACSIMILE VIOLATIONS

    ☐ Unsolicited Fax Advertisement (See Section I(A) – page 1)
    ☐ Incomplete Fax Header (See Section I(B) – page 2)
    ☐ Insufficient Opt-Out Notice (See Section I(C) – page 2)
    ☐ Opt-Out Request Not Honored (See Section I(D) – page 3)

☒ PRERECORDED AND AUTODIALED CALL MESSAGE VIOLATIONS

    ☒ Prerecorded or Autodialed Call to a Cell Phone, Emergency Line or Health Care Facility (See Section II(A) – page 4)
    ☒ Prerecorded Call to a Residential Line (See Section II(B) – page 5)
    ☐ Prerecorded Line Seizure (See Section II(C) – page 6)
    ☐ Prerecorded Identification Not Provided (See Section II(D) – page 7)

☐ DO-NOT-CALL VIOLATIONS

    ☐ National Do-Not-Call  (See Section III(A) – page 7)
    ☐ Company-Specific Do-Not-Call (See Section III(B) – page 8)

☐ TIME OF DAY VIOLATION (See Section IV – page 9)

    **If, after receipt of this citation, you or your company violates the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $16,000 for each such violation or each day of a continuing violation.**

## RESPONDING TO THE CITATION

    You may respond to this citation within 30 days from the date of this letter either through (1) a written statement, (2) a teleconference interview with the Commission's Telecommunications Consumers Division in Washington, DC or (3) a personal interview at the closest Commission Field Office.  Your response should specify the actions that you are taking to ensure that you do not violate the Commission's rules governing TCPA violations, as described above.

    **If you would like to submit a written statement, including any supporting documentation, send the response within 30 days of the date of this letter to the address below.  If you would like to arrange a teleconference interview, please contact Al McCloud at (202) 418-2499.  You should schedule an interview to take place within 30 days of the date of this letter.**

Joshua Zeldis
Assistant Division Chief
Telecommunications Consumers Division
Enforcement Bureau
Federal Communications Commission
445-12th Street, S.W., Rm. 4-A122
Washington, D.C. 20554

## Reference EB-10-TC-435 when corresponding with the Commission.

Reasonable accommodations for people with disabilities are available upon request. Include a description of the accommodation you will need including as much detail as you can. Also include a way we can contact you if we need more information. Please allow at least 5 days advance notice; last minute requests will be accepted, but may be impossible to fill. Send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau:

For sign language interpreters, CART, and other reasonable accommodations: 202-418-0530 (voice), 202-418-0432 (tty);

For accessible format materials (braille, large print, electronic files, and audio format): 202-418-0531 (voice), 202-418-7365 (tty).

Under the Privacy Act of 1974, 5 U.S.C. § 552(a)(e)(3), we are informing you that the Commission's staff will use all relevant material information before it, including information that you disclose in your interview or written statement, to determine what, if any, enforcement action is required to ensure your compliance with the Communications Act and the Commission's rules.

The knowing and willful making of any false statement, or the concealment of any material fact, in reply to this citation is punishable by fine or imprisonment under 18 U.S.C. § 1001.

Thank you in advance for your anticipated cooperation.

Sincerely,

Joshua P. Zeldis
Assistant Division Chief
Telecommunications Consumers Division
Enforcement Bureau
Federal Communications Commission

Enclosures

# Exhibit B

## CERTIFICATE OF INCORPORATION

### OF

### MANASSEH JORDAN MINISTRIES, INC.
#### (Pursuant to Article 8 of the Religious Corporation Laws)

We the undersigned, all being of full age, for the purpose of forming a Religious Corporation pursuant to and in conformity with Article 8 of the Religious Corporation Law of the State of New York hereby certify as follows:

1. That a notice of the meeting of the members of **MANASSEH JORDAN MINISTRIES** for the purpose of incorporating a unincorporated Religious Congregation was duly given in pursuance of Section 160 of the Religious Corporation Law and said meeting was held in accordance therewith on the 7th Day of September, 2010 in the afternoon of that day at Riverside Drive, New York, NY 10025.

2. At said meeting, Manasseh Jordan known as the Prophet and one of the subscribers hereto, was the presiding officer, at which meeting a majority of the qualified voters, being six in number, were present.

3. That Charlie Berrian, Naomi Cook, and Aaron Jordan the other subscribers hereto, were present and voted thereat.

4. That at such meeting it was determined to incorporate such church as a Religious Corporation in pursuance of Section 161 and 162 of the Religious Corporation Laws.

5. The names and addresses of the persons duly elected as Trustees at such meetings for the unexpired term until the next annual meeting are as follows:

| NAME | ADDRESS |
|---|---|
| 1st Annual Election   Charlie Berrian | 76 Cauthers Road<br>Woodridge, NY 12789 |
| 2nd Annual Election   Naomi Cook | 4 Bayberry Court<br>Upper Saddle River, NJ 07458 |
| 3rd Annual Election   Aaron Jordan | 1 High Meadow Road<br>Tuxedo, NY 07458 |

STATE OF NEW YORK, DEPARTMENT OF STATE,
SS: I, SECRETARY OF STATE, DO HEREBY CERTIFY AND
CLERK OF THE

2010 NOV

NOV - 8 2010

WITH THE ORIGINAL FILED IN MY OFFICE AND

AND THAT THE SAME IS A CORRECT

One third to hold office until the first annual election of trustees thereafter, one third to hold office until the second annual election thereafter, and one third to hold office until the third annual election thereafter respectively.

