IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEFFREY MOLITOR, LAURA C. DE LA CABADA, STEVE CLARKE, and RUTH MAKI, individually and on behalf of all others similarly situated,<br><br>                 *Plaintiffs*,<br><br>    *v.*<br><br>MANASSEH JORDAN MINISTRIES, INC., a New York Religious Corporation, and YAKIM MANASSEH JORDAN, an individual,<br><br>                 *Defendants*. | Case No. 1:16-cv-02106<br><br>Honorable Charles R. Norgle, Sr. |

**PLAINTIFFS' COMBINED MOTION FOR DEFAULT JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs Jeffrey Molitor, Laura C. De la Cabada, Steve Clarke, and Ruth Maki ("Plaintiffs"), by and through their counsel, request that the Court enter a default judgment against Defendants Manasseh Jordan Ministries, Inc. ("MJM") and Yakim Manasseh Jordan ("Manasseh," and together with MJM, "Defendants") and award Plaintiffs damages for the reasons set forth below.

**INTRODUCTION**

This case arises from a massive effort to separate pious consumers from their money using unsolicited robocalling and prerecorded promises of salvation-on-demand. At the heart of the scheme is Defendant MJM, a New York corporation that uses robocalling campaigns to collect "seed-faith" donations for itself and the self-proclaimed "prophet" behind the organization, Defendant Manasseh. Such were the hundreds of calls made to Plaintiffs, all containing a prerecorded message of Defendant Manasseh's voice—just as happened in well

1

over *160 million* calls Defendants placed to consumers around the country. This scheme was effectuated using autodialing software, allowing Defendants to make calls *en masse*. Each call violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*.

In light of their refusal to participate in this litigation for nearly a year, on March 22, 2019 the Court ordered the entry of default against Defendants. Plaintiffs now request that the Court enter a default judgment against Defendants under Rule 55(b)(2) for intentionally making 74 robocalls to Plaintiff Molitor, 138 robocalls to Plaintiff De la Cabada, 118 robocalls to Plaintiff Clarke, and 36 robocalls to Plaintiff Maki. Given the evidence that Defendants illegally placed each of these calls using an autodialer, and that each call featured a prerecorded message, Plaintiffs' are entitled to recover at least $500 in statutory damages for each call. In this case, however, there is overwhelming evidence that Defendants intentionally and repeatedly violated the TCPA, justifying the Court awarding Plaintiffs treble damages (or $1,500) for each call.

## FACTUAL BACKGROUND

***Defendants Knowingly and Willfully Engaged in a Mass Robocalling Scheme***

MJM is a religious corporation  ; First Amended Complaint ("FAC"), attached hereto as Exhibit B, ¶ 21.) While Defendant MJM puts itself forward as a legitimate religious organization, it is merely a vehicle for Defendant Manasseh and his associates to operate a mass robocalling enterprise for profit. (Ex. B, FAC ¶¶ 2–3, 23–25.) contains false signatures, and MJM is not registered in the New York Secretary of State's Corporation and Business Entity

2

Database. (*See* Excerpts of Deposition of Yakim Manasseh Jordan ("Manasseh Dep."), attached hereto as Exhibit C, at 23:4–13 (Manasseh unsure if signature under his name ▓▓▓▓ ▓▓▓▓▓▓ is legitimate); Excerpts of Deposition of Former MJM Trustee and Defendant Jordan's Sister Naomi Cook ("Cook Dep."), attached hereto as Exhibit D, at 122:12–14 (Cook testifying she did not sign ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); N.Y. Religious Corp. Laws § 3 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Declaration of Daniel J. Schneider ("Schneider Decl."), attached hereto as Exhibit E, at ¶¶ 16–18 (MJM not registered in New York corporation database).)