7. The name of this church shall be **MANASSEH JORDAN MINISTRIES, INC.**

8. The principle place of worship of said church shall be located in the State of New York, the County of New York or any other place as the church may deem appropriate. The current address of the church is 310 Riverside Drive, New York, NY 10025

9. The purpose for which this church is to be formed is as follows:

    a. To establish and maintain and operate one or more places of worship for members of the church and anyone wishing to fellowship with the Church, to promote, continue and encourage the assembly of persons, on a regular basis, for the purpose of Divine Worship, Spiritual Fellowship and Religious Observances according to the Christian Faith.

    b. To provide a vehicle and institution for the promulgation, preaching and teaching, of belief and faith in God through Jesus Christ.

    c. To institute, participate in and/or support, all worthy activities and projects Divinely inspired or assigned.

    d. To conduct religious services, promote religious education, training and general community work and to assist benevolent charitable and worthy causes of a similar nature.

    e. To provide religious worship services on a non discriminatory basis without regard to race, color, creed, sex, religion, ethnic or national origin.

    f. To organize missionary work for the teaching of the Gospel of Christ, within and without the United States of America according to the tenets of the Christian Church.

    g. To promote the teaching of the Gospel of Jesus Christ among the members of the Church and also among the non members according to the tenets of the Christian Church.

    h. To develop multi-service programs and services in the local community and the community at large to assist in the religious, educational and social growth of the congregation, community and the world.

    i. To rent, lease or purchase such buildings or edifices which might be needed by the congregation; to alter or repair the same, and dispose of the same when no longer needed or used by the Church.

    j. To buy vacant land or buildings; alter, develop, build or repair the same for the use of the Church, and dispose of the same when no longer needed.

    k. To hold and operate such property which shall come into the possession of said Church; and sell, assign, transfer and otherwise dispose of any and all of the securities, properties and rights which may at any time be acquired or held by the Church and in all respects to deal with and in the same, in so far as may lawfully be done under the provisions of the Religious Corporation Law.

    l. To borrow money and to contract debts when necessary for the exercise of its corporate rights, privileges, or for any other lawful purpose of its corporation; and it may issue and dispose of its obligations from time to time, for and of the objects or purposes of the Church, and to mortgage its property, and/or to make such deed

of trust as may be necessary to secure the payment of such obligation or of any debts contracted for such purpose.

m. To enter into, make perform and carry out contracts with any person, firm, corporation, private, public, municipal or political body, under the Government of the United States of America, and foreign countries, so far and to the extent that the same may be done and performed under the provisions of the Religious Corporation Laws of the State of New York.

n. To do anything and everything that is proper to the aforesaid purposes and which may properly be done by a Religious Corporation organized under and subject to the laws of the State of New York: to possess all rights and privileges, and exercise all powers, permitted to such a corporation, including, without limitation, the power to solicit monies and contributions from the general public.

o. The Prophet of this church is Manasseh Jordan.

10. The duration of the church shall be perpetual.

11. The Trustees shall be three in number or such other number as may be determined at any annual meeting, with Prophet Manasseh Jordan, ex-officio member thereof.

12. That in September, 2011 and each year thereafter, there shall be held the Annual Meeting of the church for the purpose of electing Trustees and other officers and for such other business which shall come before the church at the said meeting.

13. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code (or corresponding section of any future Federal tax code.)

14. No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, directors, officers or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of Section 501(c)(3) purposes.

15. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

16. Upon dissolution of this corporation assets shall be distributed for one or more exempt purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code, i.e. charitable, educational, religious or scientific, or corresponding section of any future Federal tax code, or shall be distributed to the Federal government, or to a state or local government for a public purpose.

3

IN WITNESS WHEREOF, we have executed and acknowledged this certificate this _6th_ day of _October_ , 2010,

_Manasseh Jordan_
Manasseh Jordan
2 Avery Street 27F
Boston, MA 02111

_Charlie B_
Charlie Berrian
76 Cauthers Road
Woodridge, NY 12789

_Aaron Jord_
Aaron Jordan
1 High Meadow Road
Saddle River, NY 07458

_Naomi Wolf_
Naomi Cook
4 Bayberry Court
Upper Saddle River, NY 07458

State of New York    _Bronx_
County of New York

On _8th_ day of _October_ , 2010 before me personally appeared Manasseh Jordan, Charlie Berrian, Aaron Jordan and Naomi Cook known to be the same parties who executed the above Certificate of Incorporation and acknowledge to me that they executed the same.

_Stephanie G. Gilbert_
Notary Public

STEPHANIE C GILBERT
Notary Public, State of New York
No. 01GI6079263
Qualified in Bronx New York
Commission Expires June 02 2011