Furthermore, MJM also fails to observe corporate formalities. (*See, e.g.*, Ex. A, FAC ¶ 24 (MJM is "undercapitalized for the TCPA liabilities it purposefully accrues"); Ex. C, Manasseh Dep. 18:2–24, 31:3–10 (Manasseh denies MJM ever "elected" trustees, and cannot not recall whether MJM has a treasurer.), *id.* 42:2–7 (Manasseh cannot say MJM has annual meetings); Ex. D, Cook Dep. 69:14–70:11 (MJM never held annual meeting, Cook does not know if MJM has bylaws or maintains corporate records), *id.* 82:2–13 (Cook never saw a financial statement for MJM, despite being a trustee), *id.* 152:15–153:10 (Cook testifying she is unsure if MJM was ever incorporated or ever observed corporate formalities.) Nor does MJM appear to engage in any of the traditional activities of a non-profit ministry, or employ a staff to assist it in its purported mission. (Ex. C, Manasseh Dep. 74:8–76:23 (Manasseh cannot recall last time MJM had services at its "church" in New York City), *id.* 81:5–8 (Manasseh does not know who controls MJM's finances); Excerpts of Deposition of MJM Chief Operating Officer Frank Juliano ("Juliano Dep."), attached hereto as Exhibit F, 252:14–15) (MJM COO stating that MJM has no employees), *id.* 273:23–274:6 (MJM COO cannot identify MJM's corporate secretary). Tellingly, Manasseh couldn't explain why ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ even though—as discussed below—the idea to use robocalls to deliver prerecorded messages to consumers was his own.[1] (Ex. C, Manasseh Dep. 55:25–56:12.)

Defendants engaged in a nationwide robocalling campaign in the following manner:



---

[1] While Manasseh knows little about the company he purports to be CEO of, MJM has done quite a bit for him. (Ex. B, FAC ¶¶ 2, 25, 25 n.8–9.) Manasseh admits that MJM manages his personal finances and pays his rent. (Ex. C, Manasseh Dep. 34:1–15; 60:8–19.) MJM pays for his travel arrangements at least some of the time. (*Id.* 36:18–23.) MJM apparently leases a fleet of several vehicles for well over $100,000, including a Rolls Royce that Manasseh purportedly uses for work purposes. (*Id.* 38:1–16; 60:13–22.) And MJM provides him with a corporate credit card, the only such card the company has issued. (*Id.* 149:11–24; Ex. F, Juliano Dep. 69:4–14.)

[2] While Defendants did not produce contracts or call records for the period prior to October 7, 2014, it is clear that they were making robocalls featuring Manasseh's prerecorded voice as early as 2012. (Ex. F, Juliano Dep. 204:6–1; *see also* Brandy Zadrozny, *He'll Raise You From the Dead for $1,000*, Daily Beast (March 20, 2016), https://bit.ly/2VJh0vU (Defendants sued "16 times in federal court" for robocalling between 2013 and March 2016).)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

██████████ Defendants went to work drumming up donations through a mass robocalling campaign. (Ex. B, FAC ¶¶ 26, 30–33.) Records from ████ show that Defendants made over 163 million autodialed, prerecorded phone calls to more than 4 million unique cell phone numbers in just two years. (*See* Ex. E, Schneider Decl., ¶¶ 12–15.) The recordings on these calls were created by Defendant Manasseh, and "nobody else." (Ex. F, Juliano Dep. 56:4–9, 214:17–21, 220:23–221:11.) Indeed, it was Manasseh's idea to begin the robocalling campaign in the first place. (*Id.* 215:21–216:10.)

MJM COO Frank Juliano admitted to Defendants engaging in much of this conduct, and Manasseh admitted Defendants "absolutely" sent out calls featuring his prerecorded voice.[3] (Ex. C, Manasseh Dep. at 54:9–16) Juliano admitted MJM only made calls to individuals using ████ autodialing system, including by setting it to make a certain number of calls per hour, and by using it to call multiple phone numbers at once. (*See* Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 181:3–5, 194:15–17.) Juliano admitted MJM used ████████████████ to "broadcast a prerecorded message" over its calls. (*id*. 61:9–18.) Juliano admitted MJM "never" used ████ live agents to place calls, *i.e.*, it only made calls using ███████████████████ (Ex. F, Juliano Dep. 83:5–17, 84:14–16; ███████████████████████ And Juliano

---

[3] Manasseh has previously admitted in court filings, alongside MJM, to having "sent prerecorded calls to people." *See* Answer of Defendants Manasseh Jordan Ministries and Yakim Manasseh Jordan to Class Action Complaint at ¶¶ 18–23, *Romack. v. Yakim Manasseh Jordan*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013).

admitted MJM used ▇▇▇▇ to make well over 500,000 robocalls from January 2012 to May 2017—although ▇ records show that this number was larger by at least a factor of 325. (Ex. F, Juliano Dep. 204:6–17; *see* Ex. E, Schneider Decl., ¶¶ 12–15.)

***Plaintiffs Received Hundreds of Illegal Robocalls from Defendants***

Like the other four million-plus victims of Defendants' mass robocalling scheme, starting in 2015 Plaintiffs received a series of calls from Defendants that were placed using an autodialer, each of which featured the prerecorded voice of Defendant Manasseh. (Ex. B, FAC ¶¶ 34–53.) Plaintiffs never consented to receiving these calls. (*Id.*) As described below, and as shown in the Declaration and Exhibits attached to this motion, Defendants placed a total of 366 calls to Plaintiffs, including 74 calls to Plaintiff Molitor, 138 calls to Plaintiff De la Cabada, 118 calls to Plaintiff Clarke, and 36 calls to Plaintiff Maki. (*See* Ex. E, Schneider Decl., ¶¶ 3–11.) Per Defendants' admissions and the FAC's allegations, each of these calls were placed using an automated telephone dialing system and featured the recorded voice of Defendant Manasseh. (Ex. B, FAC ¶¶ 2–3, 23–26, 30–33; Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 84:14–16, 181:3–5, 194:15–17 (admitting Defendants only ever made calls using ▇▇▇▇▇▇ and that all calls featured prerecorded messages); *id.* 56:4–9, 214:17–21, 220:23–221:11 (only Defendant Manasseh's recorded voice was featured in Defendants' calls).)

***Defendants Stop Participating in This Lawsuit***

Plaintiffs filed their FAC in this action on June 20, 2016, and properly served it upon Defendants. (Dkt. 120-1, ¶¶ 3–4.) Defendants engaged in the discovery process with Plaintiffs for over a year, and were active (if reluctant) litigants. (*Id.* ¶ 4.) However, Defendants abruptly stopped participating in this action after May 25, 2018, when Plaintiffs filed a properly-noticed motion with the Court. (*Id.* ¶ 5.) Not only did Defendants fail to respond to that motion, (*id.*), but

6

they also failed to appear (on their own or through counsel) at status hearings in front of the Court on July 27, 2018, February 15, 2019, and March 15, 2019, (*id.* ¶ 7.) Defendants did not retain counsel as all of their attorneys withdrew from this case over the course of a year, nor did they contact Plaintiffs about their plans to continue litigating this case. (*Id.* ¶¶ 6, 8.)

On this basis, on March 19, 2019 Plaintiffs requested an entry of default against Defendants. (Dkt. 120.) The Court granted that request on March 22, 2019. (Dkt. 121.)

## ARGUMENT

"Upon [the entry of] default, the well-pleaded allegations of a complaint relating to liability are taken as true." *W. Div. Nautilus Ins. Co. v. Front Range Envtl., LLC*, No. 14 CV 50083, 2014 WL 4414516, at *2 (N.D. Ill. Aug. 6, 2014) (citation omitted). If the admitted facts—and other evidence submitted—establish a defaulting defendant's liability and plaintiff's damages, the plaintiff is entitled to relief against that defendant. *See, e.g.*, *Hussein v. Coinabul, LLC*, No. 1:14-cv-05735, dkts. 41, 43 (N.D. Ill. July 6, 2015) (entering default judgment and awarding damages of $1,447,247.82 based on contents of the complaint and evidence submitted in support of damages). In the TCPA context, the amount of evidence needed to prove damages is "minimal" given the statutory damages the statute affords. *See Righetti v. Auth. Tax Servs., LLC*, No C-14-0146, 2015 WL 4089799, at *3 (N.D. Cal. July 6, 2015). Here, the FAC and evidence attached to this motion demonstrate Defendants repeatedly, willfully violated the TCPA by using an autodialer to place calls to Plaintiffs' cellular phones featuring prerecorded messages.

**I.  Defendants Placed Hundreds Of Illegal Robocalls To Plaintiffs' Cellular Phones.**

The TCPA makes it "unlawful for any person within the United States to . . . make any call . . . using any automatic telephone dialing system or a[] . . . prerecorded voice . . . to any

7

telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § (b)(1)(iii). The TCPA provides for statutory damages of up to $500 per violation. *See* 47 U.S.C. § 227 (b)(3)(B). In addition, the TCPA allows the Court to award Plaintiffs treble damages if "the court finds that [Defendants] willfully or knowingly violated" the TCPA. *Id.* § 227(b). Because Defendants willfully and knowingly violated the TCPA in all of the calls placed to Plaintiffs, Plaintiffs ask that the Court award them $548,000 in total damages, inclusive of:

- $110,000 to Plaintiff Molitor (74 calls x $1,500)
- $177,000 to Plaintiff De la Cabada (138 calls x $1,500)
- $207,000 to Plaintiff Clarke (118 calls x $1,500)
- $54,000 to Plaintiff Maki (36 calls x $1,500)

## A. Defendant MJM Violated the TCPA.

There can be no doubt MJM violated the TCPA. MJM's Rule 30(b)(6) representative admitted MJM engaged in a robocalling campaign using an automated dialer and prerecorded messages. (*See* Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 181:3–5, 194:15–17) (admitting MJM only made calls using ███████████████ set it to make a certain number of calls per hour, and made multiple calls at once); *id.* 23:24–24:25, 61:9–18 (admitting MJM used autodialer to "broadcast a prerecorded message"); *id.* 83:5–17, 84:14–16 (admitting MJM "never" used live agents to place phone calls); *id.* 56:4–9, 214:17–21, 220:23–221:11(Manasseh and "nobody else" created the recordings used on MJM's calls); *id.* 215:21–216:10 (MJM 30(b)(6) rep stating it was Manasseh's ideas to send calls with prerecorded messages).) This is enough on its own to support a finding of liability as to MJM (if not both Defendants).

Still, the FAC also spells out the facts supporting MJM's liability. *See, e.g.*, *Perrigo v. Premium Asset Servs., LLC*, No. 2:14-cv-1052, 2015 WL 4597569, at *4 (D. Nev. July 28, 2015)

8

(where allegations sufficient to state a TCPA claim on their own, default judgment warranted); *Spears v. N. Am. Holdings, LLC*, No. 8:16-CV-392, 2016 WL 8999462, at *5 (M.D. Fla. Aug. 31, 2016) (same). MJM placed "thousands of [] prerecorded phone calls to the cellphones of consumers who did not consent to be called," (Ex. B, FAC ¶ 31), did so using an autodialer, (*id.* ¶¶ 4–5, 20, 65), and did so to "find new donors and generate new lines of revenue," (*id.* ¶ 3.) This conduct eventually reached Plaintiffs, who received well over 300 robocalls featuring Defendant Manasseh's prerecorded voice in less than a year. (*Id.* ¶¶ 34–53.)

Thus, given the presumption that the FAC's contents are true and in light of the evidence supporting Plaintiffs' claims, there can be no doubt that MJM is liable for violating the TCPA.

### B. Defendant Manasseh Violated the TCPA.

The FAC and documents attached to this motion further demonstrate that Defendant Manasseh is liable for violating the TCPA under theories of either vicarious liability or veil piercing. Under the TCPA, "vicarious liability is appropriate when the plaintiff can demonstrate that a defendant controlled or had the right to control [the entity that committed the TCPA violation], and more specifically, the manner and means of the [telemarketing campaign] it conducted." *Roylance v. ALG Real Estate Servs., Inc.*, No. 5:14-CV-02445, 2015 WL 1522244, at *5 (N.D. Cal. Mar. 16, 2015); *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2012 WL 7062748, at *1 (N.D. Ill. Dec. 31, 2012) (collecting cases). Meanwhile, to establish that an entity is a person's "alter ego" for purposes of piercing the veil, a party must establish that the entity "is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Northbound Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 652 (7th Cir. 2015).

9

Here, Defendant Manasseh is liable because he played an integral role in devising and controlling MJM's mass prerecorded robocalling scheme, including by initiating the plan, (Ex. F., Juliano Dep. 215:21–216:10), recording *all* of the prerecorded messages himself, (*id.* 56:4–9), and by exercising total control over MJM and its robocalling-related activities, (Ex. B, FAC ¶¶ 2, 24–25, 30, 32 ("Manasseh directly participates in these calls by recording his voice and by directing MJM, over which he exercises full domination and control, to transmit these [] recordings through automated telephone calls"); Ex. F, Juliano Dep. 56:4–9, 214:17–21, 215:21–216:10, 220:23–221:11; Ex. C, Manasseh Dep. 54:9–16.) Because Defendant Manasseh controlled MJM's activities and robocalling campaign, initiated this campaign, and personally recorded the messages used in the campaign he designed, he should be held liable for violating the TCPA.

Separately, Manasseh is liable because MJM is merely his alter ego. Factors to consider in this inquiry include a failure to adhere to corporate formalities, failure to maintain an arm's length distance among related parties or entities, and whether the corporation is really a "sham" or shell. *See Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 597–98 (7th Cir. 2005) (Posner, J.) (when one entity is "a shell" for another entity, a party is "entitled to pierce the corporate veil" because "the corporation was not a separate entity"); *Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1023 (N.D. Ill. 2009). Here, as CEO of MJM, Manasseh abused New York's religious corporation form to run a mass robocalling enterprise for his personal profit. (Ex. B, FAC ¶¶ 2–3, 23–25.) Indeed, Manasseh has been highly enriched through MJM—it paid for his financial needs, (Ex. C, Manasseh Dep. 34:1–15, 60:8–19), paid his travel expenses, (*id.* 36:18–23), leased a Rolls Royce and other luxury vehicles for him to use for "work," (*id.* 38:1–16, 60:13–22; Ex. B, FAC ¶ 18), and put him up in mansions in New York, New Jersey, and Florida,

(Ex. B, FAC ¶ 25 n.8.) Yet there is scant evidence MJM actually operates a ministry or adheres to corporate formalities. It has not elected trustees, (Ex. C, Manasseh Dep. 18:2–24, 31:3–10), it does not appear to have annual meetings, (*id.* 42:2–7), and it's unclear it ever has services at its "church" in New York City, (*id.* 74:8–76:23; *see also* Ex. D, Cook Dep. 69:14-70-11 (MJM never held an annual meeting, Cook does not know if MJM has bylaws or maintains corporate records), *id.* 82:2–13 (Cook never saw a financial statement for MJM, despite being a trustee), *id.* 122:12–14. It's not even clear that Manasseh properly incorporated MJM in the first place. *Id*. (Cook testifying that ▮▮▮▮▮▮▮▮▮▮ *id.* 152:15-153:10 (Cook testifying that she is unsure if MJM was ever incorporated or if it ever observed corporate formalities); *see* N.Y. Religious Corp. Laws § 3 ▮▮▮▮▮▮▮▮▮▮ Ex. E, Schneider Decl., ¶¶ 16–18 (MJM not registered in New York Secretary of State's Corporation and Business Entity Database). Because MJM is a shell entity and Manasseh's alter ego, he should be held liable for violating the TCPA.

Allowing Manasseh to escape liability here would sanction a manifest injustice, letting a serial TCPA-violator off the hook. As noted, the robocalling campaign that swept up Plaintiffs involved Defendants placing over 163 million calls to more than 4 million cell phone numbers in just two years. (Ex. E., Schneider Decl., ¶¶ 12–15.) It took place despite Defendants receiving ▮▮▮▮▮▮▮▮▮▮ and the FCC. (*See* ▮▮▮▮▮▮▮▮▮▮ ; *In the Matter of Yakim Jordan*, Citation and Order, No. EB-TCD-14-00016252, 31 FCC Rcd. 9729 (Sept. 13, 2016).) Worst of all, Defendants' conduct *continues to this day*. *See* Matthew Grant, *Pay to Pray?*, FOX 46 (Feb. 15, 2019), https://bit.ly/2HOTEkA.

Because MJM is merely Manasseh's alter ego and because Manasseh led the robocalling campaign at issue in this case, he should be held fully liable for MJM's TCPA-violating conduct.

**C.  Plaintiffs Received 366 TCPA-Violating Phone Calls from Defendants.**

All that remains is for Plaintiffs to demonstrate entitlement to statutory damages under the TCPA through evidence of the calls for which they claim a TCPA violation:

- **Plaintiff Molitor.** Starting in May 2015, Plaintiff Molitor received 74 calls on his cellular phone from Defendants. (Ex. B, FAC ¶¶ 34–38; ████████████████████████████████████████ Ex. E, Schneider Decl., ¶¶ 6–11.) Each of these calls contained a recording of Defendant Manasseh's voice and was placed using an autodialer. (Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 84:14–16, 181:3–5. 194:15–17 (admitting Defendants only ever made calls using ████████████ and that all calls featured prerecorded messages).)

- **Plaintiff De la Cabada.** Starting in September 2015, Plaintiff De la Cabada received 138 robocalls on her cellular phone from Defendants. (*See* Ex. B, FAC ¶ 40; ████████████████████████████████████████; Ex. E, Schneider Decl., at ¶¶ 3–5.) Each of these calls contained a recording of Defendant Manasseh's voice and was placed using an autodialer. (Ex. B, FAC ¶ 39; Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 84:14–16, 181:3–5, 194:15–17 (admitting Defendants only ever made calls using ████████████, and that all calls featured prerecorded messages).)

- **Plaintiff Clarke.** Starting in December 2015, Plaintiff Clarke received 118 robocalls on his cellular phone from Defendants. (Ex. B, FAC ¶¶ 45, 47 ████████████████████████████████; Ex. E, Schneider Decl., at ¶¶ 3–5.) Each of these calls contained a recording of Defendant Manasseh's voice and was placed using an autodialer. (Ex. B, FAC ¶¶ 46–47; Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 84:14–16, 181:3–5, 194:15–17 (admitting Defendants only ever made calls using ████████████ and that all calls featured prerecorded messages).)

- **Plaintiff Maki**. Starting in December 2015, Plaintiff Maki received 36 robocalls calls on her cellular phone from Defendants. (Ex. B, FAC ¶ 51; █ ████████████████████████████; Ex. E, Schneider Decl., ¶¶ 3–5.) Each of these calls contained a recording of Defendant Manasseh's voice and was placed using an autodialer. (Ex. B, FAC ¶ 51; Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 84:14–16, 181:3–5, 194:15–17 (admitting Defendants only ever made calls using ████████████, and that all calls featured prerecorded messages).)

Based on the foregoing, the Court has sufficient evidence that Defendants made repeated phone calls to Plaintiffs' cell phones using an automated telephone dialing system, and that all these calls featured Defendant Manasseh's recorded voice. The Court also has evidence that Defendant Manasseh can be held directly or vicariously liable for Defendant MJM's conduct, given his role in directing this mass robocalling scheme and his personal control over his alter ego MJM. And the Court has evidence that Defendants violated the TCPA 74 times as to Plaintiff Molitor, 138 times as to Plaintiff De la Cabada, 118 times as to Plaintiff Clarke, and 36 times as to Plaintiff Maki. Such evidence merits entering a default judgment against Defendants, and awarding Plaintiffs $500 per violative call. 47 U.S.C. § 227 (b)(3)(B).

## II. Defendants' Conduct Was Knowing and Willful.

Plaintiffs ask the Court to award treble damages given Defendants' egregious, willful conduct. *See* 47 U.S.C. § 227(b)(3). Under the TCPA, an award of treble damages is appropriate where Defendants conduct is "intentional or volitional, as opposed to inadvertent." *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013), *aff'd*, 816 F.3d 935 (7th Cir. 2016). It does not require Defendants to have "known the conduct would violate the [TCPA]," but such evidence does support a finding of knowledge. *Id.* Here, the evidence that Defendants' conduct was knowing and intentional is overwhelming.

*First*, the allegations in the FAC establish Defendants' willfulness. Plaintiff Molitor was called by Defendants numerous times despite making attempts to get them to stop. (Ex. B, FAC ¶¶ 36–38.) The same was true for Plaintiff De la Cabada, (*id.* ¶¶ 42–44), Plaintiff Clarke, (*id.* ¶¶ 48–49), and Plaintiff Maki, (*id.* ¶ 53), who all attempted to get Defendants to stop calling them. These allegations are sufficient on their own to establish that Defendants' conduct was willful.

13

*Second*, Defendants openly admitted in depositions that they intentionally led a campaign of autodialed robocalls featuring prerecorded messages. (*See* Ex. F, Juliano Dep. 49:16–18, 60:24–61:10, 181:3–5, 194:15–17) (MJM 30(b)(6) representative admitting MJM only made calls using an autodialer, set it to make a certain number of calls per hour, and used it to make multiple calls at once); *id.* 23:24–24:25, 61:9–18 (MJM 30(b)(6) representative admitting MJM used autodialer to "broadcast a prerecorded message"); *id.* 83:5–17, 84:14–16) (MJM "never" used live agents to place phone calls); *id.* 56:4–9, 214:17–21, 220:23–221:11(Manasseh and "nobody else" created the recordings used on MJM's calls); *id.* 215:21–216:10 (MJM 30(b)(6) representative stating it was Manasseh's idea to send calls with prerecorded messages); *see also* Ex. C, Manasseh Dep. 54:9–16 (Manasseh stating Defendants "absolutely" sent out calls featuring his prerecorded voice). Nothing more should be necessary to find that Defendants willfully and knowingly violated the TCPA.

*Third*, the daunting scale of Defendants' conduct supports the inference that it was knowing and intentional. During the robocalling campaign that swept up Plaintiffs' cell phones, Defendants made at least 163 million autodialed, prerecorded message-carrying phone calls to over 4 million consumers—in just two years. (Ex. E, Schneider Decl., at ¶¶ 12–15.)

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Using these services—and no others, (Ex. F, Juliano Dep. 83:5–17, 84:14–16)—Defendants perpetrated an audacious robocalling scheme and solicited millions of consumers for donations.

(Ex. B, FAC ¶¶ 3–4; Ex. E, Schneider Decl., at ¶¶ 12–15.) Defendants were thus well aware what they were contracting for, and made ample use of it.

*Fourth*, Defendants were repeatedly warned their actions violate the TCPA. While this is unnecessary to show that Defendants' conduct was willful, it is relevant—and, damning. In September 2016, the FCC cited Defendants for violating the TCPA. *See In the Matter of Yakim Jordan*, Citation and Order, No. EB-TCD-14-00016252, 31 FCC Rcd. 9729 (Sept. 13, 2016).

███████████████████████████████████████████████████████████████████

██████████ regarding their illegal conduct over the past decade. ██████████████████ And at the time the FAC was filed this case, Defendant MJM had been sued for allegedly violating at least fourteen times since 2012 (agreeing to settle at least nine of those cases, and with Defendant Manasseh admitting in at least one that he "sent prerecorded calls to people"). (*See* Ex. B, FAC ¶¶ 3, 32.) Despite these warnings, Defendants pushed forward with their robocalling campaign—and they appear to have continued their conduct throughout this litigation. *See* Matthew Grant, *Pay to Pray?*, FOX 46 (Feb. 15, 2019), https://bit.ly/2HOTEkA (describing how Defendants' robocalling campaign continues).

On this record, one conclusion is possible. Defendants intentionally perpetrated a robocalling scheme of vast proportions, despite being told to stop and with full awareness that their conduct violated the TCPA. As such, the Court should use its discretion to hold Defendants liable for treble damages and increase Plaintiffs' damages awards to $110,000 (Plaintiff Molitor), $177,000 (Plaintiff De la Cabada), $207,000 (Plaintiff Clarke), and $54,000 (Plaintiff Maki).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a judgment of default against Defendants and award Plaintiffs damages in the amounts stated herein.

                                Respectfully submitted,

Dated: April 16, 2019                            By: /s/ Daniel J. Schneider
                                              *One of Plaintiffs' Attorneys*

                                         Benjamin H. Richman
                                         brichman@edelson.com
                                         Sydney M. Janzen
                                         sjanzen@edelson.com
                                         Dan Schneider
                                         dschneider@edelson.com
                                         EDELSON PC
                                         350 North LaSalle Street, 14th Floor
                                         Chicago, Illinois 60654
                                         Tel: 312.589.6370
                                         Fax: 312.589.6378

                                         Joseph I. Marchese (*Pro Hac Vice*)
                                         jmarchese@bursor.com
                                         Philip L. Fraietta (*Pro Hac Vice*)
                                         pfraietta@bursor.com
                                         BURSOR & FISHER, P.A.
                                         888 Seventh Avenue
                                         New York, New York 10019
                                         Tel: 646.837.7150
                                         Fax: 212.989.9163

## CERTIFICATE OF SERVICE

      I, Daniel J. Schneider, an attorney, hereby certify that on April 16, 2019, I served the above and foregoing document by causing a true and accurate copy to be filed electronically through the Court's CM/ECF system, by serving a true and accurate copy on Defendants' attorney, by sending a true and accurate copy via certified mail to the last known addresses for Defendants (listed below), and by leaving a a true and accurate copy with the court clerk.

Manasseh Jordan Ministries
Yakim Manasseh Jordan
12220 NW 68th Court
Parkland, Florida 33076

Manasseh Jordan Ministries
Yakim Manasseh Jordan
P.O. Box 3320
New York City, New York 10163

Manasseh Jordan Ministries
c/o Frank Juliano, COO
279 West 117th Street, Apartment 1Q
New York City, New York 10026

Yakim Manasseh Jordan
17001 Collins Avenue, Suite 3202
Sunny Isles Beach, Florida 33160

Yakim Manasseh Jordan
3401 Northeast 165th Street
North Miami Beach, Florida 33160

                                                        /s/ Daniel J. Schneider